UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                                       :
   UNITED STATES OF AMERICA,                           :
                                                       :
              - v. -                                   :            14 Cr. 799 (RA)
                                                       :
   VIRGIL FLAVIU GEORGESCU,                            :
                                                       :
                    Defendant.                         :
                                                       :
------------------------------------------------------ x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN SUPPORT OF ITS MOTIONS *IN LIMINE***

PREET BHARARA
United States Attorney for the
Southern District of New York

Ilan Graff
Andrea Surratt
Assistant United States Attorneys
        -Of Counsel-

## PRELIMINARY STATEMENT

Virgil Flaviu Georgescu ("the defendant") is charged in a two-count indictment (the "Indictment"), with (1) conspiracy to kill officers and employees of the United States, in violation of Title 18, United States Code, Section 1117; and (2) conspiracy to provide material support to a terrorist organization, in violation of Title 18, United States Code, Section 2339B. The Government expects the evidence at trial to show that the defendant was the leader of a conspiracy to obtain high-powered, military-grade weapons to sell to individuals whom the defendant believed were members of the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC"), a designated terrorist organization, to be used against American soldiers in Colombia. These individuals were, in fact, three Drug Enforcement Administration ("DEA") confidential sources ("CS-1," "CS-2," and "CS-3," and together, the "CSes") who were, at all times, acting at the direction of DEA agents.

The Government respectfully submits this motion seeking *in limine* rulings with respect to the following: (1) an instruction to the jury that the defendant's anticipated "negation of intent" argument is not a legal defense to the offense charged in Count Two; (2) the Government's intent to elicit testimony about the defendant's efforts to obstruct justice while incarcerated at the Metropolitan Correction Center ("MCC"); (3) the inadmissibility as hearsay of the defendant's false exculpatory statements to the arresting agents and other government officers in the hours and weeks following his arrest; (4) the need for the defendant to comply with relevant federal regulations and assert a theory of relevance if he intends to call agents of the Federal Bureau of Investigation ("FBI") to testify regarding his tenure as an FBI confidential informant in the early 2000s; and (5) limited protection of CS-1's identity in connection with CS-1's anticipated testimony at trial.

1

## FACTUAL BACKGROUND

I.      **The Charged Conspiracy**

A.  **Overview**

As set forth in greater detail below, the Government expects that the evidence at trial will show that the defendant first learned about a potential FARC weapons deal from an unindicted coconspirator in or around 2012. In or around May 2014, the defendant participated in a series of recorded telephone conversations with CS-1 regarding the FARC weapons deal. The defendant proceeded to enlist two coconspirators to help him obtain the weapons that CS-1 sought and provide the CSes—whom he understood to represent the FARC—with, among other things, technical assistance, services, and false documentation related to the weapons deal. In fall 2014, the defendant participated in five recorded meetings with the CSes in Romania and Montenegro. During these meetings, the CSes explained that the FARC needed high-powered weapons to kill American military personnel who were working to curtail FARC cocaine production, and the defendant and his coconspirators agreed to provide those weapons. Between October and December 2014, the defendant and his coconspirators traveled across Europe to identify and meet with weapons brokers and suppliers and, ultimately, obtain a signed contract for the weapons sought by the CSes. On or about December 15, 2014, the defendant was arrested in Montenegro, following a final recorded meeting with the CSes.

B.  **Spring 2012-May 2014:  The Defendant's Introduction to CS-1 and Recruitment of CC-1**

In or around the spring of 2012, CS-1 spoke with an unindicted coconspirator named Andi Georgescu (who does not have a familial relationship with the defendant) ("Andi"). CS-1 asked Andi if Andi could help CS-1 obtain weapons for the FARC, who were fighting U.S.

2

military personnel in Colombia.  Andi thereafter conveyed this request to the defendant, and
provided the defendant with a list of weapons that CS-1 had given to Andi (the "Weapons List").

Nearly two years later, in or around May 2014, CS-1 received the defendant's contact
information from Andi and reached out to the defendant via telephone.[1]  During a series of
recorded calls in the ensuing months, the defendant and CS-1 had lengthy conversations about
the logistics of the defendant's providing CS-1 with weapons for the FARC.  CS-1 and the
defendant also discussed meeting in person to continue their negotiation.

Shortly after CS-1 and the defendant first discussed the defendant's provision of weapons
to the FARC, the defendant enlisted the help of coconspirators to advance the deal.  In particular,
after the defendant's first call with CS-1, the defendant reached out to a coconspirator ("CC-1")
who had a lengthy professional history in the weapons industry and whom the defendant
understood to be both well-connected to arms manufacturers and knowledgeable about military-
grade weapons.  The defendant visited CC-1 at CC-1's home in Romania and provided CC-1
with the Weapons List.  CC-1 told the defendant that he would try to determine if the weapons
on the list were available for purchase.

Throughout the summer and into the fall of 2014, the defendant and CS-1 continued to
speak on the telephone about the weapons deal.  Simultaneously, the defendant and CC-1 met in
person in Romania on several occasions to discuss their progress in procuring the weapons that
CS-1 was seeking for the FARC.  Among other things, in furtherance of the deal, CC-1 contacted
an individual with whom CC-1 had previously done business ("Supplier-1").  CC-1 was aware
that Supplier-1 knew a Russian weapons supplier ("Supplier-2"), and hoped to enlist Supplier-

---

[1] Calls and meetings between the confidential sources and the defendant were recorded, and the
Government anticipates playing excerpts of the calls and meetings for the jury.

1's help in obtaining the weapons for the FARC from Supplier-2.  Ultimately, the defendant gave CS-1's phone number to CC-1 to provide to Supplier-1.  The defendant indicated to CC-1 that the defendant had relayed the number to CC-1 so that CS-1 and Supplier-2 could directly discuss the weapons that CS-1 wished to purchase.[2]

### C.  September 2014: Recorded Meetings in Romania and the Defendant's Recruitment of CC-2

On September 23, 2014, the defendant and CS-1 met in Bucharest, Romania.  At this meeting, the defendant introduced to CS-1 an individual whom the defendant claimed had close contacts with Serbian weapons suppliers.  The defendant and CS-1 also discussed the weapons deal, and CS-1 told the defendant that CS-1's associates (*i.e.*, the FARC) "want to fight and they want to kill the Americans.  And they want to buy this [weaponry] because of the Americans."  CS-1 further emphasized to the defendant that CS-1's associates wanted weapons to "protect their drug industry" and "bring down the American helicopters because they're the enemy."

The next day, September 24, 2014, the defendant called CC-1 and asked him to attend a meeting with CS-1 and CS-2.  CC-1 came to the meeting and brought a weapons catalogue.  At the meeting, the defendant and CC-1 discussed the logistics of supplying CS-1 and CS-2's FARC associates with an array of military-grade weapons, and spoke in particular about the weapons and defensive systems in CC-1's weapons catalogue, which included handguns, machine guns, and anti-aircraft cannons.

