UNITED STATES DISTRICT CIOURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

UNITED STATES OF AMERICA

v.

Indict. # 14 cr. 799 (RA)

VIRGIL FLAVIU GEORGESCU,

Defendant.

-----------------------------------------------------------

## DEFENDANT'S MEMORANDUM OF LAW
## IN OPPOSITION TO THE GOVERNMENT'S
## MOTIONS IN LIMINE

The defendant, Virgil Flaviu Georgescu, is charged, in Count One of the

Indictment, with conspiracy to kill officers and employees of the United States

in violation of Title 18, United States Code, Section 1117. And, in Count Two,

with conspiracy to provide material support to a terrorist organization, in

violation of Title 18, United States Code, Section 2339B. The charges arose

from a "sting" operation conducted by the DEA wherein DEA operatives, posing

as members of FARC, a terrorist organization, endeavored to purchase weapons

ostensibly for the purpose of killing Americans in Colombia. By their present

motions in *limine* the government seeks, as to Count Two only, (1) to preclude

the defendant's anticipated defense, denominated "negation of intent," i.e. that

defendant "lacked the intent essential to the offense charged because of his good

1

faith belief that he was acting on behalf of the government," **United States v. Giffen,** 473 F.3d 30, 43-44 (2d Cir. 2006), and, (2), as to both counts, to exclude evidence of the defendant's post-arrest statements. The government seeks other relief but we respond only to the two issues referred to above.

## FACTUAL BACKGROUND

The defense will establish at trial that upon being contacted by his acquaintance, Andy Georgescu, about a potential FARC weapons deal, Mr. Flaviu Georgescu immediately contacted the CIA in two consecutive phone calls. During the telephone conversations with the CIA operators, Mr. Georgescu identified himself by his true name; He provided his true Social Security Number; He provided his true telephone number and his citizenship; He identified the individuals interested in the arms as guerrilla fighters from Columbia; He identified the intended use for the arms to kill U.S. nationals; He described the request by the purchasers for a fraudulent End-User Certificate; He vehemently described his desire to help the United States Government in preventing the killing of its' servicemen and women stationed overseas; He described his appreciation for the united Sates and that he will do everything necessary to gather information to assist the United States except for testifying in court and except for working for or notifying the Romanian government; He

2

provided information about his experience as a proactive cooperator and informant for the United States Government in the past and how he was familiar with the modis aperandi of gathering information without himself committing a crime and that he will employ his past experiences in the present investigation. Among several responses by the CIA operator, crucial to Mr. Flavius' defense, the operator stated that the CIA needed "CONFIRMATION" before they would act on the information provided to them by Mr. Georgescu. For the next forty five minutes during the telephone conversation, Mr. Georgescu outlined specifically his intended step by step process to gather information that will help save American lives. The CIA's response was "OK". (Please see, transcript of phone calls attached as Exhibit "A").

Mr. Georgescu expects the evidence at trial will show by clear and convincing evidence that he was gathering information for the CIA and he never intended to join the conspiracy in Counts One or Two. During the course of his current information and intelligence gathering process, similarly as in the course of his cooperation with the FBI, he never accepted a dime from any one connected with the current criminal conspiracy although he was offered to receive it on several occasions. He never delivered nor did he assist any one in delivering a single bullet to anyone involved in this conspiracy. His sole objective was to gather information and to deliver it to the CIA. He was

3

arrested before he could secure the signatures of all relevant parties on the written contract which he hoped to deliver to the CIA as "confirmation" they asked for.

