**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 14 CR 799 (RA) |
| Plaintiff, | |
| v. | |
| FLAVIU VIRGIL GEORGESCU, | |
| Defendant. | |

## SENTENCING MEMORANDUM OF
## <u>FLAVIU VIRGIL GEORGESCU</u>

**FRIED FRANK HARRIS**
  **SHRIVER & JACOBSON, LLP**
Steven M. Witzel
Jennifer L. Colyer
Michael P. Sternheim
1 New York Plaza
New York, New York 10004
Tel: (212) 859-8000
Fax: (212) 859-4000

*Attorneys for Defendant Flaviu*
  *Virgil Georgescu*

Flaviu Virgil Georgescu, by and through his undersigned counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining a sentence that is sufficient, but not greater than necessary for Mr. Georgescu.

### Preliminary Statement

In April 2012, Mr. Georgescu was informed by an acquaintance that individuals holding themselves out as representatives of the Fuerzas Armadas Revolucionarias de Colombia ("FARC") sought to procure $10 million worth of weapons.[1]  Although he was invited to participate in the deal, Mr. Georgescu did not engage with the purported FARC representatives. Rather, Mr. Georgescu almost immediately called a publicly-available telephone line for the Central Intelligence Agency ("CIA") to inform the agency of the FARC's plot to procure weapons.  Over the course of two phone calls with the CIA spanning more than forty-two minutes, Mr. Georgescu described the plot in detail and offered to assist the CIA with an undercover investigation to prevent the FARC from obtaining the weapons.

Mr. Georgescu's actions were not surprising.  Indeed, he had previously volunteered to work as an unpaid cooperating witness for the Federal Bureau of Investigation ("FBI") in Las Vegas, Nevada a decade earlier.

Two years later, the same purported FARC representatives contacted Mr. Georgescu, again seeking to procure weapons.  After receiving their call, Mr. Georgescu set out on a course of action that, remarkably, resembled the exact details of the undercover investigation he pitched to the CIA in 2012.  Of course, the purported weapons deal was, in fact, a sting operation

---

[1]    FARC is a guerrilla movement that has operated in Colombia since 1964.  It is classified as a foreign terrorist organization by the United States.  On October 2, 2016, Colombian citizens voted to reject a peace accord intended to end the 52-year conflict between the Colombian government and the FARC.  *See* Ex. B. On November 12, 2016, the Colombian government and the FARC agreed to a revised peace accord, but the agreement has not yet been approved by Colombian citizens or the national congress.  *See* Ex. C.

orchestrated by another arm of United States law enforcement, the Drug Enforcement Agency ("DEA").  Mr. Georgescu was subsequently charged and convicted of one count of conspiracy to kill officers and employees of the United States and one count of conspiracy to provide material support or resources to a foreign terrorist organization.  Now, the United States Probation Office (the "Probation Office") recommends that the Court impose a sentence of life imprisonment, consistent with its calculations under the United States Sentencing Guidelines (the "Guidelines").

Given the facts and circumstances here, of which the Court is aware, a life sentence would be manifestly unjust.  Accordingly, we respectfully request that the Court reject the life sentence recommended by the Probation Office and instead impose a non-Guidelines sentence that adequately reflects the unusual circumstances of Mr. Georgescu and this case, as set forth below.

### Procedural Background

On December 4, 2014, Mr. Georgescu, Christian Vintila, and Massimo Romagnoli were indicted by a grand jury in the Southern District of New York on one count of conspiracy to kill officers and employees of the United States and one count of conspiracy to provide material support or resources to a foreign terrorist organization.  On December 15, 2014, Mr. Georgescu and Vintila were arrested by officers of the Montenegrin National Police in Podgorica, Montenegro in connection with that indictment.  Romagnoli was arrested in Podgorica the next day, after Mr. Georgescu lured him to Montenegro in coordination with the DEA.   Mr. Georgescu and his co-defendants were held in custody in Montenegro until February 26, 2015, when they were extradited to the United States on the above charges.

In September 2015, Vintila and Romagnoli pleaded guilty to both counts.  Earlier this year, the Court sentenced Vintila and Romagnoli each to a term of incarceration of four years.

2

On May 25, 2016, Mr. Georgescu was convicted on both counts following a nine-day trial before this Court, and he is scheduled to be sentenced on December 2, 2016.  In connection with the sentencing in this case, the Probation Office prepared a Presentence Investigation Report ("PSR") in which it calculated an Offense Level of 53, Criminal History Category of VI, and a Guidelines range of life imprisonment.  Consistent with its Guidelines calculation, the Probation Office recommends a sentence of life imprisonment.

## Argument

### I.      A Downward Departure is Warranted Under the Guidelines.

#### A.      Mitigating Circumstances Warrant a Downward Departure.

Sentencing courts have the authority to depart downward from the Guidelines range in unusual or atypical circumstances not contemplated by the Guidelines.  *See Koon v. United States*, 518 U.S. 81, 94 (1996).  For example, Section 5K2.0 of the Guidelines provides a court with discretion to grant a downward departure if mitigating factors exist "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described."  U.S.S.G. § 5K2.0(a)(1).  The Guidelines could not and certainly did not take into account the unusual circumstances presented by the instant case.

In or about April 2012, individuals holding themselves out as representatives of the FARC contacted Andi Georgescu (no relation) to procure approximately $10 million in weapons.  Andi Georgescu reached out to Mr. Georgescu regarding the deal, but Mr. Georgescu did not agree to participate.  Instead, during two calls with the CIA, Mr. Georgescu described what he had heard about the purported weapons deal from Andi Georgescu in detail, and expressed his grave concern that, not only would the weapons be used to harm Americans, but that the buyers

3

would continue to purchase more weapons in the future.  To prevent this from happening, Mr.

Georgescu offered to go undercover to investigate the deal and provide the CIA with the

information that he discovered.