At the September 24 meeting, while in the defendant's presence, CC-1 conveyed to CS-1 and CS-2 technical information about specific weapons systems, drawn from CC-1's extensive

---

[2] Supplier-2 and CS-1 spoke on the telephone on two occasions in July 2014.  Supplier-1 and Supplier-2 ultimately withdrew from the deal, citing similarities between CS-1's request and a recent, well-publicized arrest in the Czech Republic of defendants who conspired to provide weapons to DEA confidential sources purporting to be members of the FARC.

4

experience in the weapons industry.  For instance, CC-1 discussed with CS-1 and CS-2 an "anti-rocket shield" and a "base for rockets."  He also explained to the group that ZU-23 are "anti-aircraft machine guns" and offered to procure these weapons for CS-1 and CS-2.  CC-1 explained to CS-1 and CS-2 that he could obtain portable optical products, such as "infrared light technology . . . that detects any live being" from a few kilometers away.  CC-1 described to CS-1 and CS-2 a large-caliber, complex "automatic shooting system" which could be controlled remotely and display activity via video camera.  CS-1 and CC-1 also discussed drone aircraft, which CC-1 explained were "planes without a pilot."

On September 25, 2014, the defendant enlisted another coconspirator ("CC-2") into his plot to supply weapons and other services to the FARC.  The defendant met with CC-2 in Bucharest and told CC-2 that the defendant had "dear friends" who were Colombians looking for a weapons supplier.  During this same September 25 meeting, CC-2 called a contact (the "EUC Contact") to discuss the possibility of obtaining an end-user certificate ("EUC") for the deal.[3]

After this September 25, 2014 meeting, CC-2 gave the defendant another weapons list, which CC-2 had obtained from the EUC Contact ("CC-2's Weapons List").  The defendant subsequently sent CC-2's Weapons List to CC-1, and sought CC-1's advice on the technical specifications of the weapons on the list.  The defendant then asked CC-1 and CC-2 to meet him in Tivat, Montenegro, in October 2014 for another meeting with the CSes.

---

[3] An EUC is a document that legitimizes a weapons transaction by certifying to the weapons supplier that the weapons are being sold to an individual or entity who is permitted to make the purchase.  In this case, the evidence will show that the defendant and his coconspirators sought to obtain a fraudulent EUC from Ethiopia to make their weapons deal appear legitimate.

### D.  October 8, 2014: Recorded Meetings in Montenegro

On the morning of October 8, 2014, while in Tivat, the defendant instructed CC-2 to obtain a sample EUC from the EUC Contact.  The EUC Contact emailed CC-2 an EUC and CC-2 forwarded the EUC to the defendant, who edited the document on his laptop.   A short time later, the CSes arrived to meet with the defendant, CC-1, and CC-2 to discuss the deal.

During the ensuing meeting, CC-2 showed the CSes the EUC on the defendant's laptop. After the EUC had been examined by CS-3 and discussed by the meeting participants, the defendant and CC-1 confirmed that the sale could proceed quickly.  The defendant also indicated that the weapons could be left in Ethiopia, with the CSes bearing the burden of ensuring the shipment was transported to Colombia.  As the conversation transitioned to specific weapons systems, the defendant reported that certain anti-aircraft cannons were available and CS-1 indicated that twenty units would be appropriate.  The defendant suggested that one of the CSes join CC-1 at the weapons factory in order to learn how to assemble the weapons systems.

Later on the evening of October 8, the defendant and CC-1 again met with the CSes in Podgorica, Montenegro.  At this meeting, the defendant attempted to install an encrypted communication platform on CC-1 and CS-1's phones.  The defendant indicated that he wanted to ensure that he could communicate with CC-1 and CS-1 without fear of being tracked or intercepted, and wanted to put CC-1 and CS-1 in direct communication with one another so that they could securely discuss the technical aspects of the weapons deal, among other things.

### E.  October-December 2014: The Defendant, CC-1, and CC-2 Travel Europe to Advance the Weapons Deal and Secure a Signed Weapons Contract

In the days following the October 8 meetings, the defendant requested that CC-1 and CC-2 meet him in late October, to discuss CC-2's Weapons List and to continue to refine the

weapons deal's logistics.  On or about October 29, 2014, the defendant, CC-1, and CC-2 met inside the Italian Parliament in Rome, Italy.  At this meeting, the defendant, CC-1, and CC-2 discussed the weapons deal's progress and planned a trip to Germany where they would meet CC-2's weapons suppliers in person ("Supplier-3" and "Supplier-4").

On or about November 15, 2014, the defendant, CC-1, and CC-2 traveled to Germany and met with Supplier-3 and Supplier-4.  At this meeting, the defendant, CC-1, CC-2, Supplier-3, and Supplier-4 discussed the technical specifications of the weapons on CC-2's Weapons List. While in Germany, the group decided to travel to visit a weapons factory.

On or about December 9, 2014, the defendant, CC-1, CC-2, and other individuals traveled to Albania in an attempt to locate weapons to supply to the FARC.  While in Albania, the group drove to a weapons factory.  At the factory, the defendant, CC-1, and CC-2 were shown assault rifles, which CC-1 and CC-2 test fired.

On or about December 14, 2014, the defendant and CC-1 drove from Albania to Bulgaria to meet representatives from another weapons-supply company (the "Weapons Company") in order to locate a supplier for the CSes.  Around the same time, the defendant directed CC-2 to travel to Poland to meet with other potential weapons contacts, which CC-2 did before joining the defendant and CC-1 in Bulgaria.  At the conclusion of the meetings in Bulgaria, a Weapons Company representative signed a contract promising to supply millions of Euros' worth of weapons and military-grade optical devices, including sniper rifles and submachine guns.

### F.  December 15, 2014: Recorded Meeting and Arrest in Montenegro

Finally, on or about December 15, 2014, the defendant and CC-1 met the CSes in Tivat, Montenegro.  At this meeting, the defendant told the CSes that he had weapons available to sell to the CSes immediately and could provide more weapons in approximately four months.  The

defendant and CC-1 were arrested at the conclusion of this meeting.  Following the defendant's

arrest, he briefly cooperated with law enforcement, see infra Part II.A, and placed recorded calls

to ensure that CC-2 would travel to Montenegro. CC-2 did so and was arrested in Montenegro on

or about December 16, 2014.

## II.  The Defendant's Post-Arrest Statements and Efforts to Obstruct Justice

### A. The Defendant's Post-Arrest Statements

Following his arrest, the defendant elected to waive his Miranda rights and speak to DEA

agents.  Among other things, the defendant told the DEA agents that he was working for the CIA

and needed to speak with the DEA agents.  While the defendant was detained in Montenegro

awaiting extradition to the United States, he also spoke with other U.S. government personnel,

and told them, in sum and substance, that several years prior to his arrest, he had provided

information to the FBI.[4]  Though his relationship with the FBI had terminated, the defendant

stated that he decided to continue to pursue his own evidence collection operations "on behalf

of" the U.S. government, and had collected much information over the years.  The defendant

claimed that he was engaging in the weapons deal as a favor to the U.S. government in order to

collect evidence against people who were trying to harm the United States.