Immediately after his arrest and without being asked a single question by the DEA Agents, Mr. Georgescu made an immediate and spontaneous outcry about his sole intent in this case to gather information for the CIA.   The first words out of his mouth were that "I am working for the CIA" and that he "needed to speak with SAs Lambert and Scott". (Please See, Exhibit "B") After being transported from the Hotel to a processing center, Mr. Georgescu knowingly waived his wright to counsel and continued to inform the Agents in great detail about his true intent in this case to help the U.S. Government. Georgescu had explained, as is illustrated by the Agent's notes, that he had went far beyond the fake FARC sting operation and had actually uncovered the entire arms laundering process of how phony End User Certificates are created and utilized to illegally smuggle arms into conflict zones in harms way of American troops (Please See Exhibit "C"). Mr. Georgescu offered the Agents to take over the investigation from that point on. They refused, claiming they had no procedure for it. While still in custody, Mr. Georgescu continued to cooperate by placing a DEA monitored phone call to decoy Mr. Massimo from Italy to Montenegro to be arrested. But for that phone call, it is unlikely that the U.S.

4

would secure extradition of Mr. Massimo from Italy where he is highly

politically connected and was even able to arrange for fake criminal charges

levied upon himself in Italy to hamper U.S. extradition and prosecution.

Although Mr. Georgescu waived extradition, he was still detained in

Montenegro for several months awaiting for his extradition.  While in custody

in Montenegro, Mr. Georgescu was interviewed three more times by United

States Officials from the Department of State, wherein he continued to declare

his ultimate intent to secure information for the United States to protect its

service men and women. (Please See, Exhibit "C")


## NEGATION OF INTENT

The crucial question in determining whether the "negation on intent"

defense is applicable to a particular crime is resolved by examining "the nature

of the intent element of the charged crime, and whether a defendant's belief that

his action were authorized by the government would negate the intent." *United

States v. Giffen, supra*. But, the government mistakenly posits the notion that

the only intent to be examined, when the crime under consideration is

conspiracy, is the intent element of the crime that is the object of the conspiracy.

5

See, Government's memorandum of Law, pp. 14-15. [1]

Footnotes

[1]    The government argues; By contrast, [to Count One] Count two alleges a conspiracy to
provide to material support to the FARC, in violation of Title 18, United States Code,
Section 2339B. That statute provides in pertinent part that, "[Whoever knowingly provides
material support or resources to a foreign terrorist organization, or attempts or conspires to
do so, shall be [guilty of a crime]." 18 U.S.C. 2339B(a)(1). By its terms, the statute"
imposes two express *scienter* requirements: that the aid be intentional and that the defendant
know the organization he is aiding is a terrorist organization or engages in acts of
terrorism." *United States v. Al Kassar*, 660 F.3d 108, 129 (2d Cir. 2011). The Second
Circuit has explicitly declined to impose a further intent requirement, rejecting the claim
that "defendant must intend that his aid support the terrorist activity." Id. (quoting *Holder v.
Humanitarian Law Project*, 561 U.S. 1, 16-17 (2011)."

    Perhaps the government did not notice that the cited and quoted portions of *Al Kassar*
they rely on for their argument concerning the intent necessary to prove conspiracy, refer
only on to the intent required to prove the object crime of the conspiracy. What *Al Kassar*
had to say about the requisite intent to be proved for conviction of conspiracy was first, the
defendant "must intend to agree to participate in the conspiracy and second, that defendant
knew the object crime of the conspiracy and intended to participate in it.

    And the Court of Appeals approved the instruction given by the District Court on
conspiracy:

    … the government must prove beyond a reasonable doubt
    each of the two elements: First, the existence of the charged
    conspiracy, as further described below; and second, that the
    defendant you are considering intentionally joined and
    participated in the conspiracy during the applicable time
    period in order to further its lawful purpose.

The law, however, is absolutely clear that in order to prove a conspiracy the

government must prove not only that defendant intended the commission of the

crime that is the object of the conspiracy but, in addition, the government must

prove that defendant intended to join in the conspiracy. See, e.g. *United States

v. Acosta*, 470 F.3d 132, 136-137 (2d Cir. 2006) ("A conspiracy conviction

6

requires, among other things, proof of a specific intent to join the conspiracy

with knowledge of its illegal purposes."); *United States v. Diez*, 736 F.2f 840,

843 (2d Cir. 1984) ("without proof of a deliberate, knowing, specific intent to

join the conspiracy" there can be no conviction). *United States v. Kham* is, 674

F.2d 390 (5th Cir. 1982) ("The evidence [to prove a conspiracy] must establish

that each conspirator knew the conspiracy, intended to join it, and participated in

it.); *United States v. Bulman*, 667 f.2d 1374 (11th Cir. 1982) we must be

satisfied.. that the defendants had the deliberate, knowing, specific intent to join

the conspiracy).