Mr. Georgescu's calls with the CIA merit a significant downward departure under

Section 5K2.0 of the Guidelines.  The Second Circuit has recognized that, although Section

5K1.1 of the Guidelines generally governs the credit a defendant receives for assisting the

government, there is an exception to this rule "where the defendant offers information regarding

actions he took, which could not be used by the government to prosecute other individuals

(rendering § 5K1.1 inapplicable), but which could be construed as a 'mitigating circumstance'

for purposes of § 5K2.0."  *United States v. Khan*, 920 F.2d 1100, 1107 (2d Cir. 1990).  In *Khan*,

the defendant sought a Section 5K2.0 departure, arguing on appeal that he had provided

information to the government that saved the life of a kidnapped confidential DEA informant.

*Id.*  Ultimately, the Second Circuit found that a Section 5K2.0 departure was unavailable on

procedural grounds because the defendant had failed to present this information to the sentencing

court.  *Id.*  However, the Court's analysis of the substance of the defendant's claims in dicta is

instructive:

> If, as Khan alleges, he did in fact save the life of a confidential
> DEA informant who had been kidnapped by Pakistani heroin
> traffickers, this information could not provide direct benefit to the
> government in its prosecution of others.  Nevertheless, if true, it
> certainly reflects well on defendant's character and could have
> provided a mitigating factor at his sentencing.  Because rescuing
> confidential informants from the jaws of death is not a grounds for
> departure taken into account by the Guidelines, the district court is
> empowered to consider it as a possible grounds for downward
> departure under § 5K2.0.

*Id.*; *see also United States v. Stoffberg*, 782 F. Supp. 17, 19-20 (E.D.N.Y. 1992) (although

defendant's cooperation with Congressional investigation regarding the hostage situation in Iran

did not result in criminal prosecution of other individuals, it nevertheless merited a downward

departure under Section 5K2.0).  Mr. Georgescu's calls with the CIA present an extraordinary

mitigating circumstance that merits a downward departure under Section 5K2.0.

First, this was not a mere anonymous tip.  Over the course of two phone calls spanning

**forty-two minutes and thirty-eight seconds**, Mr. Georgescu provided a detailed account of the

proposed weapons deal and explained his suspicion that the buyers sought to harm American

interests.  Among other things, Mr. Georgescu told the CIA:

- The full list of weapons that the purported buyers sought to purchase.  *See* Ex. E at 6 ("The first one it is AK-47 7.3 millimeters, . . . and 5.45 millimeters, FPG-7, . . . second one, it's M4 Carbine, okay . . . anti-personnel mines, whatever you have in stock. Uh, the order, uh, to stock will be . . .  one thousand pieces of each item. Please advise the price, and the . . . availability.").

- His suspicion that the weapons would go to the FARC, who would use the weapons to harm Americans.  *See id.* at 7 ("Yeah, these, these guys from, uh, Miami, . . . they are Colombian citizens. And they have . . . the guerillas and stuff like that over there."); *and see id.* at 11 ("I was try to provide this information to you, you know, you have a lot of headache in Colombia all the time, and . . . a lot of agents were killed over there, and . . . I'm not happy with that.").

- The buyers' attempt to secure a fraudulent End-User Certificate ("EUC") to illegally purchase and transport the weapons to Colombia.  *See id.* at 7 ("they cannot provide the end-user certification, because I tell them like that: send me the end-user certification, and it is a database which I can check the end-user certification which is legal or not. And after that they said, yeah, you know, can you increase the prices and, uh, help us . . . ."); and *see id.* at 10 ("I ask him for a end-user certification. He said, I don't have one.").

- Details regarding Andi Georgescu, including his phone number, as well as his home and business addresses.  *See id.* at 9 (phone number), 15-18 (home and business addresses).

The CIA telephone operator told Mr. Georgescu that the CIA was interested in the information

Mr. Georgescu provided and that it needed to verify that information.  *See id.* at 10 ("It's

definitely something that, if we can verify, would be of interest to the, to the Agency to be aware

of, you know.  Again, particularly if these guns are going to . . . cartels.").

5

Second, Mr. Georgescu repeatedly told the CIA telephone operator that he wanted to help the CIA investigate the buyers, just as he had worked with the FBI to investigate Eurasian organized crime a decade earlier.[2]  *See id.* at 10 ("these guns they don't go in United States, they go to Colombia, but the thing it is . . . you want me investigate some"); *and see id.* at 11 ("We have to protect each other.  This is the way we have to work together").  During the calls, Mr. Georgescu made it clear that he offered to investigate the deal to help the United States.  *See id.* at 13 ("I help you with all my, with all my heart, every help from me to the United States government come from my heart").

Mr. Georgescu then proposed an undercover investigation of the weapons deal.  *See id.* at 13 ("start the investigation, and after that, don't do anything – let me to get more deeper and deeper . . . .").  His proposal mirrored the course of action upon which he eventually embarked two years later – he offered to go undercover as a witness for the CIA, continue the arms deal to collect information for the CIA, identify the middlemen involved, and determine how the buyers would obtain the EUC.  *See id.* at 10 ("If you want to find more, you have to allow me to continue the deal, to see the end-user certification, the middleman, everything, and I can provide you more, more, and more information"); *and see id.* at 13-14 ("You just give me a call, or someone, and tell me, 'go forward.'  And I go forward, and when I get the middleman in Nigeria or Sierra Leone, I provide all your information . . . . In my opinion, you don't have to stop anything right now. . . . But we have to go forward, forward, forward to see everything how, how they work . . . ."); *and see id.* at 16 ("we have to allow [Andi] to continue the deal, to find the whole, the whole picture.  You know, right now . . . I can't put everything together – I don't

---

[2]       The parallels between Mr. Georgescu's offer to assist the CIA and his work with the FBI are addressed in detail in section II.C.ii, *infra*.

know the people from . . . Colombia.  I don't know the country which is the audition to be middleman in this transaction.").