### B. The Defendant's Effort to Induce CC-1 to Lie

The defendant, CC-1, and CC-2 were extradited to the United States in late February

2015 and initially housed at the MCC.  Shortly after their arrival in this country, the defendant

and CC-1 spoke to one another at the MCC.  The defendant told CC-1 that, together, they could

make up a story predicated on the defendant's prior relationship with the FBI.  In particular, the

defendant told CC-1 that they should claim that the weapons deal was never meant to be

---

[4] The defendant's prior relationship with the FBI is discussed in Section III, infra.

8

completed, and that the defendant and CC-1 were trying to "catch" the CSes.  CC-1 declined to fabricate such a story.

### C.  The Defendant's Effort to Induce CC-2 to Lie And Deter CC-2 From Testifying Against Him

The defendant also attempted to induce CC-2 to obstruct justice and, later, to threaten CC-2 so as to prevent CC-2 from testifying against him.  Shortly after the defendant and CC-2's arrival at the MCC, in or around early March 2014, the defendant informed CC-2 that the defendant and CC-1 were not "seeing eye to eye" (an apparent reference to CC-1's unwillingness to concoct a story with the defendant, see supra Part II.B).  The defendant also told CC-2 that CC-2 and the defendant should "make up a story," which both the defendant and CC-2 could tell their attorneys to use as a defense.  CC-2 expressed his unwillingness to lie in concert with the defendant.  Shortly thereafter, both CC-1 and CC-2 were separated from the defendant.

Months later, in the summer of 2015, both the defendant and CC-2 were in the MCC's infirmary, and the defendant again approached CC-2.  On this occasion, the defendant told CC-2 that the defendant would pay for CC-2 to retain a private attorney and emphasized to CC-2 that the defendant and CC-2 had to work together.  Shortly after that encounter, in or around August 2015, another inmate approached CC-2 and stated that he (the other inmate) had a message from the defendant.  That message was, in sum and substance, not to accept any deal or otherwise cooperate with the Government.  The message concluded with an admonition to CC-2 to remember that CC-2 was a father and it was best for CC-2's children for CC-2 to work with the defendant.   CC-2 understood the reference to CC-2's children to be a threat from the defendant, aimed at deterring CC-2 from cooperating with the Government.

### III.     The Defendant Was an FBI Source from 2001-2003

In or around June 2001—roughly thirteen years before the charged offense conduct—the defendant and another individual presented themselves to FBI agents in Las Vegas, claiming to have information about criminal activity.  On or about June 6, 2001, the defendant signed a form which detailed the FBI's "[r]equired admonishments to criminal informants/cooperating witnesses" (the "2001 Admonishments").  Among other things, by signing the 2001 Admonishments, the defendant certified that he understood that he would:

- Not initiate a plan to commit criminal acts;

- Not participate in criminal activities unless specifically authorized by the FBI;

- Not engage in any unlawful acts, except as specifically authorized by representatives for the FBI, and would be subject to prosecution for any unauthorized unlawful acts;

- Report all information as promptly as possible; and

- Abide by the instructions of the FBI and not take or seek to take any independent action on behalf of the United States Government.[5]

After signing these admonishments, in around July 2001, the defendant was officially "opened" as an FBI confidential source.

Between June 2001 and when the defendant was closed as an FBI source in 2003, the defendant met frequently with his handling FBI agents and reported information about various criminal activities, mostly credit card and other types of fraud.  On one occasion, at the direction of FBI agents, the defendant traveled out of state in order to participate in a meeting related to the investigation.  Though he was officially closed as a source in 2003, the defendant had infrequent, periodic contact with at least one of his handling FBI agents until in or around 2009.

---

[5] These admonishments were repeated to the defendant in June 2002.

The defendant was not in contact with his handling FBI agents during the time period at issue in this case, nor did he receive any direction from them related to the offense conduct.

### IV.    The Defendant Called the CIA in April 2012

In April 2012—approximately two years before the offense conduct described in Section I, <u>supra</u>—the defendant called the CIA via a publicly available CIA tip line (the "CIA Call").  In this two-part call (the defendant called back after the initial call was terminated), which was recorded by the CIA,[6] the defendant provided a CIA operator with his name and contact information, and told the CIA that an individual named Andi Georgescu had contacted the defendant about brokering a $10 million weapons deal for Colombians.

The defendant told the CIA operator that he was "try[ing] to be useful to the U.S. government" and that he understood the "procedure" because it was the "same drill with the FBI."  The CIA operator told the defendant that people in the CIA would "take a look at" the information provided by the defendant.  At no time did the CIA operator instruct the defendant to obtain additional information about or otherwise investigate the request for weapons.  Between April 2012 and the defendant's arrest, the defendant did not call or otherwise contact the CIA.

## ARGUMENT

### I.    The Jury Should Be Properly Instructed that "Negation of Intent" Does Not Constitute a Legal Defense to Count Two

Based on its conversations with defense counsel, the Government understands the defendant's anticipated trial defense to be that the defendant lacked the necessary mental state to commit the charged offenses, since he purportedly acted with the intent to gather information and report what he had learned to the U.S. government rather than with criminal intent.  The

_____

[6] The Government anticipates that the roughly forty-minute recorded conversation will be played for the jury at trial.

Government expects the evidence to show that the defendant did not, in fact, believe himself to be conducting a long-term, one-man clandestine investigation for the benefit of the United States.   In any event, as discussed more fully below, the defendant's proposed "negation of intent" theory has never been recognized in this Circuit.   To the contrary, the Second Circuit has explicitly cautioned against allowing a defendant to assert his independent determination that his actions served a government interest as a valid legal defense.   The Second Circuit's guidance with respect to this novel theory allows for the possibility that it may be applicable to offenses with a heightened *mens rea*—such as Count One's requirement that the defendant have acted with the specific intent to kill another person.   It is, however, similarly clear that the defense should not be available when—as in Count Two—the defendant's subjective belief as to why he was engaging in criminal activity is not an element of the charged offense.   Against this backdrop, the Government respectfully requests that the defendant be precluded from arguing negation of intent as a defense to Count Two and that the Court clarify for the jury the defense theory's narrow contours.

### A.  Applicable Law

1.  <u>Negation of Intent</u>

The Second Circuit has recognized two forms of the public authority defense.   The first, "actual public authority," is an affirmative defense, which requires a showing that "a defendant has in fact been authorized by the government to engage in what would otherwise be illegal activity."   <u>United States</u> v. <u>Giffen</u>, 473 F.3d 30, 39 (2d Cir. 2006); <u>see</u> <u>also</u> <u>United States</u> v. <u>Doe</u>, 63 F.3d 121, 125 (2d Cir. 1995).   The second, "entrapment by estoppel," is also an affirmative defense, whereby a defendant is permitted to argue that the government "by its own actions, induced him to do [illegal] acts and led him to rely reasonably on his belief that his actions

would be lawful by reason of the government's *seeming* authorization." Giffen, 473 F.3d at 41 (emphasis in original).