    In the first place, therefore, Mr. Georgescu intends to argue at trial that he

never intended to join the Conspiracy charged in this Indictment. Government's

onerous reliens  on **United States v. Giffen** to preclude the Defendant from

arguing lack of intent to commit the crime as charged, and to have the Court

charge the Jury that his intent is irrelevant here,  is erroneous under the facts and

the Indictment as charged in this case.  *Giffen*  does not address the application

of the "negation of intent defense" to the separate and distinct intent element of

joining the conspiracy rather than the application of that defense to the intent

element of the crime that is the object of the conspiracy.  *Giffen* reasoning deals

with self deputized individuals involved with the commission of substantive

crimes.   Therefore, understandably, in many cases, *"As the Court explained,*

*such an unwarranted extension of the good faith defense would grant any criminal carte blanche to violate the law should he subjectively decide that he serves the government's interests thereby, "* (Government brief at page 13). But in this case and under this indictment as charged, the defendant has not violated the law because he did not commit the crime of conspiracy unless and until the government proves beyond a reasonable doubt that he intended to join the conspiracy. The Defendant in this case, as in any case where a conspiracy is charged, is free to argue that he did not intend to join the conspiracy regardless of his own or others' over acts. The cases that the Government sites, speak directly at defendants intent to commit the object of the charged crime. Their reasoning by-passes the element of every conspiracy charged, that's is the intent to join the conspiracy which Georgescu will argue that he did not here.

In the second place, defendant intends to argue that, based upon his past experience with the FBI and the CIA conversation,[2] he had a good faith belief that he was acting with government authorization. The Second Circuit addressed the defense of "negation of intent" in *United States v. Giffen, supra at*

---

[2] Both evidences expected to be introduced at trial by stipulation between Government and Defense along with all other stipulations previously agreed to by parties.

8

*43-44.*, where they described it as follows:

> This is not an affirmative defense, but rather an attempt to
> rebut the government's proof of the intent element of a
> crime by showing that the defendant had a good-faith belief
> that he was acting with government authorization.

After noting that the defense had never before been considered by the

Second Circuit, the Court indicated that it had "great difficulty" with the notion

that the defense could be raised against all crimes but made it clear that its is a

proper defense to some crimes, depending on the nature of the intent element of

the charged crime, and whether a defendant's belief that his actions were

authorized by the government would negate that intent. As the *Giffen* Court put

it:

> The district court seemed to assume that, with respect to
> any crime, a defendant may raise a defense "that he honestly,
> albeit mistakenly, believed that he was committing the charged
> crimes in cooperation with the government." We have great
> difficulty with this proposition, which would swallow the
> actual public authority and entrapment-by-estoppel defenses.
> "Such an unwarranted extension of the good faith defense
> would grant any criminal carte blanche to violate the law
> should be subjectively decide that he serves the government's
> interests thereby. Law-breakers would become their own
> judges and juries. *United States v. Wilson*, 721 F.2d 967,
> 975 (4th Cir. 1983). We will assume for the purposes of
> argument---without expressing any view on the matter ----that,
> at least in some circumstances, a defendant may offer
> evidence that he lacked the intent essential; to the offense
> charged because of his good-faith belief that he was acting
> on behalf of the government. The relevance, and hence
> admissibility, of such a belief would depend, however,

9

> on the nature of the intent element of the charged crime,
> and whether a defendant's belief that his actions were
> authorized by the government would negate that intent.

(emphasis added.)