Mr. Georgescu was not aware that he was informing the CIA of a weapons deal that was, in fact, a long-running DEA sting operation designed to build criminal cases against suspected arms dealers.  That this case arises from a sting operation is another significant factor relevant to the sentencing.[3]  But the fact that Mr. Georgescu was unwittingly informing one arm of U.S. law enforcement regarding a sting operation orchestrated by a <u>separate</u> arm of U.S. law enforcement is truly remarkable, and makes this case unique.

Mr. Georgescu ultimately did "go forward" when the purported FARC representatives contacted him in May 2014.  He undertook the undercover operation he proposed to the CIA in 2012, but he was ultimately arrested in connection with the DEA's sting operation.

Although Mr. Georgescu was not able to prove his affirmative defense of entrapment by estoppel at trial, the CIA calls nevertheless merit a Section 5K2.0 downward departure under the standard articulated by the Second Circuit in *Khan*.  Because the subject of the CIA call was, in fact, a DEA sting operation, the information Mr. Georgescu provided to the CIA could not be used prosecute the buyers.  However, the CIA calls "reflect[] well on [Mr. Georgescu's] character" and should be a mitigating factor at his sentencing.  *See Khan*, 920 F.2d at 1107.  Accordingly, a downward departure is warranted here.  *See* U.S.S.G. § 5K2.0(a)(1).

---

[3]  Judges in the Southern District have held that the fact that a case arises from a sting operation is a mitigating factor where, as here, there is no evidence that the defendant would have participated in the charged offenses <u>but for</u> the sting operation itself.  *See* Transcript at 33, *United States v. Bout*, No. 08-cr-00365 (SAS), Dkt. No. 97 (S.D.N.Y. Apr. 5, 2012) (attached as Exhibit F) ("While the government argues that the fact that this case arises from a sting operation is not a mitigating factor, I disagree.  But for the approach made through this determined sting operation, there is no reason to believe that Bout would ever have committed the charged crimes.").

B.      No Obstruction of Justice Enhancement is Warranted.

The PSR recommends a two-level upward adjustment to Mr. Georgescu's Offense Level for obstruction of justice.  PSR at ¶ 50.  The stated basis for this adjustment is the testimony of Vintila and Romagnoli, who alleged at trial that Mr. Georgescu attempted to recruit them to join his defense and prevent them from cooperating with the government.  *Id.* at ¶ 39.  These allegations do not warrant the recommended upward adjustment.  The verdict did not address this subject and there is no indication that the jury found that the witnesses' testimony on this subject was reliable.[4]

## II.      The Section 3553(a) Factors Support a Non-Guidelines Sentence.

Whether or not the Court grants a downward departure, the Court should nevertheless also impose a below-Guidelines sentence under the factors set forth in 18 U.S.C. § 3553(a).

A.      Legal Framework under Section 3553(a)

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are, merely, guidelines and courts are not constrained by them when imposing a sentence.  Although the "advisory" Guidelines should serve as a "starting point and . . . initial benchmark," they are but one factor in the sentencing determination.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Court is required to "make an individualized assessment based on the facts presented," (*id.* at 50) in order to "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing.  18 U.S.C. § 3553(a)(1).

---

[4]      Although the PSR does not take a position on Mr. Georgescu's trial testimony, the government contends that Mr. Georgescu also obstructed justice when testifying at trial.  *See* PSR at ¶ 40.  The Court should likewise decline to impose an obstruction of justice enhancement as to Mr. Georgescu's trial testimony because the testimony was consistent with the evidence the defense proffered, as well as Mr. Georgescu's prior statements to the government regarding his conduct.

The factors the Court must consider when determining the sentence are set forth at 18 U.S.C. § 3553(a).  In addition to the applicable Guidelines range, the Section 3553(a) factors include: the history and characteristics of the defendant, the nature and circumstances of the offense, whether the contemplated punishment would serve the purposes of sentencing such as deterrence, public safety and rehabilitation, and the need to avoid unwarranted sentence disparities.  *See* 18 U.S.C. § 3553(a).  The Court may also consider "'any and all information that reasonably might bear on the proper sentence for the particular defendant[,]'" including the factors listed in Section 5H of the Guidelines (*e.g.*, age, socioeconomic status, and employment history).  *See United States v. Juwa*, 508 F.3d 694, 700 (2d Cir. 2007) (quoting *Wasman v. United States*, 468 U.S. 559, 563 (1984)).

    B.    Nature and Circumstances of the Offense

As discussed above, Mr. Georgescu's calls to the CIA present unusual mitigating circumstances that warrant a downward departure.  For the same reasons, the information Mr. Georgescu provided to the CIA regarding the purported attempt to procure weapons and his offer to investigate the deal for the CIA justify the imposition of a below-Guidelines sentence.  And, as explained below, Mr. Georgescu's post-arrest assistance to the United States while in custody in Montenegro provides further support for a below-Guidelines sentence.

First, upon his arrest during the evening of December 15-16, 2014, Mr. Georgescu gave a statement to DEA Special Agents Robert Scott and Adam Lambert.  *See* Ex. G.  His interview with the agents lasted more than two hours.  *See id.* at 5.  Mr. Georgescu fully and completely outlined the work he had performed since May 2014.  *See id.* at 2-5.  In providing this account to the DEA agents, Mr. Georgescu identified numerous high-level weapons manufacturers and weapons brokers that his co-defendants recruited, all of whom were willing to supply weapons to the FARC.  *See id.*  Specifically, Mr. Georgescu provided names, corporate affiliations, and

9

contact information for several of his co-defendants' associates in the arms industry, including Werner Wintermeyer, Gerardo Tanga, Peter Menchikov and Stefan Penchev (who are associates of Romagnoli), as well as Viktor Chumakov (who is an associate of Vintila).  *See id.* at 3-5.  At the conclusion of the post-arrest interview, Mr. Georgescu expressed his interest in continuing to cooperate with the DEA.  *See id.* at 5.