The Second Circuit has characterized "negation of intent" as a third variation on the public authority defense, albeit one that it has never recognized. Id. at 43 (noting that the theory had "been expressly recognized only in the Eleventh Circuit"); see also United States v. Mergen, 764 F.3d 199, 205 (2d Cir. 2014); United States v. Alvarado, 808 F.3d 474,487 (11th Cir. 2015) ("[I]n recognizing the availability of an innocent intent theory of defense for a defendant who has failed to meet the standard for a public authority affirmative defense, we acknowledge that our Circuit may be the only circuit to explicitly allow an innocent intent defense in this context."). As the Second Circuit has explained, this doctrine "is not an affirmative defense," but instead an effort by a defendant "to rebut the government's proof of the intent element of a crime by showing that the defendant had a good-faith belief that he was acting with government authorization." Giffen, 473 F.3d at 43. In other words, negation of intent contemplates a situation in which a defendant "honestly, albeit mistakenly, believed he was committing the charged crimes in cooperation with the government." Id.

The Second Circuit has, in dicta, expressed "great difficulty" with this defense theory. Id. In doing so, it observed that such a doctrine would "swallow the actual public authority and entrapment-by-estoppel defenses." Id. As the Court explained, "[s]uch an unwarranted extension of the good faith defense would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interests thereby," rendering "[l]awbreakers . . . their own judges and juries." Id. (quoting United States v. Wilson, 721 F.2d 967, 975 (4th Cir. 1983)).

Notwithstanding its grave concerns, the Second Circuit proceeded to "assume for

13

purposes of argument . . . that, at least in some circumstances, a defendant may offer evidence that he lacked the intent essential to the offense charged because of his good-faith belief that he was acting on behalf of the government." Id.  Even then, however, the Circuit cautioned that "[t]he relevance, and hence admissibility, of such a belief would depend . . . on the nature of the intent element of the charged crime," and, in particular, on "whether a defendant's belief that his actions were authorized by the government would negate that intent." Id. at 43-44.  In short, charged offenses' *mens rea* requirements are essential considerations in assessing those rare circumstances when negation of intent may be a viable legal defense.  See id. at 44.

> 2.  The Charged Conduct's *Mens Rea*

As a general matter, to prove a defendant guilty of participation in a conspiracy that requires an overt act—like Title 18, United States Code, Section 1117—the Government must show "(i) an agreement about the object of the conspiracy, (ii) specific intent to achieve that object, and (iii) an overt act in furtherance of the agreement."  United States v. Wallace, 85 F.3d 1063, 1068 (2d Cir. 1996).  Count One alleges a conspiracy to violate Title 18, United States Code, Section 1114, which provides, in relevant part, that:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished . . . in the case of murder, as provided under section 1111.

For its part, Section 1111(a) defines "murder" as "the unlawful killing of a human being with malice aforethought."  Thus, in order to convict a defendant of conspiring to kill officers and employees of the United States, the Government must prove that the defendant agreed (1) to kill a federal officer (including any member of the uniformed services), (2) while the federal officer

was engaged in the performance of official duties, (3) with malice aforethought, and (4) with premeditation.  See 18 U.S.C. §§ 1111(a), 1114, 1117.  With respect to the *mens rea* analysis, "[m]alice is the state of mind that would cause a person to act without regard to the life of another . . . [T]he defendant must have acted consciously, with the intent to kill another person." United States v. Bout, 08 Cr. 365, 2011 WL 3369797, at *4 (S.D.N.Y. Aug. 2, 2011) (internal citation omitted); see also United States v. Velazquez, 246 F.3d 204, 214 (2d Cir. 2001).

By contrast, Count Two alleges a conspiracy to provide material support to the FARC, in violation of Title 18, United States Code, Section 2339B.  That statute provides in pertinent part that, "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [guilty of a crime]." 18 U.S.C. § 2339B(a)(1).  By its terms, the statute "imposes two express *scienter* requirements: that the aid be intentional and that the defendant know the organization he is aiding is a terrorist organization or engages in acts of terrorism."  United States v. Al Kassar, 660 F.3d 108, 129 (2d Cir. 2011). The Second Circuit has explicitly declined to impose a further intent requirement, rejecting the claim that "the defendant must intend that his aid support the terrorist aims of the organization." Id.  "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activity."  Id. (quoting Holder v. Humanitarian Law Project, 561 U.S. 1, 16-17 (2011)).

**B. Discussion**

Consistent with the facts set forth above, at trial, the Government expects to prove that the defendant agreed with others to provide individuals whom he understood to represent the FARC with material support and resources, including access to weapons and optical equipment

suppliers, weapons brokering services, advice and assistance from weapons experts, false end user certificates, optical equipment, and weapons. The evidence will also show that the defendant knew and intended that the weapons would be used to murder U.S. soldiers in Colombia. Faced with this evidence, the defendant has repeatedly signaled his intent to argue to the jury that when he did these things—that is, for instance, when he put CS-1 in direct contact with Supplier-1, introduced the CSes to a weapons expert (CC-1), attempted to put CS-1 in direct contact with CC-1, endeavored to obtain a fake EUC, and secured a signed contract for millions of dollars' worth of military-grade armaments—he did so for the purpose of collecting intelligence that he planned to relay to the U.S. government at some future time. According to defense counsel, the defendant will cite the CIA Call and claim that he was driven by a good-faith, albeit mistaken, belief—anchored in his past experience as an FBI source—that he needed to assemble a body of evidence in order to be taken seriously by government officials. As a result, per defense counsel's theory, the defendant lacked the intent required to conspire to provide material support to the FARC or kill officers and employees of the United States.

At most, the defendant's theory is a highly attenuated form of the negation of intent argument. That is, even if the defendant's claim is true—and the Government expects the evidence to show otherwise—he does not and cannot assert that he understood himself to be "acting with government authorization." Giffen, 473 F.3d at 43. The defendant is instead asserting that he erroneously believed himself to be acting *in the government's interest*, *i.e.*, that he had deputized himself as a government actor and conferred upon himself "*carte blanche* to violate . . . the law [when] he subjectively decide[d] that he serve[d] the government's interests thereby." Id. (quoting Wilson, 721 F.2d at 975).