Here defendant's "good-faith belief that he was acting on behalf of the government" was based on his past history of working in cooperation with the FBI and his conversation with the CIA that defendant initiated after first being approached about procuring arms for FARC. In the CIA conversation defendant revealed specific and detailed information concerning the proposed crime including the identity of participants, the type and number of weapons sought and that the arms were to be used to kill Americans in Colombia. When the defendant was told that the CIA needed more information before it could act he offered to get that information if the CIA allowed him to continue the arms deal. The CIA did not reject defendant's offer and seemingly accepted it. *See, for example*, the following excerpt from the recording of the conversation:

> Def: If you want to find more you have to allow me to continue
> the deal, to see the EUC, the middle man, the everything and
> I can provide your more, more and more information because
> In this moment it's just the start ... you know ... it's just a
> small deal of $10 million. It's nothing. It's nothing that
> much, it's nothing important ... you know ...
>
> CIA: OK ...

10

The government apparently agrees that the "negation of intent' defense is an appropriate defense to some crimes, including conspiracy, since no motion was made by the government to preclude its use in connection with the conspiracy charged in Count One. Yet it is claimed that the defense is not appropriate in connection with the conspiracy charged in Count Two. In support of their argument, that the defense is not appropriate here for Count Two, the government sites cases with elements and holdings pertaining to substantive crimes, in opposite to the crime of conspiracy charged here. *("an intent to return money or property is not a defense to the charge of embezzlement" ... "that the offense of making a false statement in a passport application may be proven without regard to whether the defendant had any intent to make fraudulent use of the passport"... "The court properly instructed the jury that proof of motive is not an element of the offense of mail fraud").* However, as discussed above, in this case, unlike the cases sited by the government, no substantive crimes are charged nor did the defendant intend to and/or believed that he was committing any crime while he was gathering information for the CIA. The same can not be said for individuals who engaged in substantive crimes exemplified in the government's brief.  There is a reason why Defendant here is not charged with a commission of a substantive crime.  Because he did

not commit any.   At best, the government may argue that defendant's own overt acts illuminate on the issue of his intent or lack thereof to join the conspiracy.

Clearly then, in this case, intent to join the conspiracy is a critical element of the charged conspiracy and "defendant's belief that his actions were authorized by the government would negate the intent." *United States v. Giffen, supra.* Thus,  if the government does not prove, beyond a reasonable doubt, that defendant's actions were performed with the intent to actually join in the criminal conspiracy to kill Americans for Count One, and/or that the government does not prove, beyond  a reasonable doubt, that defendant's actions were performed with intent to actually join the criminal conspiracy to provide material support to a terrorist organization for Count Two, rather than with the intent of securing information to be turned over to the CIA, there must be acquittal.

Of course. Whether defendant actually had a "good-faith belief that he was acting on behalf of the government" to garner information is ultimately a question of fact for the jury.  But, a criminal defendant is entitled to a jury instruction reflecting his defense theory "for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court." *United States v. Dover*, 916 F.2f 41, 47 (2d Cir. 1990) (a defense theory must be charged so long as it has "some foundation in the proof, no matter how tenuous

that defense may appear to the trial court." *United States v. Dover*, 916 F.2d Cir.

1990).

As to the government's Requested Charge, Government's Memo p. 18

and 19 should be denied in all respects.

> *I instruct you as a matter of law that any subjective belief by the defendant that providing material support to the FARC was in the interest of the United States government is irrelevant to your consideration of his intent. As I have said, the question before you with respect to the defendant's intent is whether the Government has proven beyond a reasonable doubt that the defendant entered into an agreement to provide material support to the FARC knowing the FARC to be engaged in terrorist activity and intending to provide them with "material support or resources," in the forms that I have specified. The defendant's subjective belief as to the reason why he was providing the support is not relevant.*

The defendant has not and will not claim to have had a "subjective belief

that providing material support to the FARC was in the interest of the United

States government," as the government so smarmily suggests. Defendant will

argue that he did not enter into an agreement to provide material support, he will

argue that every action undertaken by him in connection to the proposed arms

deal was for the CIA, and defendant will argue that he did not believe that he

was providing material support and in fact that he did not provide any material

support to FARC.