Mr. Georgescu also cooperated with the government to secure Romagnoli's arrest.  The morning after Mr. Georgescu's arrest, Mr. Georgescu assisted the DEA by calling Romagnoli and luring him to Montenegro.  *See* Ex. H.  Following this call, Romagnoli traveled from Italy to Podgorica, Montenegro, where he was arrested by Montenegrin police.  *Id.*

Finally, Mr. Georgescu provided information regarding the criminal activities of others when he was interrogated by representatives of the United States while in custody in Montenegro.  *See* Ex. I at 1 ("[Mr.] Georgescu then stated that he decided to pursue his own collection operations 'on behalf of' the CIA and FBI, and that he had collected much information over the years. He said that he was ready to present this information in the name of protecting American citizens and the U.S.").  Mr. Georgescu was interrogated on four occasions while in custody.  *See id.*  Although the matters Mr. Georgescu discussed during the interrogations are classified, Mr. Georgescu maintains that he provided information regarding a weapons deal in Libya and corruption at the Malaysian state investment fund, 1MDB.[5]

In sum, Mr. Georgescu's calls to the CIA from Romania, coupled with his post-arrest assistance to the DEA in Montenegro (as well as his work as a cooperating witness with FBI in Las Vegas, Nevada, discussed *infra*) demonstrate a character for cooperation and merit a below-Guidelines sentence.

---

[5]  The classified information has been addressed separately in a sealed letter to the Court from Mr. Witzel.

C.    History and Characteristics of the Defendant

Mr. Georgescu's unusual conduct in this case can only be fully understood when viewed in the context of his history and personal characteristics.  In particular, Mr. Georgescu's actions must be viewed through the prism of two animating sets of facts: (i) Mr. Georgescu's upbringing in Romania and (ii) Mr. Georgescu's prior cooperation with the FBI.

i.    *Mr. Georgescu's Upbringing in Ceausescu's Romania.*

Mr. Georgescu was born in Alexandria, Romania in 1972.  His parents were geologists employed by the state-owned petroleum company.  They traveled during much of Mr. Georgescu's childhood, so Mr. Georgescu was raised primarily by his grandparents on the family farm in Alexandria.  Mr. Georgescu had a comfortable upbringing in his family home, but the dominant force and influence over Mr. Georgescu's life, as well as the lives of all Romanians, during that period was the oppressive totalitarian regime of Nicolae Ceausescu.

Under Ceausescu, the state controlled all facets of life in Romania.  The state owned all real property, instituted rationing programs to regulate access to food and electricity, and exercised total control over the dissemination of information.  *See* Ex. J at 2.  Ceausescu did not tolerate political dissent and he utilized a secret police force, the "Securitate," to root out and silence opposing views and voices.  *See* Ex. K at 1.  Those expressing or merely suspected of holding dissenting views were arrested, tortured, sent to labor camps and, sometimes, killed.  *See* Ex. L at 1.  The Securitate used a system of informants and collaborators within the population to collect information and investigate suspected dissidents.  *See* Ex. M at 9-10.  Informants provided information to the Securitate to ingratiate themselves with the state or for their own protection.  *See id.*  The perceived power and reach of the Securitate created a culture of overwhelming suspicion throughout Romania during Ceausescu's rule.

Mr. Georgescu was born six years after Ceausescu rose to power, and he spent his formative years living under Ceausescu's rule.  Growing up in Romania during this time, Mr. Georgescu was taught that he had to be on the "same side" as the government, regardless of the government's actions.  He had a very real fear that opposing the oppressive Ceausescu regime could result in imprisonment or death.  In Mr. Georgescu's young mind, he could be a "friend" to the government and a "good citizen" by collecting information to give the government when called upon.

In that environment, Mr. Georgescu viewed himself as a "secret agent."  He felt as if he was working undercover to discover information to share with the government.  Indeed, Mr. Georgescu developed an ambition to become an actual "secret agent," a sentiment he shared with the Probation Office during his presentence interview.

Ceausescu's regime collapsed following a violent political revolution in 1989; however, Mr. Georgescu's deeply ingrained views regarding his relationship with the government continue to influence him to this day.  After immigrating to the United States in 1998 and becoming a United States citizen in 2003, Mr. Georgescu views the United States as his country.  He has a deep appreciation of the liberty he has experienced as a citizen of the United States, and he views helping the United States government as an essential part of being a "good citizen."

Mr. Georgescu's worldview is clearly reflected in his voluntary calls with the CIA.  The fact that Mr. Georgescu called the CIA is, alone, indicative of his desire to be a "friend" to the United States.  Indeed, Mr. Georgescu repeatedly and directly articulated this motivation to the CIA telephone operators.  *See* Ex. E at 2 ("I was just try[ing] to be useful to the U.S. government because I love that country and, you know, I'm so proud to be a . . . U.S. citizen. That's all, you know."); *and see id.* at 3 ("And believe me or not, . . . when I have . . . the chance to help [the]

U.S. government and help that country, I consider my country, too, . . . I help them.").  Mr. Georgescu's post-arrest assistance to the United States, as described above, evidences this same attitude.  *See* Ex. I at 1.