16

The defendant's argument is not a legal defense to conspiring to provide material support to a foreign terrorist organization.  See id. at 43-44.  As set forth above, in order to prove the defendant guilty of Count Two, the Government need only demonstrate that the defendant knew the FARC to be engaged in terrorist activity and intentionally provided or conspired to provide material support to individuals whom he understood to represent that organization.  Al Kassar, 660 F.3d at 129.   His subjective belief as to *why* he provided such support is irrelevant.  If the defendant, as he appears to concede, believed the CSes to represent the FARC and agreed with CC-1 and CC-2 to provide them with various forms of material support—including the services and expert advice and assistance that he had already provided them before his arrest—he is guilty of Count Two.    Any subjective belief by the defendant that his material support would ultimately be offset by unsolicited information he provided to the U.S. government has no bearing on his guilt.[7]

The law could not be otherwise.  On the defendant's theory, any individual could independently decide that it was appropriate to arm terrorists—or sell drugs, or rob banks—to advance a self-identified investigation into the Islamic State, the Sinaloa Cartel, or the Gambino crime family.  "Lawbreakers would become their own judges and juries."  Giffen, 473 F.3d at 43 (quoting Wilson, 721 F.2d at 975).

_____

[7] This is far from the only situation in which a defendant's purported motivation is irrelevant to the statutory *mens rea* for committing a charged offense.  See, e.g., United States v. Thomas, 581 F. App'x 100, 102 n.3 (2d Cir. 2014) (noting that the Second Circuit has yet to "squarely" address the issue, but collecting cases in support of the proposition that "an intent to return money or property is not a defense to the charge of embezzlement") (quoting United States v. Young, 955 F.2d 99 (1st Cir. 1992)); United States v. Jean-Baptiste, 166 F.3d 102, 111 (2d Cir. 1999) (joining other circuits in holding "that the offense of making a false statement in a passport application may be proven without regard to whether the defendant had any intent to make fraudulent use of the passport");  United States v. Weinstein, 172 F.3d 39, 1999 WL 38803, at *3 (2d Cir. 1999) (unpublished) ("The court properly instructed the jury that proof of motive is not an element of the offense of mail fraud.").

Depending on the particulars of defense counsel's presentation at trial, this may be a case in which the defendant's alleged good faith belief that his actions would ultimately serve the government may be relevant to his intent with respect to Count One.  That is, the defendant's purported subjective belief that he would at some point report his confederates' activities to government authorities may properly inform a jury's consideration of whether he acted "without regard to the life of another" and "with the intent to kill another person."  Bout, 2011 WL 3369797, at *4.  As a result, to the extent that defense counsel proposes to elicit testimony from the defendant or other defense witnesses regarding the CIA Call and the basic contours of the defendant's past relationship with the FBI, such evidence may be admissible in service of that narrow argument—provided it is accompanied by an appropriate limiting instruction to that effect.  See United States v. Prawl, 168 F.3d 622, 626 (2d Cir. 1999) ("A limiting instruction is justified when evidence . . . is admissible for a limited purpose but might also be considered for a purpose that is impermissible.") (citing Fed. R. Evid. 105).

In order to clarify the limited scope of the defendant's proposed defense and avoid confusion with respect to a doctrine about which the Second Circuit has expressed "great difficulty," the Government respectfully requests that the Court include the following language in its jury charge as to Count Two should the defendant advance this defense in any respect:[8]

> I instruct you as a matter of law that any subjective belief by the defendant that providing material support to the FARC was in the interest of the United States government is irrelevant to your consideration of his intent.  As I have said, the question before you with respect to the defendant's intent is whether the Government has proven beyond a reasonable doubt that the defendant entered into an agreement to provide material support to the FARC knowing the FARC to be engaged in terrorist activity and intending to provide them with "material support or

---

[8] This language is included in the Government's proposed Requests to Charge, which were filed today.  The Government also reserves the right to amend or modify the proposed instruction at or near the close of evidence, based on the substance of defense counsel's trial presentation.

resources," in the forms that I have specified. The defendant's subjective belief as to the reason *why* he was providing the support is not relevant.

## II. The Defendant's Repeated Attempts to Obstruct Justice While Incarcerated at the MCC are Admissible at Trial

At trial, the Government anticipates eliciting testimony to show that the defendant attempted to obstruct justice while incarcerated at the MCC by (1) attempting to enlist CC-1's assistance in fabricating a joint cover story that the parties did not intend to complete a weapons deal but were, in fact, gathering evidence for the U.S. Government; (2) attempting to enlist CC-2 in fabricating a cover story after his attempts at recruiting CC-1 failed; and (3) approaching CC-2, both directly and through another inmate, to discourage him from cooperating with the Government.  The Government respectfully submits that all of these incidents are admissible as "other act" evidence that, given the anticipated defense, is highly relevant to the defendant's intent and not unduly prejudicial.

### A.  Applicable Law

Federal Rule of Evidence 404(b), which addresses the admission of "other act" evidence and can serve as a separate basis for the admission of uncharged conduct provides, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

When determining the admissibility of prior act evidence pursuant to Rule 404(b), a court is to consider whether: "(1) the prior acts evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court administered an appropriate

19

limiting instruction." United States v. Brand, 467 F.3d 179, 196 (2d Cir. 2006); see also United States v. Curley, 639 F.3d 50, 56-57 (2d Cir. 2011) (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).   The Second Circuit "follows an 'inclusionary' approach to the admission of other act evidence, so that 'evidence of prior crimes, wrongs or acts is admissible for *any* purpose other than to show a defendant's criminal propensity.'" United States v. LaSanta, 978 F.2d 1300, 1307 (2d Cir. 1992) (emphasis in original, citations omitted).   The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and its ruling will be reviewed only for abuse of discretion.   See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994).   Under the Rule 404(b) standard, "[e]vidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt." United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.08 (2d ed.1997)).

Other acts evidence is, like all other evidence, inadmissible under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403.   Evidence is unfairly prejudicial, however, "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).   Other acts evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990); see also United States v. Smith, 727 F.2d 214, 220 (2d Cir. 1984).

### B. Discussion

At trial, the Government anticipates offering evidence of the defendant's above-described communications with CC-1 and CC-2 while incarcerated at the MCC.   Evidence of this conduct

is admissible, pursuant to Rule 404(b), because it is probative of the defendant's consciousness of guilt as to the charged conduct.  Indeed, the proffered evidence of the defendant's efforts to obstruct justice meets both requirements outlined in Perez: that "reasonable inferences can be drawn from it and . . . the evidence is probative of guilt."  Perez, 387 F.3d at 209.