In conclusion, with regard to intent for both Counts of the Indictment,

what must be proved by the government beyond reasonable doubt is twofold:

that defendant <u>intended to join the conspiracy</u> which has as its object the

provision of material support to FARC and that defendant did <u>not</u> have a good-

faith belief that he was acting with government authorization. The Government

Requested Charge does not properly state the law and incorrectly presumes

defendant's argument at trial.


II.    POST-ARREST STATEMENTS

Following his arrest, defendant made statements of two distinct types.

Immediately upon coming in contact for the first time with U.S. Agents, in the

hotel room where he had been arrested, defendant made a spontaneous utterance.

He indicated to the arresting Agents that he wished to speak to them out of the

presence of his co-arrestee. When taken to the side, he stated that "I worked for

the CIA" and "need to speak with the agents." The Agents told him "to sit on

the couch located in the room and stated to Georgescu he should stop talking and

listen". (Please See, Exhibit "B"). Shortly thereafter, Mr. Georgescu, despite

being told to stop talking continued to cooperate with the Agents by providing

them with detailed information about his underlying intent and everything that

he had learned for the CIA. (Please See Exhibit "C")

On or about December 19, 2014, December, 29, 2014, January 21, 2015

and February 17, 2015 Mr. Georgescu continued to voice his innocents and his

14

true intent in gathering information for the CIA when he continued to meet with representatives of the U.S. Government at Spotz prison in Podgorica, Montenegro. "During some of these meetings, Georgescu claimed that, several years ago, he had volunteered information to the FBI about international organized crime and arms dealing.  Georgescu stated, however, that the FBI did not continue meeting with him.  Georgescu then stated that he decided to pursue his own collection operations "on behalf of" the CIA and FBI, and that he had collected much information over the years.  He said the he was ready to present this information in the name of protective American citizens and the U.S. Georgescu gave his U.S. citizenship oath, with the phrase "against all enemies, foreign and domestic" underlined.  Georgescu then claimed again that his activities with arm dealers were aimed at collecting information on criminal who would harm the U.S.  Georgescu also spoke about his (Georgescu's) identity as an American citizen and the importance of his citizenship responsibilities. Georgescu stressed that he was engaging in the arms deal as a favor to the U.S. Government in order to collect what Georgescu considered to be important evidence against people who were trying to harm the U.S. …" (Please See, Exhibit "D")

15

DISCUSSION

Defendant seeks to offer in evidence those statements, or parts of statements in which he informs the agents that he works for the CIA, as well as the statements in which he claims, in substance, that he participated in the acts in question in order to gather evidence for the CIA.

The government moves to exclude all defendant's statements as inadmissible hearsay urging that they are (1) out-court statements (2) offered to "prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). That is wrong. The statements that defendant works for the CIA are not offered to prove the truth of the matter asserted i.e. that defendant actually worked for the CIA. They are offered to prove defendant's belief that he worked for and was gathering information for the CIA. The relevance of this belief being the central focus of his defense; that the defendant "had a good-faith belief that he was acting with government authorization" and therefore, lacked the intent to join the conspiracy required for conviction of that crime. *Giffen, supra.*

So too are defendants statements that he was gathering evidence for the CIA not offered for their truth. Those statements are offered to rebut the admission by silence that would flow naturally from these circumstances. Surely, under the present undisputed facts and the otherwise ostensible defense raised by Mr. Georgescu, jurors would expect that if defendant truly believed

16

that he was working for the CIA and gathering evidence for the Agency, he
would have said so at the earliest opportunity after arrest. *United States v.
Flecha*, 539 F.2d 874 (2nd Cir. 1976) (Silence is admissible as an admission if
"there are circumstances which render it more reasonably probable that a man
would answer the charge made against him that he would not"). And, if
defendant testifies, but is not allowed to testify that he told the arresting agents
of his relation to the CIA, the jurors, will undoubtedly draw the false conclusion
that he had not, and that his trial defense is a recent fabrication. This perceived,
but false, conclusion that defendant remained silent when an innocent man
would have spoken out would be taken as an unwarranted admission of guilt.