The CIA calls also demonstrate Mr. Georgescu's long-held residual fear of the Romanian government.  Mr. Georgescu repeatedly declined requests by the CIA telephone operators that he go to the American embassy to discuss the potential arms deal, explaining that the Romanians working there would recognize him and inform the Romanian government of his actions.  *See* Ex. D at 4 ("No, no, no . . . in the Embassy works a lot of Romanians, they know me, you know . . . "); *and see* Ex. E at 4 ("Around your Embassy in Romania, all the time . . . is a lotta [sic] Romanian services . . . and, you know, they take pictures for everyone which they going inside. . . . Because this is the way the works, the, you know, the services.").  In a similar vein, Mr. Georgescu also made clear to the CIA telephone operators that he would not work with Romanian security agencies.  *See id.* at 14 ("But . . . don't ask me never to go to the Embassy or to be in touch with the Romanian agency . . . [and] don't ask me to cooperate with the Romanian local things, because there's nothing happening in Romania.  We don't have to discuss anything in Romania . . . .").

Because Mr. Georgescu's upbringing in Romania helps explain his conduct in this case, it is a relevant consideration when determining his sentence.

  ii.  *Mr. Georgescu's Work with the Federal Bureau of Investigation.*

Mr. Georgescu's work with the FBI is similarly relevant.  Between June 2001 and August 2003, Mr. Georgescu served as a cooperating witness with the FBI's Organized Crime Unit in

Las Vegas, Nevada, providing information regarding the illicit activities of Eurasian criminal organizations.[6]

Mr. Georgescu's early interactions with his FBI case agents demonstrate his interest in being a "friend" to the government, with his only motivation being his desire to assist the FBI. Shortly after he began cooperating with the FBI, Mr. Georgescu told his case agents that he did not want to be labeled an "informant" and, instead, he would prefer to be considered a "friend" of the FBI.  *See* Ex. N at FG000122.   To demonstrate his "friendship," Mr. Georgescu offered his case agent three bottles of wine as a "gift."  *See id.*  Despite the agent's protests regarding this gift, Mr. Georgescu left the wine with the agent.  *Id.* at FG000122-23.

Mr. Georgescu's arrangement with the FBI was atypical, but it similarly reflected his desire to be a "friend" to the government.  First, Mr. Georgescu's offer to assist the FBI was entirely voluntary.  Motivated only by his desire to be a "good citizen," Mr. Georgescu approached the FBI "on his own initiative" and told agents that he wanted to provide information regarding criminal activity in the area.  *See* Ex. O at 1.  Unlike many informants and cooperators, Mr. Georgescu was neither accused of any crime, nor asked to cooperate.  Indeed, he had never been arrested and was not suspected of any criminal activity.  Second, throughout his tenure as a cooperating witness, Mr. Georgescu neither requested nor accepted any compensation for the information he provided to the FBI.[7]  *See id.*  In fact, he specifically told his case agents that he did not want any money, he just wanted to help the United States.  *See* Ex. N at FG000122.

---

[6]     Mr. Georgescu was officially opened as a cooperating witness by the FBI on or about July 5, 2001.  *See* Ex. N at FG000115.  He was officially closed as a cooperating witness on or about August 4, 2003.  *See id.* at FG000093-94.

[7]     Mr. Georgescu was reimbursed by the FBI in the amount of $573.02 for expenses incurred in the course of his cooperation.  *See* Ex. N at FG000094.

In his work as a cooperating witness for the FBI, Mr. Georgescu viewed himself as an undercover agent. He provided the FBI with information regarding criminal activities such as credit card fraud, falsification of official documents (including, but not limited to, green cards, driver's licenses, and passports), illegal prostitution, and narcotics distribution. *See id.* at FG000118-20, FG000125, FG000127-28, FG000161, FG000163. During his two years working with the FBI, Mr. Georgescu met with his case agents on at least twenty occasions. He provided information regarding at least twenty-five individuals that directed, worked for, or otherwise associated with Eurasian criminal organizations. Mr. Georgescu not only provided the names and aliases of the involved individuals, but other identifying information, including phone numbers, addresses, and license plate numbers. *See, e.g.*, *id.* at FG000165-66. In addition, Mr. Georgescu once traveled alone to Seattle, Washington for the FBI to gather information regarding a criminal subject. *See id.* at FG000105-06. Mr. Georgescu's work as a cooperating witness enabled the FBI to identify criminal subjects, initiate investigations, obtain search warrants, make arrests, and secure indictments. *See id.* at FG000109, FG000111, FG000117, FG000126.

The connection between Mr. Georgescu's assistance to the FBI and his attempts to assist the CIA nearly a decade later is readily apparent. In both instances, Mr. Georgescu observed criminal activity and not only notified the government, but proactively volunteered to assist with an investigation into that criminal activity. And, in both instances, Mr. Georgescu's offer to cooperate was entirely voluntary and motivated only by a desire to assist the United States. In fact, Mr. Georgescu's approach to the CIA in 2012 virtually mirrors his approach to the FBI in 2001:

- Mr. Georgescu notified the CIA of potential illegal activity and volunteered to operate undercover to provide more information, just as he did for the FBI. *See* Ex. E

15

at 13 ("That's why I said start the investigation, and after that, [you] don't do anything – let me to get more deeper and deeper. . . . I was educated undercover operations, and I know everything.").

- Mr. Georgescu did not want to testify regarding the information he obtained as part of his cooperation. *See id.* at 4 ("my request you is to don't be a . . . testif[ying] witness. I'm a not a testifying witness.")

- Mr. Georgescu did not ask for money or anything else in return for his assistance. *See id.* at 14 ("I'm not coming with you like a lot of people comes to you, and maybe they say, you know, I give you something and I need something back. . . . I don't need anything. I don't need money, I don't need anything.").

The similarities are striking. In effect, Mr. Georgescu attempted to recreate his arrangement with the FBI, confirming his genuine interest in assisting the CIA with an investigation of the purported FARC scheme to procure weapons from Andi Georgescu.