First, evidence of the defendant's attempts to induce CC-1 to join the defendant in concocting a story that the defendant never intended to complete the weapons deal and was instead attempting to "catch" the CSes tends to undermine the defendant's claim that he was in fact working on the U.S. government's behalf.  Accordingly, it is directly relevant to the central issue at trial: the defendant's intent to commit the charged crimes.  As described above, it is anticipated that the defendant's defense at trial will be that he engaged in the offense conduct to gather information to produce to the U.S. government.  Should the defendant, in fact, make this claim to the jury, evidence of the defendant's post-arrest communications with CC-1 is admissible to support the inference that the defendant fabricated his defense and instead—as the Government intends to argue at trial—intended to broker weapons to the FARC.  See United States v. George, 779 F.3d 113, 122 (2d Cir. 2015) (noting that a "factfinder could . . . infer consciousness of guilt" from the defendant's efforts to urge a witness "to lie to law enforcement officials"); United States v. Mickens, 926 F.2d 1323, 1329 (2d Cir. 1991) (affirming admission of evidence of attempted witness tampering by making a threatening gesture in court as proof of a defendant's consciousness of guilt); see also United States v. Wilson, 447 F.2d. 1, 9 (9th Cir. 1971) ("[A]n attempt to suborn a witness manifests a consciousness of guilt . . . ." (citing United States v. Culotta, 413 F.2d 1343 (2d Cir. 1969)).  Moreover, by enlisting CC-1 to repeat an invented story, the defendant was also endeavoring to ensure that CC-1 would not provide truthful testimony at any trial against the defendant.  This proof is directly relevant to the issue of

the defendant's intent and, in particular, his consciousness of guilt.  See Perez, 387 F.3d at 209

(citing Mickens, 926 F.2d at 1329).

Second, for the same reasons, evidence that the defendant made a similar approach to

CC-2, after his attempts to enlist CC-1 in his lies failed, is also admissible.  Indeed, evidence that

the defendant separately approached both of his coconspirators in an effort to try to convince

them to help him bolster what has become his trial defense is particularly probative evidence of

the defendant's consciousness of guilt, as it demonstrates his increasing desperation to create

what he believed to be an innocent explanation for his actions in this matter.  See United States

v. Cassese, 428 F.3d 92, 101 (2d Cir. 2005) (endorsing district court's reasoning that "evidence

of after-the-fact consciousness of guilt may have independent probative force, and may

strengthen inferences supplied by other pieces of evidence").

Third, evidence of the defendant's attempts to discourage CC-2 from cooperating with

the Government—both directly and through another inmate—is admissible in support of the

inference that the defendant wanted to dissuade CC-2 from providing truthful information to the

Government and preclude the possibility of CC-2's testifying against the defendant at trial.  See

Perez, 387 F.3d at 209; United States v. Bein, 728 F.2d 107, 114-15 (2d Cir. 1984) ("Evidence of

threats by a defendant against a potential witness against him can, if [the 404(b)] balancing test is

met, be used to show guilty knowledge."); United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir.

1972) ("Evidence of conduct designed to impede or prevent a witness from testifying is

admissible as showing consciousness of guilt."); see also United States v. Mokol, 646 F.3d 479,

483 (7th Cir. 2011) (collecting cases) (defendant's statement to a witness that "anyone who

informed on him would 'end up in the ground' . . . fit[s] comfortably within the widely

recognized principle that a defendant's attempts to intimidate potential witnesses are probative of

his consciousness of guilt"); United States v. Meling, 47 F.3d 1546, 1557 (9th Cir. 1995) (noting

that, in terms of consciousness of guilt, evidence of witness intimidation is "second only to a

confession in terms of probative value").

Importantly, the defendant's efforts to obstruct justice are no more graphic or sensational

than other evidence in this trial—which includes numerous recorded discussions of the

anticipated use of military-grade weapons to murder American soldiers.   Moreover, to the

limited extent that this evidence poses any danger of unfair prejudice, any such risk can be

addressed with a limiting instruction from the Court on the proper consideration of Rule 404(b)

evidence.  See United States v. McCallum, 584 F.3d 471, 475 (2d Cir. 2009); Prawl, 168 F.3d at

626; see also United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) (noting that limiting

instructions serve as an appropriate "final protection" against prejudice).

### III.     The Defendant's Post-Arrest Statements Are Hearsay and Not Admissible When Offered Through Him

From its conversations with defense counsel, the Government understands that the

defendant will seek to admit at trial his own post-arrest, exculpatory statements to DEA agents

and other U.S. government personnel, in which he claimed he was engaging in the offense

conduct to gather evidence for the U.S. government.  When offered by the defendant, these

statements are hearsay and are not admissible at trial.

#### A.  Applicable Law

Hearsay is an out of court statement that "a party offers in evidence to prove the truth of

the matter asserted in the statement." Fed. R. Evid. 801(c).  "When the defendant seeks to

introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not

admissible."  United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982); see also United States v.

Kadir, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)).

### B. Discussion

The defendant should not be permitted to introduce evidence—either through his own testimony or through direct or cross-examination of other witnesses—of the statements that he made to DEA agents and other U.S. government personnel after his December 2014 arrest. As discussed throughout this brief, it is expected that the defendant will argue at trial that he lacked the intent to commit the charged offenses because he was engaging in the offense conduct intending to gather evidence to provide to the U.S. government. The defendant's post-arrest statements, when introduced by the defendant for the truth of the matter asserted—that the defendant was engaging in the offense conduct for purportedly innocent reasons—fall squarely within the rule against hearsay, and are not admissible. See, e.g., Marin, 669 F.2d at 84.

There is no exception or exclusion to the hearsay rule that would allow for the admission of these statements. For instance, Federal Rule of Evidence 801(d)(1)(b) defines as non-hearsay a declarant-witness's prior statement so long as the declarant testifies, is subject to cross-examination about a prior statement, and "the statement is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying . . . ."[9] For statements to be admissible pursuant to this Rule, the proponent of the statement must show "(1) that the prior consistent statement is consistent with the witness's in-court testimony; (2) that the

_____

[9] In conversations with the Government, defense counsel has suggested Rule 801(d)(1)(b) as a possible vehicle for admitting the defendant's post-arrest statements.

prior consistent statement is being offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive; and (3) that the prior consistent statement was made prior to the time that the supposed motive to falsify arose." Phoenix Associates III v. Stone, 60 F.3d 95, 103 (2d Cir. 1995) (citing United States v. Quinto, 582 F.2d 224, 234 (2d Cir.1978)) (internal quotation marks omitted)).

Here, even if the defendant testifies at trial consistently with certain of his post-arrest statements—as counsel has indicated that he will—and even if the Government attempts to impugn the defendant's credibility as a witness by alleging recent fabrication, the defendant's post-arrest statements are still not admissible under Rule 801(d)(1)(B). All of the purportedly exculpatory statements that the defendant could seek to admit were made following his arrest, when he had already developed a strong incentive to devise an innocent explanation for his actions. They can therefore not be presented to the jury to rebut the charge that the defendant "recently fabricated" his testimony. See Tome v. United States, 513 U.S. 150, 1657 (1995) ("[Rule 801(d)(1)(B)] permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made *before* the charged recent fabrication or improper influence or motive.") (emphasis added); Phoenix Associates III, 60 F.3d at 103 (prior statement must have been "made *prior to the time that the supposed motive to falsify arose*") (emphasis added). To the contrary, they simply show that the defendant has stuck with a version of the story that he proffered shortly after his arrest—when he had an essentially identical motive to fabricate a defense.