In this particular case it is all to clear that Georgescu's immediate, and
thereafter at every opportunity provided for by the U.S. Government,
exculpatory statements made by him would have been necessitated if his defense
has any chance of being viewed as credible. If the Jury will not be made aware
of the fact that he made exculpatory statements at the earliest and at every
opportunity he had, they will surely convict because his prior declarations of
innocence at the time of his arrest and thereafter are an indispensible variable to
his defense.

By withholding from the Jury the fact that he made the exculpatory
statements at every opportunity provided to him by the U.S. Government, the

17

Jury will be misled to believe that his defense is a recent fabrication. And that perhaps, Mr. Georgescu called the CIA for insurance purposes, as has been suggested by the prosecutors in this case in the past.

Moreover, and more disturbing, is that the exclusion of the fact-necessitated statements here proclaiming his, and only his, innocents  would add credence to the otherwise perceptibly false-swearing cooperators who intend to establish that shortly after their arrival in this country, the defendant encouraged both of them on separate occasions to make up a story predicated on the defendant's prior relationship with the FBI and that they were trying to "catch" the CSes.[3]  Unless the Jury is informed about Georgescu's prior statements, they would likely believe the false testimonies of the cooperators because Georgescu's own defense at trial will seem as a recently fabricated the defense. Unless, the Jurors are made aware of the fact that Mr. Georgescu had never mentioned any one of the two cooperators  in all of his prior exculpatory statements he made to the United Sates government prior to his extradition to the U.S.

---

[3]  Both cooperators were together imprisoned in the same unit at MCC while awaiting trial and both of whom, through discovery,  learned of Georgescu's defense, and that it was Georgescu who responsible for their arrests and extradition.

Should the statements come into evidence, as we urge upon this Court that hey should, it would then be rightfully difficult for the Jurors to imagine that Mr. Georgescu, whom the prosecutors have called the mastermind, would throw it all away by needlessly recruiting the other two individuals to join in his defense on the eve of trial, one of whom he decoyed to the U.S. authorities to be arrested, when he had never mentioned any one of them as his partners before. In fact, as is illustrated by Exhibit "B" Paragraph 4, Mr. "Upon SAs Lambert and Scott entering the room both observed Georgescu to be sitting on the hotel bed, handcuffed in the rear. When Georgescu was approached by SAs Lambart and Scott he stood up and motioned for SAs Lambert and Scott to step to the side away from Christian Vintila who was also present in the room. Once Georgescu and SAs Lambert and Scott stepped to the side Georgescu stated he was working for the CIA and needed to speak with SAs Lambert and Scott". He obviously meant to speak to them alone. Not in the presence of Mr. Vintilla. Nevertheless, if the Government chooses to put the cooperators on the witness stand to ensnare Georgescu, to the detriment of the credibility of their entire case, so be it. But, we respectfully ask this Court to allow for the Jury to be aware of everything relevant that had transpired leading to this trial where an innocent man hopes only for a fair trial by letting it all known to the Jury. To exclude defendant's

19

post arrest statements under these particular facts and his defense, the government is seeking from this Court a direct order of conviction.

But even if the statements were deemed to be hearsay, they would properly be admitted as an exception to the hearsay rule; Rule 803(2), excited utterance, or Rule 803(3), state of mind. *United States v. Lim,* 98 4F.2d 331, 336 (9th Cir.) (holding statements made during arrest are admissible under excited utterance exception); *Bemis v. Edwards,* 45 F.3d 1369, 1372 (9th Cir. 1995) (a statement by a 911 caller who is witnessing the violent arrest of a suspect by the police could qualify under either the present sense or excited utterance exception."); *United States v. Dimaria,* 727 F.2d 265 (2nd Cir. 1984) (statement tending to disprove the state of mind required for conviction admissible).

CONCLUSION

For the reasons set out above the government's motions, in *limine* should be denied.

Dated: Queens, New York
       April 25, 2016

                                        Respectfully submitted,

                                        *Albert Y. Dayan*

                                        Albert Y. Dayan