Mr. Georgescu's upbringing in Romania and his work with the FBI provide critical context for the four year odyssey that began with Mr. Georgescu calling the CIA in April 2012 and concluded with his conviction before this Court in May 2016. These aspects of his life are also essential to understanding Mr. Georgescu's character. Furthermore, Mr. Georgescu's family and friends submitted letters to the Court that attest to his good character. *See* Ex. A. Accordingly, we request that the Court consider these aspects of Mr. Georgescu's background and history in imposing a non-Guidelines sentence here. *See* 18 U.S.C. § 3553(a)(1).

D.    The Purposes of Sentencing

The Court must also consider whether the sentence imposed will serve the purposes of sentencing. *See* 18 U.S.C. § 3553(a)(2). The excessive life sentence recommended by the Probation Office quite clearly does not. Although within the Guidelines range, a life sentence is inconsistent with the purposes of sentencing for four critical reasons: (i) it reflects the unwarranted and unjust application of the Terrorism Enhancement under Section 3A1.4(a) of the Guidelines; (ii) it reflects the unnecessary application of the Official Victim Enhancement; (iii)

it creates unwarranted sentencing disparities insofar as it exceeds the sentences imposed in several other cases involving DEA sting operations; and (iv) it is far longer than necessary to promote deterrence and protect the public.

       i.      *The Application of the Terrorism*
                     *Enhancement is Unwarranted and Unjust.*

This is not a terrorism case.  Mr. Georgescu is not a terrorist.  Yet, due to the Probation Office's use of the Terrorism Enhancement, Mr. Georgescu faces an automatic 12-level enhancement to his Offense Level and an increase in his Criminal History Category from I (0 criminal history points) to VI.  The circumstances here simply do not warrant such an extreme enhancement to Mr. Georgescu's sentence and we ask that the Court decline to apply the Terrorism Enhancement here.  Alternatively, the Court may grant a downward departure on the grounds that the Terrorism Enhancement "over-represents the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (internal quotation marks omitted).

The Terrorism Enhancement is unwarranted because there is no evidence that Mr. Georgescu wished to attack Americans or actively sought to participate in the FARC or any other terrorist organization before he was contacted by the DEA's confidential sources.  To the contrary, there is substantial evidence in this case demonstrating that Mr. Georgescu was interested in assisting the United States and its citizens.  Mr. Georgescu is a former <u>volunteer</u> cooperating witness with the FBI who <u>proactively</u> notified the CIA of a plot to purchase weapons for the FARC and offered to go undercover to investigate that plot.  Indeed, as noted above, Mr. Georgescu repeatedly explained to the CIA telephone operators that he contacted the CIA and volunteered to investigate the weapons deal because of his love for and desire to assist the United States.  *See* Ex. E at 1 ("I was just try[ing] to be useful to the U.S. government because I love

that country and, you know, I'm so proud to be a . . . U.S. citizen."); *and see id.* at 3 ("And believe me or not, you don't know me, but, when I have  . . . the chance to help U.S. government and help that country, I consider my country, too, I, I help them.").[8]

On the other hand, the evidence supporting the use of the Terrorism Enhancement here amounts to a handful of statements Mr. Georgescu made during recorded conversations with the DEA's confidential sources.  While these statements reflect negative sentiments towards the United States, they do not evidence an intent to commit acts of terrorism.[9]  Mr. Georgescu was egged on by the DEA's confidential sources, who made repeated anti-American statements as part of their role in a sting operation intended to build a case against him for providing material support to a terrorist organization.  On these facts, the 12-level increase in Mr. Georgescu's Offense Level under the Terrorism Enhancement is entirely unwarranted.

The Terrorism Enhancement is also unjust because it places Mr. Georgescu in Criminal History Category VI, despite the fact that he has no criminal history whatsoever.  *See United States v. Nayyar*, No. 09-cr-1037 (RWS), 2013 U.S. Dist. LEXIS 79002, at *21-22 (June 4, 2013) (use of Terrorism Enhancement for defendant with no criminal history was "inequitable" because it would result in the defendant "being punished to the same extent as would be an offender with a lengthy and serious criminal record, who has demonstrated continual recidivism and a lack of ability to reform").  Mr. Georgescu has never been arrested before, and he has zero criminal history points.  He should not be punished as if he were a serial offender.  *Id.* Furthermore, the unjust increase in Mr. Georgescu's Criminal History Category from I to VI has

---

[8]     Mr. Georgescu similarly communicated his desire to help the United States and protect American citizens when he was interrogated by representatives of the United States in Montenegro.  *See* Ex. I at 1-2.

[9]     Although Mr. Georgescu was not able to prove his affirmative defense at trial, he testified that he did not mean what he said about Americans during the recorded conversations.  *See* Ex. P ("Q: Did you mean what you said about Americans? A: Never, Never.  It was just simple, simple words from the mouth.  Nothing else. Not in the mind, not in the heart.").

the potential to drastically change the conditions of his confinement by, for example, changing his designation from a medium security prison to a maximum security prison.

The Court's decision not to apply the Terrorism Enhancement in *United States v. Bout*, No. 08-cr-365 (SAS) (S.D.N.Y.) is instructive. There, the defendant, unlike Mr. Georgescu, was a "well known and long time international arms dealer." *See* Ex. F at 28. He attempted to sell 5,000 AK-47s, C4 explosives and millions of rounds of ammunition, as well as 700-800 surface-to-air missile to individuals posing as representatives of the FARC in a similar DEA sting operation. *See id.* at 6. During meetings with the DEA's confidential sources, the defendant praised the FARC and demonstrated familiarity with its methods and its goals. *Id.* at 22. At trial, the defendant was convicted of four counts, including (1) conspiracy to kill U.S nationals; (2) conspiracy to kill officers and employees of the United States; (3) conspiracy to acquire and use anti-aircraft missiles; and (4) conspiracy to provide material support or resources to a foreign terrorist organization. *Id.* at 5. The defendant's Guidelines sentence was life imprisonment, with a mandatory minimum of 25 years for the missiles-related offense. *Id.* The Guidelines range reflected, among other things, the use of the Terrorism Enhancement to calculate the defendant's Offense Level. *Id.*