In short, the Government is aware of no theory under which the defendant should be permitted to introduce his own post-arrest, exculpatory statements. Absent a legal basis to do so, the Government respectfully submits that the defendant should be precluded from offering them

at trial, whether through his own testimony or the testimony of other witnesses.

**IV.    In Order to Call FBI Agents to Testify, the Defendant Is Required to Follow the Procedures Under <u>Touhy</u> and Assert a Theory of Relevance**

As noted above, the defendant provided information to the FBI from 2001 to 2003.  The Government understands from speaking with counsel for the defendant that the defendant may attempt to call as a defense witness one or more of the defendant's handling FBI agents.  As the Government has explained to defense counsel, for the defendant to call a federal agent to testify, the defendant must, in advance of trial, follow the FBI's <u>Tuohy</u> regulations, which include the requirement that the defense submit an affidavit setting forth the testimony or evidence that the defendant wishes to elicit.

**A.   Applicable Law**

In <u>Touhy</u> v. <u>Ragen</u>, 340 U.S. 462 (1951), the Supreme Court upheld the constitutionality of agency regulations that prohibit agency employees from responding to subpoena requests absent compliance with those regulations.  <u>See</u> <u>SEC</u> v. <u>Chakrapani</u>, Nos. 09 Civ. 325 (RJS), 09 Civ. 1043 (RJS), 2010 WL 2605819, at *9 (SDNY, June 29, 2015) (Sullivan, J.) ("In <u>United States ex rel. Touhy</u> v. <u>Ragen</u>, the Supreme Court affirmed that agency employees must refuse to provide subpoenaed agency records when their production would violate the agency's housekeeping regulations. Agencies, therefore, refer to such requests as '<u>Touhy</u> requests.'" (internal citations omitted)).  <u>Touhy</u> is now codified as the Federal Housekeeping Statute, 5 U.S.C. § 301, which provides that the "head of an Executive department . . . may prescribe regulations . . . [regarding] the custody, use, and preservation of its records, papers, and property."  <u>See</u> <u>Meisel</u> v. <u>FBI</u>, 204 F. Supp. 2d. 684, 686 n.1 (SDNY 2002) ("In response to the Supreme Court's decision in [<u>Touhy</u>], as codified at 5 U.S.C. § 301, agencies of the United

States government drafted procedural rules to govern requests for information from them and the agency's determination of whether it will release the information.").

In 28 C.F.R. § 16.21, *et seq*, the Department of Justice promulgated <u>Touhy</u> regulations setting "forth procedures to be followed with respect to the production or disclosure of any material contained in the files of the Department, any information relating to material contained in the files of the Department, or any information acquired by any person while such person was an employee of the Department as a part of the performance of that person's official duties or because of that person's official status."  As relevant to this case, 28 C.F.R. § 16.23 explains that if the "oral testimony" of a DOJ employee—which includes both current and former FBI agents—is sought "in a case or matter in which the United States is a party, an affidavit, or, if that is not feasible, a statement by the party seeking the testimony or by the party's attorney setting forth a summary of the testimony sought must be furnished to the Department attorney handling the case or matter."

In addition to complying with <u>Tuohy</u>, any testimony that the defendant wishes to elicit from an FBI agent must be relevant.  That is, in order to be admissible at trial, the testimony that the defendant hopes to elicit must have a tendency "to make a fact more or less probable than it would be without the evidence," and that fact must be "of consequence in determining the action."  Fed. R. Evid. 401.  As the Second Circuit has explained:

> Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved? Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand.

<u>Contreras</u> v. <u>Artus</u>, 778 F.3d 97, 108 (2d Cir. 2015) (quoting Fed. R. Evid. 401 Advisory Comm.

Notes (1972)).

### B.  Discussion

The defendant has suggested that as part of his trial defense that he was engaging in the offense conduct in order to gather evidence for the U.S. government, he will seek to introduce evidence of his prior cooperation with the FBI.  It is the Government's understanding that the defendant will then seek to argue that his behavior in the instant case was driven, in part, by his own interpretation of past experience at the FBI.  Though the defendant has suggested that he may attempt to call an FBI agent or agents to elicit information regarding his prior cooperation, he has not yet made a <u>Touhy</u> request.  Until such a request is properly made, the Government will oppose—and in fact, the FBI will disallow—the testimony of any FBI agents at trial.[10]

## V.      Limited Protection of CS-1's Identity is Appropriate

The Government respectfully requests that CS-1, a DEA confidential source who is actively involved in ongoing investigations, be allowed to testify using his true first name and a pseudonymous last name. The Government requests this limited measure to protect a witness whose safety and effectiveness as a confidential source would be endangered by the public disclosure of his true identity.  The defendant's rights under the Confrontation Clause or otherwise will not be impeded because the source's full, true name will be disclosed to defense counsel prior to trial.  Defense counsel has consented to the request.

---

[10] To the extent that the defendant complies with <u>Touhy</u> and calls an FBI agent, the Government reserves the right to object to any testimony that is irrelevant to the issue at trial or otherwise prejudicial or confusing to the jury—including but not limited to the FBI's internal assessment of the defendant's credibility, the specific cases or charges to which the defendant's information related, and the specific purposes for which the FBI used the defendant's information, including whether the information was used to draft search warrants or seek indictments.

A defendant does not have an absolute right to publicly disclose the identity of the Government's potential witnesses at trial.  <u>Alford</u> v. <u>United States</u>, 282 U.S. 687 (1931), and <u>Smith</u> v. <u>Illinois</u>, 390 U.S. 129 (1968), require as a constitutional minimum that a defendant be given an opportunity "to place the prosecution's witness in their proper setting and to test the weight of their testimony and their credibility before the jury."  In dicta, the majority in <u>Smith</u> suggested that a demonstrated risk to the safety of a witness could, in an appropriate case, justify some curtailment of the accused's right to a full disclosure of the witness' identity.  390 U.S. 129, 133-134 (White J., concurring).  Courts have therefore found that the confrontation rights of the accused are not absolute and should yield where threats to a witness are "actual and not the result of conjecture."  <u>See</u> <u>United States</u> v. <u>Palermo</u>, 410 F.2d 468, 472 (7th Cir. 1969).  <u>See also</u> <u>Siegfriedt</u> v. <u>Fair</u>, 982 F.2d 14, 17-18 (1st Cir. 1992) (Confrontation Clause does not require disclosure of witness's name or address).

Testimony by pseudonym and other similar measures have long been permitted in this Circuit in a variety of contexts when a witness's safety is at risk.  For example, the Second Circuit has affirmed a district court's decision to bar testimony and cross examination with respect to a witness's true name and the address of the witness's employer when the witness stated that he had received death threats.  <u>See</u> <u>United States</u> v. <u>Baker</u>, 419 F.2d 83, 87 (2d Cir. 1969).  <u>See also</u> <u>Brown</u> v. <u>Artuz</u>, 283 F.3d 492, 533 (2d Cir. 2002) (noting that an undercover detective who testified in a closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); <u>United States</u> v. <u>Watson</u>, 599 F.2d 1149, 1157 (2d Cir. 1979) (affirming trial court's prohibition against cross examination concerning a witness's recent activities, employment, and other matters where the government showed that attempts had been made on the witness's life and that disclosure of his occupation would

endanger his life); United States v. Cavallaro, 553 F.2d 300, 304 (2d Cir. 1977) (affirming trial court's decision to preclude defense questioning about a witness's address where there was "good reason to fear for the safety of the witness").