At sentencing, the Court imposed a non-Guidelines sentence of 25 years, the mandatory minimum sentence. The Court declined to impose a Guidelines sentence because, among other things, the "use of the terrorism enhancement to increase the offense level by 12 levels and to place the defendant in criminal history category VI, despite no criminal record at all, creates an extraordinarily high guideline range that . . . is fundamentally unfair to this defendant, given all the circumstances of this offense." *Id.* at 34-35. In particular, the Court noted that, like here, there was no evidence that the defendant was "actively looking for an opportunity to become

19

involved with a terrorist organization . . . or looking for a way to attack Americans." *Id.* at 35. Accordingly, the Court distinguished *Bout* from "[t]he vast majority of terrorism cases around the country [that involve] individuals who sought out opportunities to join a terrorist organization for the sole purpose of harming Americans or American interests." *Id.* at 36.

      For the reasons articulated above, the use of the terrorist enhancement here would be even more "fundamentally unfair" to Mr. Georgescu.   In particular, Mr. Georgescu's calls to the CIA evidence Mr. Georgescu's genuine interest in helping the United States and protecting its citizens and it is entirely consistent with his past cooperation with the FBI.   Accordingly, the Court should not consider the Terrorism Enhancement in sentencing Mr. Georgescu.

      ii.    *The Enhancement for Official Victims is Likewise Unwarranted.*

      For largely the same reasons articulated in Section II.D.i, *infra*, the Court should also decline to apply the six-level enhancement for official victims under Section 3A1.2 of the Guidelines, as recommended in the PSR.  In particular, the evidence that Mr. Georgescu sought to attack or harm United States officers or employees is outweighed by his past efforts to cooperate with the United States, as well as his calls to the CIA to report the potential weapons deal.  Moreover, the six-level enhancement is entirely duplicative of the charge (which already carries an Offense Level of 33) and, therefore, represents the unjust "piling-on of points" that leads to inequitable sentences under the Guidelines.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (internal quotation marks omitted), *aff'd* 301 F. App'x 93 (2d Cir. 2008).

      iii.    *A Life Sentence Creates Unwarranted Sentencing Disparities.*

      A life sentence is also unjustified because it would create unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6) (requiring sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct").  In recent cases arising from DEA sting operations that involved confidential sources posing as FARC members and resulted in convictions on charges similar to or more serious than the instant case, this Court has consistently imposed below-Guidelines sentences.  *See* Judgment, *United States v. Garavito-Garcia*, 12-cr-839 (JSR) (S.D.N.Y. Jul 22, 2015) (25 years) (attached as Ex. Q); *Bout*, No. 08-cv-365 (SAS) (25 years); Transcript, *United States v. Al Kassar*, No. 07-cr-354 (JSR), Dkt. No. 126 (S.D.N.Y. Feb. 24, 2009) (30 years for Monzer Al-Kassar; 25 years for Luis Felipe Moreno Godoy) (attached as Ex. R).  In those cases, judges in the Southern District of New York imposed non-Guidelines sentences despite the fact that the defendants were known to be long-time weapons dealers and the charges included missiles-related offenses that carried 25-year mandatory minimum terms of imprisonment.  Because the instant case does not involve the aggravating factors present in the past DEA sting cases and presents substantial mitigating factors, any sentence approaching 25 years would be greater than necessary and, indeed, entirely unjustified.

The Court's analysis in *Bout* is, again, instructive because the defendant there faced life in prison.  *See* Ex. F at 5.  At sentencing, the Court imposed a non-Guidelines sentence of 25 years imprisonment, reflecting the mandatory minimum.  *See id.* at 26-27.  The Court held that the Guidelines range of life was inappropriate because: (i) the defendant was the target of a sting operation designed to make a case against him, despite the fact that he had not previously "committed a crime chargeable in an American court in all his years as an arms dealer" and that he may no longer have been involved in arms dealing; and (ii) the use of the Terrorism Enhancement was "fundamentally unfair" to the defendant given the facts of the case (as detailed above).  *See id.* at 31-37.  There, a 25 year sentence was sufficient given the mandatory minimum for the missiles-related offense and the need to protect the public from the defendant,

who "spent a lifetime as a weapons dealer." *Id.* at 33.  Of course, there is no mandatory minimum here.

The Court's analysis in *Bout* amply demonstrates why a below-Guidelines sentence should be imposed here.  First, Mr. Georgescu, like *Bout*, was the target of a DEA sting operation despite the fact that he had never previously committed a crime that could have been charged in a federal court.  Indeed, there is not the faintest scintilla of evidence here that Mr. Georgescu had previously committed <u>any</u> crime or that he would have participated in an illegal weapons deal <u>but for the efforts of the DEA</u>.  Second, as explained above and as was the case in *Bout*, the use of the Terrorism Enhancement here results in an unfair and unjustifiably high Guidelines range that simply does not reflect the circumstances of this case or Mr. Georgescu's culpability.

Moreover, the substantial differences between *Bout* and the instant case demonstrate that a sentence well below the 25 year non-Guidelines sentence the Court imposed in *Bout* would be sufficient, but not greater than necessary here.  Significantly, this case involves <u>none</u> of the aggravating factors that warranted a 25 year sentence in *Bout*.  Unlike the defendant in *Bout*, Mr. Georgescu was not and had never been involved in the arms business.  Accordingly, the need to impose a sentence to protect the public is demonstrably lower here than it was in *Bout*.   Finally, the extraordinary mitigating factors present in the instant case further warrant a reduced sentence.

iv.     *A Life Sentence Is Greater than Necessary to Achieve the Goals of Deterrence and Protection of the Public.*

The risk of recidivism is extremely low in this case, indicating that a life sentence is far greater than necessary to protect the public and deter Mr. Georgescu from criminal conduct in the future.  *See* 18 U.S.C. § 3553(a)(2)(B) (requiring courts to consider "the need for the

sentence imposed . . . to afford adequate deterrence to criminal conduct"); 18 U.S.C.