Indeed, Courts in this District have allowed law enforcement witnesses to testify in numerous cases without disclosing their true identity.  See, e.g., United States v. Cheng Le, 15 Cr. 38 (AJN) (Nathan, J.); United States v. Rafael Antonio Garavito-Garcia, 12 Cr. 839 (JSR) (Rakoff, J.); United States v. Javel Taylor, 11 Cr. 310 (PGG) (Gardephe, J.); United States v. Viktor Bout, 08 Cr. 365 (SAS) (Scheindlin, J.); United States v. Bruno Ramirez, 07 Cr. 135 (RPP) (Patterson, J.); United States v. Cyril Smith, S2 05 Cr. 922 (DLC) (Cote, J.); United States v. Nelson Miranda, S10 05 Cr. 189 (GBD) (Daniels, J.); United States v. Richard Grant, et al., 04 Cr. 207 (BSJ) (Jones, J.).  Cf. Nelson v. Crowley, 07 Civ. 849 (RJS), 2009 WL 498909, at *5 (S.D.N.Y. Feb. 23, 2009) (concluding, in habeas context, that allowing undercover officer to testify "anonymously—as opposed to testifying in absentia—did not offend" the Confrontation Clause).

Courts outside this Circuit have also concluded that a witness's use of a pseudonym is appropriate under certain circumstances, finding that the Government's interest in protecting the witness from harm outweighs any interest the defendant may have in learning the true name of the witness—a fact that, in itself, has no constitutional significance.  In Clark v. Ricketts, 958 F.2d 851, 855 (9th Cir. 1991), for example, the Ninth Circuit found no violation of the Confrontation Clause where a DEA confidential informant testified at trial under a pseudonym, because the defendant knew the witness's name before testifying and, therefore, had an opportunity to investigate and conduct cross-examination.  Id.  ("[T]here is no absolute right of an accused to have a jury hear a witness's true name and address.").

30

Likewise, in United States v. Fuentes, 988 F. Supp. 861 (E.D. Pa. 1997), the court held that, although it would require the Government to disclose to defense counsel the true identity of a DEA confidential informant working in Colombia (with limits on the defense's dissemination of the identity), the Confrontation Clause did not require revelation of the true identity of the confidential informant in open court.  Id. at 867 ("[N]ot permitting use of [the confidential informant's] true name during trial has in our view no constitutional significance.").  See also United States v. Ramos-Cruz, 667 F.3d 487, 500 (4th Cir. 2012) (affirming district court decision to allow two government witnesses from El Salvador to testify under pseudonyms without revealing their names, home and work addresses, or dates and places of birth due to safety concerns); United States v. Celis, 608 F.3d 818, 832-34 (D.C. Cir. 2010) (holding, in the context of trial of defendants with ties to a Colombian terrorist organization, that a protective order allowing government witnesses from Colombia to testify under pseudonyms, and limiting disclosure of their true identities, did not impermissibly intrude upon defendants' confrontation rights); Siegfriedt, 982 F.2d at 18 (rejecting Confrontation Clause challenge in the context of lay witness, noting that "all pseudonyms are not equal in the eyes of the Confrontation Clause," and that in some cases, "the use of a fictitious name will be no more than a mere curiosity, possessing no constitutional significance"); United States v. Contreras, 602 F.2d 1237, 1239-40 (5th Cir. 1979) (where there was a reasonable fear that disclosure of DEA agent's home address and frequented locations would endanger him and his family, no error in precluding cross examination as to home address and other background information even though agent was "instrumental in defendant's arrest"); United States v. Rangel, 534 F.2d 147, 148 (9th Cir. 1976) (where record showed that witness's life had been threatened and witness and family relocated, no error in permitting witness to testify without divulging true name, address and phone

number); United States v. Palermo, 410 F.2d 468, 472 (7th Cir. 1969) ("[W]here there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute.").

The facts here strongly militate in favor of permitting CS-1 to testify using a pseudonym. CS-1 has worked on many investigations for the DEA, including, most recently, for DEA's Special Operations Division ("SOD") Bilateral Investigations Unit.  As demonstrated by the instant case, which is reflective of CS-1's work, CS-1's role in these investigations requires CS-1 to interact regularly with individuals believed to be involved in large-scale narcotics and/or weapons trafficking, and who very likely could seek retaliation against CS-1 and/or his family. See, e.g., United States v. Santos, 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force."); United States v. Taylor, 707 F. Supp. 696, 703 (S.D.N.Y. 1989) (noting, where defendant requested a witness list, that "[e]specially in narcotics cases . . . the dangers of witness intimidation, subordination of perjury or actual injury to witnesses are great").  At times, these interactions occur in settings where the risk of threats and violence are high and in situations where physical protection by the DEA is not feasible.

Moreover, CS-1 continues to work on multiple investigations with SOD.  To continue in that capacity, CS-1 must not be recognizable as an individual who has in the past assisted law enforcement.  Revealing CS-1's true identity to the public would likely compromise those investigations while simultaneously placing CS-1 at additional risk.

 Under these circumstances, the need to ensure CS-1's physical safety outweighs any interest in the public disclosure of his surname.  CS-1's observations and his role in the investigation, which will be public and revealed in open court, are crucial to his testimony.  His

32

surname is not.  The disclosure of CS-1's last name adds nothing of value to the substance of his testimony or to the defense's cross-examination.  In addition, allowing CS-1 to testify under a pseudonym will not violate the defendant's rights pursuant to the Confrontation Clause.  Defense counsel will be told CS-1's true name at the time the Government produces CS-1's materials pursuant to 18 U.S.C. § 3500 (for which the Government anticipates seeking a protective order), providing the defendant with adequate means to investigate the witness in connection with the preparation of a defense.  The defendant will have the opportunity to confront in open court and to cross-examine CS-1, and the jury will have a full opportunity to assess his demeanor and credibility.  In addition, the witness will give his testimony under oath, subject to the penalty of perjury.  Hence, there will be no curtailment of the defendant's Confrontation Clause rights.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the motions herein.

Dated:  New York, New York
           April 14, 2016

                                                    Respectfully submitted,

                                                    PREET BHARARA
                                                    United States Attorney for the
                                                    Southern District of New York


                                         By:      /s/ Ilan Graff
                                                    Ilan Graff/Andrea Surratt
                                                    Assistant United States Attorneys
                                                    (212) 637-2296/(212) 637-2493