§ 3553(a)(2)(C) (requiring courts to consider "the need for the sentence imposed . . .to protect

the public from further crimes of the defendant").

Mr. Georgescu is 44 years old and has no criminal history.  But for the efforts of the

DEA's confidential sources, there is no evidence that Mr. Georgescu would have ever engaged in

an illegal weapons deal.  Indeed, there is no evidence Mr. Georgescu has ever sold a bullet in his

life.  *cf. Bout*, Ex. F at 33 ("indeed, the public does need protection from this defendant.  This

defendant has spent a lifetime as a weapons dealer . . . .").  To the contrary, as outlined above,

Mr. Georgescu has a record of attempting to help the United States and protect its citizens by

cooperating with United States law enforcement.  Under these circumstances, the need to protect

the public from Mr. Georgescu is minimal.

Furthermore, the risk of recidivism is even lower here due to Mr. Georgescu's age.  Both

the courts and the Sentencing Commission have found that recidivism decreases as the age of the

defendant increases.  *See United States v. Hodges*, No. 07-CR-706 (CPS), 2009 WL 366231, at

*8 (E.D.N.Y. Feb. 12, 2009) ("[P]ost-*Booker*, courts have observed that recidivism is markedly

lower for older defendants."); U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal*

*History Computation of the Federal Sentencing Guidelines*, at 28 (May 2004), *available at*

http://www.lb5.uscourts.gov/ArchivedURLs/Files/08-10643(1).pdf.  As a result, this Court often

imposes below-Guidelines sentences where defendants are over 40 years of age when sentenced.

*See, e.g.*, *United States v. Ruiz*, No. 04-CR-1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y.

May 10, 2006) (imposing a below Guidelines sentence and recognizing that "[t]his Court and

others have previously declined to impose Guidelines sentences on defendants who, like [the

defendant], were over the age of forty at the time of sentencing on the grounds that such

23

defendants exhibit markedly lower rates of recidivism in comparison to younger defendants"). At this stage in Mr. Georgescu's life, a sentence of any length is sufficient to protect the public and deter him from any criminal conduct in the future.

Given Mr. Georgescu's age, lack of criminal history, and record of cooperation with the United States, a life sentence is unconscionable and far greater than necessary to achieve the goals of deterrence and protection to the public.

### E.   Collateral Issues That Should Further Mitigate the Sentence.

#### i.   *Mr. Georgescu's Medical History.*

Mr. Georgescu suffers from serious medical conditions that have and will continue to require frequent medical attention during his term of incarceration, and that could even decrease his life expectancy.  First, Mr. Georgescu suffers from osteoporosis, a condition that causes bones to become weak and brittle.  *See* Ex. S.  This condition has caused various maladies, such as frequent joint pain and dislocations.  Additionally, Mr. Georgescu has an increased risk of severe injuries should he fall, such as fractures and bone breaks.

Second, several years ago an MRI revealed that Mr. Georgescu has 11 lesions on his brain.  *See* Ex. T at 1.  He is currently undergoing treatment for these lesions, and doctors suspect the lesions may indicate early onset of serious medical conditions such Multiple Sclerosis or Dementia.  *See id.* at 4.  Mr. Georgescu requires access to frequent medical care and treatment in order to be properly diagnosed and treated for any conditions associated with these lesions.

#### ii.   *Request for Recommended Designation.*

We respectfully ask that the Court recommend that Mr. Georgescu serve his sentence at the Metropolitan Detention Center ("MDC") or as close to New York City as possible.   This will allow Mr. Georgescu continued access to his counsel, who work in New York City and represent Mr. Georgescu on a pro bono basis.  Furthermore, Mr. Georgescu's wife lives in Queens, New

York, and travels frequently to Romania to care for Mr. Georgescu's sick mother, as well as her own parents. Placing Mr. Georgescu in a facility nearby would minimize the burden on Ms. Georgescu of visiting Mr. Georgescu, and allow Mr. Georgescu to maintain his connection to his family here and in Romania.

iii. *Credit for Time Served Prior to Sentencing.*

We respectfully request that the Court recommend that Mr. Georgescu receive credit for (1) the over two months time he spent in custody in Montenegro awaiting extradition to the United States (December 15, 2014 – February 26, 2015); and (2) the time he spent in custody at the Metropolitan Correctional Center and MDC (February 26, 2015 – present).

Pursuant to the order from the Podgorica Tribunal granting the extradition of Mr. Georgescu to the United States, Mr. Georgescu should receive credit for his time in custody in Montenegro. *See* Ex. U at 7 ("If the accused [Cristian Vintila] and Virgil Flaviu [Georgescu] are extradited to the U.S., the time spent in preventive is going to court toward criminal sanction, based on article 33 st. 4 of the Law on International legal assistance in criminal matters."). We ask that the Court fulfill this condition of Mr. Georgescu's extradition and recommend that he receive credit for his time in custody in Montenegro.

## Conclusion

For all of the reasons stated above, we respectfully request that the Court impose a below-Guidelines sentence sufficient but no longer than necessary for Mr. Georgescu.

Dated:  New York, New York
        November 18, 2016

**FRIED FRANK HARRIS SHRIVER**
**& JACOBSON, LLP**

By:

Steven M. Witzel
Jennifer L. Colyer
Michael P. Sternheim

One New York Plaza
New York, New York 10004
Telephone:  (212) 859-8000
Facsimile:   (212) 859-4000
steven.witzel@friedfrank.com

*Attorneys for Defendant Flaviu Virgil Georgescu*

12396901