EXHIBIT F

C45ZBOUS                     Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                 New York, N.Y.

                v.                        08 CR 365 (SAS)

VIKTOR BOUT,

                Defendant.

------------------------------x

                                          April 5, 2012
                                          4:40 p.m.


Before:

                    HON. SHIRA A. SCHEINDLIN,

                                          District Judge


                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  BRENDAN McGUIRE
     ANJAN SAHNI
     Assistant United States Attorneys

ALBERT DAYAN
KENNETH KAPLAN
     Attorneys for Defendant


Also Present:  Andrew Harkuscha, Russian Interpreter
               Yana Agoureev, Russian Interpreter
               Anna Mazurova, Russian Interpreter

C45ZBOUS                     Sentence

1            THE DEPUTY CLERK:  All rise:

2            THE COURT:  All right, please be seated.

3            Good afternoon, Mr. McGuire.

4            MR. McGUIRE:  Good afternoon, Judge.

5            THE COURT:  Good afternoon, Mr. Sahni.

6            MR. SAHNI:  Good afternoon, your Honor.

7            THE COURT:  Good afternoon, Mr. Kaplan.

8            MR. KAPLAN:  Good afternoon, your Honor.

9            THE COURT:  Good afternoon, Mr. Dayan.

10            MR. DAYAN:  Hi, Judge.

11            THE COURT:  Good afternoon, Mr. Bout

12            And I assume that's an interpreter or translator?

13            MR. DAYAN:  He is.  That's Andrew Harkuscha.  He will

14    be the one interpreting Mr. Bout's statement, if Mr. Bout

15    decides to address the Court.

16            THE COURT:  All right.  In the meantime, is he going

17    to interpret what's said in the courtroom?

18            MR. DAYAN:  No.

19            THE COURT:  No.

20            MR. DAYAN:  That's not our intention.

21            THE COURT:  Mr. Bout, is that okay with you?  We'll

22    proceed in English, okay.

23            All right.  I have reviewed the revised presentence

24    report dated January 30th, 2012, together with the sentencing

25    recommendation and the addendum of the same date.

C45ZBOUS                    Sentence

1          I've also reviewed a letter from defense counsel dated

2    March 27th, 2012, a response from the government dated

3    March 30th, 2012 attaching a proposed order of forfeiture, and

4    another letter from defense counsel dated April 4th, 2012, but

5    received today, April 5th, 2012.

6          In addition, I've reviewed an undated letter from Lisa

7    Bout, the defendant's daughter.

8          I've also reviewed an April 2nd, 2012 letter from the

9    Consulate General of the Russian Federation in New York,

10   attaching the following documents:  1st, a statement from the

11   Russian Ministry of Foreign Affairs, which I will call the MFA,

12   of the Russian Federation dated November 16th, 2010; 2nd,

13   comments made by Russia's Official MFA representative, Mr. A.

14   K. Lukashevich regarding the decision rendered by the New York

15   Court in the matter of V.A. Bout dated November 3rd, 2011; 3rd,

16   a press release regarding the meeting between MFA

17   Representative K.K. Dolgov with Representatives of the American

18   Embassy concerning Bout, dated November 10, 2011; and, 4,

19   responses from MFA representative Dolgov to a question

20   submitted by the Interfax Agency dated December 19th, 2011.

21         I've also reviewed an April 4th, 2012 letter from

22   something known as Freedom against Censorship Thailand, which

23   attached an excerpt from an article in the New Yorker entitled

24   "How Casinos in China made Siu Yun Ping rich."

25         All of those materials will be docketed.

C45ZBOUS                    Sentence

1              Now, Mr. Dayan, have you had the opportunity to review

2     the report, the recommendation, the addendum, the Government's

3     letter and all the other materials I've just described?

4              MR. DAYAN:  I have, Judge.

5              THE COURT:  And have you gone over all of those

6     materials with your client?

7              MR. DAYAN:  I have.

8              THE COURT:  Do you have any objections to anything in

9     the presentence report, other than what you've raised in your

10    submission?

11             MR. DAYAN:  I have no objections but for the factual

12    findings.

13             THE COURT:  Everything, right, everything you raised

14    in you submission.

15             Okay.  Mr. McGuire, have you reviewed the report, the

16    recommendation, the addendum and defense counsel's two letters,

17    and all of the other materials I've just described?

18             MR. McGUIRE:  Yes, Judge.

19             THE COURT:  Do you have any objections to anything in

20    the presentence report?

21             MR. McGUIRE:  We do not.

22             THE COURT:  Now, there was trial here, so it's

23    unlikely we will have a factual dispute, but let me,

24    nonetheless, ask -- which I usually do at this point -- are

25    there any factual issues in dispute here that would require a

C45ZBOUS                    Sentence

1    Fatico hearing?  We can't name issues at the trial that the

2    trial jury already decided, but there are there any other

3    factual issues in dispute that are material to the sentence

4    that you feel would require a hearing either side.  Mr.

5    McGuire?

6            MR. McGUIRE:  None from the government's perspective,

7    Judge.

8            MR. DAYAN:  None from the defense, Judge.

9            THE COURT:  All right.  I, therefore, adopt the

10   findings of fact in the presentence report, which, as I already

11   said, do reflect the verdict in the case.

12           Defendant was convicted of four counts by a jury

13   verdict.  The first two counts, conspiracy to kill U.S.

14   Nationals and conspiracy to kill officers and employees of the

15   United States, permit a maximum sentence of life in prison, but

16   carry no mandatory minimum term in custody.  The third count,

17   conspiracy to acquire and use anti-aircraft missiles, also

18   permit a maximum sentence of life imprisonment, but require a

19   mandatory minimum sentence of 25 years in custody.  The fourth

20   count, conspiracy to provide material support or resources to a

21   foreign terrorist organization, permits a sentence of up to 15

22   years in custody, but requires no mandatory minimum term.

23           I shall now calculate the guidelines.  All counts are

24   grouped together for guideline purposes as they arise out of a

25   single course of conduct.  The base offense level is determined

C45ZBOUS                    Sentence

by the most serious offense, which is the third count.  The

base offense level for that count is 18 based on section

2K2.1(a)(5) of the Guidelines, because the offense involved

firearms described in 26 U.S.C. Section 5845(a).  A ten level

enhancement to level 28 is warranted by Section 2K2.1(b)(1)(E)

because the defendant conspired to sell 5,000 AK-47 machine

guns, C4 explosives, and millions of rounds of ammunition.  A

15 level enhancement to level 43 is warranted by Section

2K2.1(b)(3)(A) because the offense involved surface to air

missiles which is a destructive device defined in the statute.

Because the defendant engaged in arms trafficking, a further

four level enhancement to level 47 is warranted pursuant to

Section 2K2.1 (b)(5).  An additional four level enhancement to

level 51 is warranted because the defendant conspired to

transfer firearms and ammunition with the knowledge that they

would be used in connection with another felony, namely, to

kill United States nationals, officers and employees.

          Finally, because the offense involved or was intended

to promote a federal crime of terrorism, defined as an offense

that "is calculated to influence or affect the conduct of

government by intimidation or coercion or to retaliate against

government conduct,"  An additional 12 level enhancement to

level 63 is warranted pursuant to Section 3A1.4(a) of the

guidelines.

          The government argues that because Mr. Bout expressed

C45ZBOUS                        Sentence

that he was -- this is a quote -- that because he was

"personally supportive of the FARC's armed campaign against the

United States in Colombia," this revealed Bout's intent to

assist the FARC and in retaliating against Americans for their

involvement in Colombia.  And that quote was from the

Government's submission at page 11, note four.

          Because Section 3A1.4(a) of the guidelines applies to

this case for the reasons just described, namely, this is a

federal crime of terrorism based on Bout's intent to assist the

FARC in retaliating against the Americans for their involvement

in Colombia, the defendant falls in criminal history category

six, the highest criminal history category, even though he has

no prior convictions.

          His guideline range at offense level 63, criminal

history category six, is life in prison.

          Before proceeding, I will briefly address the two

primary issues raised by the Russian submissions.  The first

issue concerns the legality of Bout's extradition from

Thailand.  I've already ruled on this issue, and any further

arguments on this issue must now be addressed to the Court of

Appeals.

          The second issue concerned the conditions of Bout's

confinement.  As soon as this issue was raised by Bout's

counsel, I ordered the Bureau of Prisons to transfer Bout out

of the Special Housing Unit where he had been held in solitary

C45ZBOUS                    Sentence

| 1 | confinement, and the Bureau of Prisons complied with that |
| 2 | order.  Hopefully, after sentencing, the Bureau of Prisons will |
| 3 | continue to place him in general population, rather than in |
| 4 | solitary confinement. |
| 5 | With that, Mr. Dayan, do you wish to be heard? |
| 6 | MR. DAYAN:  Yes, Judge.  I would like to ask your |
| 7 | Honor to modify the word "hopefully" to a recommendation. |
| 8 | THE COURT:  Of course. |
| 9 | MR. DAYAN:  If possible. |
| 10 | THE COURT:  I will make a recommendation on the |
| 11 | judgment and commitment form.  You do understand that it would |
| 12 | still only be a recommendation to the Bureau of Prisons. |
| 13 | MR. DAYAN:  Yes, Judge.  I understand. |
| 14 | May I, Judge, use the podium? |
| 15 | THE COURT:  Of course. |
| 16 | MR. DAYAN:  Thank you. |
| 17 | I promise, Judge, this is not going to be another |
| 18 | three and a half hour summation. |
| 19 | THE COURT:  No. |
| 20 | MR. DAYAN:  Your Honor knows this case very well, |
| 21 | knows the arguments I made on paper, and I'm not going to |
| 22 | attempt to repeat them. |
| 23 | I do want to ask your Honor just to recall several |
| 24 | statements that your Honor had made during the course of the |
| 25 | proceedings in this case and trial. |

C45ZBOUS                    Sentence

1          Your Honor did indicate, once, when this case -- at

2     the inception of this case that the case against, the case

3     against Victor Bout and the evidence against Victor Bout was

4     weak to begin with.  I recall your Honor making that statement.

5     I --

6          THE COURT:  I don't recall that, and I must say having

7     sat through the trial, the evidence was not weak, but go ahead.

8     The evidence is the tapes, as you know, but let's continue.

9          MR. DAYAN:  This was not during the course of the

10    trial, Judge.

11         THE COURT:  I understand that.  I don't recall that

12    comment.

13         MR. DAYAN:  I think that by going through the trial, I

14    think it became more evident, for me at least and for the

15    defense, and I believe for anyone who was in this courtroom,

16    that the evidence against Viktor Bout was extremely weak,

17    Judge.  There was nothing but talk.  Everyone talked, both

18    sides playing their respective roles; the DEA agents, the DEA

19    operatives pretending to be a bogus FARC, Victor Bout

20    pretending to wanting to sell them arms.

21         But when the Prosecutor stands up, Judge, and asks

22    your Honor to sentence Viktor Bout to life in imprisonment --

23    and they will use very strong language like, you know, kill

24    Americans, and terrorism, and breath taking quantity of arms.

25    And this is all -- and I've always argued, Judge, that this is

C45ZBOUS                          Sentence

1    nothing but inflammatory language that is used by the

2    government and has been always used by the government to

3    prejudice the -- to prejudice either the fact finder, or now

4    your Honor at the time of sentencing; prejudice the defendant

5    in the eyes of your Honor at the time of sentencing.  Because

6    ultimately I will ask the government, and I actually challenge

7    them to point to any piece of evidence where it's something

8    that Viktor Bout did, whether it's something that Viktor Bout

9    attempted to do in this case, besides just getting on an

10   airplane with two pamphlets of airplanes that he intended to

11   sell.  What did he do in this case that they can actually, in

12   good conscience, ask your Honor to sentence him to life

13   imprisonment?

14        I understand that the government in this case does not

15   want to accept our proposition, and our position and our belief

16   that Viktor Bout is innocent.  And we don't want to.  And we

17   asked the jury and we still ask your Honor and we ask the world

18   not to accept the Government's position that he's guilty.  But

19   I just fail to understand how reasonable legal minds with

20   experience, educated people, people who have lived, people who

21   know life, people who know people, how can they argue that the

22   facts of this case does not have what I call built-in

23   reasonable doubt.  And what I mean by built-in reasonable

24   doubt, what that means is that no one in this case who sat

25   through the facts of this case, can or should say, without any

C45ZBOUS                        Sentence

1    hesitation, that Viktor Bout intended to sell arms.  Because

2    the government has no such evidence.  They can point to

3    nothing, except Viktor Bout's words.  That's all this case was

4    about, it was about words.

5          And for us to drag in a foreign man from a foreign

6    country to whom our criminal laws are foreign, and prosecute

7    him for words that he had just spoken, to me is -- will seem an

8    extremely draconian measure for anyone who does not reside in

9    the United States.  For Viktor Bout, who goes to this meeting,

10   and he talks about selling arms and he talks about his hate for

11   America and for Americans, those are just words, Judge, words

12   that are protected by our Constitution.  There was nothing that

13   he did in furtherance of those words.  He got on a plane, he

14   came to the meeting

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

C45MBOUS2                              Sentence.

1            MR. DAYAN:  How is a foreign person supposed to know

2     that it is enough just for the missiles count, that it is

3     enough just to say something that could be interpreted as an

4     agreement without having to do anything in furtherance of that?

5     It's mind boggling.

6            I would dare to declare, Judge, that 70 percent of

7     this audience would not even know that if they are sitting

8     somewhere and discussing missiles, this can be interpreted as

9     an agreement, that they could be facing a sentence of 25 to

10    life without even having to lift themselves from the chair.

11           It's an irony, Judge, that the case of Viktor Bout is

12    prosecuted in this building.  Because it is the Patrick

13    Moynihan federal building, who coined the memorable phrase,

14    defining deviancy down.  It is encapsulates how standards of

15    what is acceptable are generally eroding.

16           The missiles count is a new count drafted by the

17    United States Congress.  It doesn't even require an overt act.

18    It doesn't even require somebody to get up and do anything

19    about it.  Will it later become that if somebody even thinks

20    about missiles that they can get 25 to life?

21           You see, I bring the issue, and this notion of

22    built-in reasonable doubt, it's not something that I've

23    created.  We, as defense lawyers in state practice, use it very

24    often because we believe that it is the good-faith basis of a

25    prosecutor, regardless of his own feelings, regardless of what

C45MBOUS2                          Sentence.

he feels, if a case has been built in reasonable doubt, like I

argue to your Honor this case has built in reasonable doubt,

they cannot and should not prosecute this case.  But they still

did.  The U.S. Attorneys still prosecuted Viktor Bout and I

believe they did it and they felt that they could do it because

they could argue to your Honor and to anyone else that Viktor

Bout is actually a bad guy.  So it's okay if there is any doubt

in this case.  He deserves to be punished because he's a bad

guy.

          And we, as Americans, are powerful, self-righteous,

God's jury in this case.  We can take it upon ourselves to

punish him for his prior deeds.  And that is wrong, Judge.

That is completely wrong, regardless of whether we live in

America, the greatest country in the history of the world.  It

is just wrong.  Because I can stand here, Judge, and I can draw

parallels and I can draw from the Old Testament where people

would act as God's jurors where they would sell their own

brother into slavery and felt that they were doing God's work,

and that's just wrong.

          No one deserves, no innocent person deserves because

there is no greater sin to condemn an innocent person for a

crime that he did not commit because he may be a bad guy.

Judge, I have written about this extensively and I've cited to

your Honor cases.  I'm not going to repeat everything.  But I

found no comparable case in the history of the United States

C45MBOUS2                          Sentence.

 1   that was so clearly demonstrated as this case where the State

 2   Department or even the White House under the second Bush

 3   administration had explicitly gave an order to go out and get a

 4   man, not to investigate a man, but to go out and get him.

 5          It reminds me of this old outdated doctrine which we

 6   no longer use in the federal system.  It's called the Silver

 7   Platter Doctrine.  I know it's used in different types of

 8   cases, but here it's used in the following way, where it was

 9   told to the Justice Department, the DEA agents, get us this

10   man's head on a silver platter.  And that's what the agents did

11   in this case.  They had admitted that once we were going to go

12   get Bout, we were going to get him, not that we were going to

13   investigate him, not that we were going to see if he is still

14   involved in transporting arms.  We were going to go get him.

15   And it could not have been, Judge, because Bout posed a threat

16   to the United States.  That couldn't have been that.

17          Because Agent Brown, who is here today, testified to

18   his credit honestly, that he did not have any information that

19   Viktor Bout ever targeted the lives or the interests of the

20   United States.  And I have said this before.  The United States

21   had combed the world and they found no one that can come and

22   testify.  No one can tell them that Bout had delivered arms

23   after 2000, after the year 2000.  And it couldn't have been

24   because Viktor Bout was a danger to the national security

25   because the United States' own admission shows that they used

C45MBOUS2                          Sentence.

his services during the ill-advised Iraq war.  They went after

him.  They got him.

        Again, I don't want to get into how they got him,

Judge, although I'm very tempted, but I won't.  But he is here

now because he spoke negatively against Americans.  The

evidence against him, Judge, was weak.  It was extremely weak.

The only thing they had against him was pure prejudice.  I

remember one of the jurors made a statement in the New York

Times to Mr. Noah Rosenberg that the way he looked, she said

the way he looked, sort of like identified with his past.  What

is an innocent man supposed to do?  Is he supposed to jump up

and down?  Is he supposed to get on his knees?  How is he

supposed to act?  There is no comparable case in the United

States.

        The only comparable case that I know of, Judge, is

from 1898 in France, during the Dreyfus Affair.  It was an

identical type of a situation where for their own political

reasons they had orchestrated an investigation and prosecuted a

man, an innocent man.  And they used the same type of

inflammatory language that Dreyfus was -- he was a Jew who

basically had conspired against espionage against France.  The

mob, when they hear things like that, they eat that up because

the mob has a mind and energy of its own.  That's what happened

in this case.

        When Mr. Brendan McGuire stands and argues that he

C45MBOUS2                           Sentence.

wanted to kill Americans, we need to set an example to the

world.  I agree with Mr. Brendan McGuire that an example should

be sent to the world because I myself, as a father to three,

nothing is more important than the safety of our servicemen and

women over seas.

        There is also this conscious side, Judge, that talks

about an innocent man spilling innocent blood for that.  It's

not right.  When I say spilling blood, Judge, I'm not saying

that Viktor Bout is going to be executed, of course.  I'm

saying, when they ask for life, it's a life.

        I wrote to your Honor that the way this case was

choreographed by the DEA, it was done in such a way that I have

to ask your Honor for 25.  I don't want to ask your Honor for

25.  I want to ask your Honor for a hearing, although I

promised Ken Kaplan that I will not.  I want to ask your Honor

for a hearing, why they went after Viktor Bout, because it

doesn't matter that he was convicted.  If they went after him

because of vindictiveness, because of someone's personal

politics, the conviction is unlawful.

        I can't ask your Honor for 25.  I can only say 25 is a

lot.  When Congress had enacted these statutes, they were meant

for terrorists, people who were bent on destroying this

country, people who were not deterred by a sentence of life.

This is not Viktor Bout.  He is no terrorist.

        The difference between 25 and anything more, Judge, is

C45MBOUS2                          Sentence.

1    really a life sentence.  I'll explain to you why.  Because the

2    man is 45 years old.  Although he has complete faith that he

3    will be home soon and that the truth will prevail.  It did in

4    the Dreyfus Affair.  And no matter how much we may talk about

5    France, they did the right thing eventually.  And I believe

6    that the United States will do the right thing as well.

7              He's 45, Judge.  At 25, the man could skill come home

8    at 65 and see his daughter, who is in the audience right now,

9    maybe see her children.  Anything more than that, it's taking a

10   life.  He didn't hurt anyone.  Like your Honor described, he

11   was a businessman, like we have businessmen in the United

12   States.

13             If America, rightfully so, wants to send a message to

14   the world, don't sell arms to anyone who will use it against

15   Americans, it's a great message and I support it; again, not at

16   the expense of an innocent man.  But I think the message is

17   made from this case, Judge.  I think the message is sent.  I

18   ask your Honor not to sentence him to any more than is required

19   by the statute.

20             Of course, I can get into the fact that the sentencing

21   guidelines are advisory.  We all know that, Judge.  I don't

22   want to waste your time.  Thank you.

23             THE COURT:  Thank you, Mr. Dayan.

24             Mr. Bout, do you wish to say anything before sentence

25   is imposed?

C45MBOUS2                          Sentence.

1          THE DEFENDANT:  Your Honor, I am not guilty.  I never

2     intended to kill anyone, and I never intended to sell any arms

3     to anyone.  God knows this truth.  And this truth is known by

4     these people here.  And they will live with this truth.  They

5     will go to bed with this truth.  They will get up with this

6     truth.  They will have to raise their children with this truth

7     and they will love their wives with this truth.

8          I'm thankful to America, people with a clear

9     conscience, like Ken Kaplan, like Albert Dayan.  Even the two

10    guys whose names I don't even know because they treated me with

11    respect.  I'm thankful to Albert Dayan who proved my innocence.

12    Let God forgive me and you will answer to him, not to me.  Time

13    will answer for me and my country and my compatriots.  Thank

14    you.

15          THE COURT:  Thank you, Mr. Bout.

16          Mr. McGuire, did you wish to be heard?

17          MR. McGUIRE:  Yes, Judge.  Thank you.

18          We are here today because of a series of choices, a

19    series of choices that the defendant made over a period of

20    months, a series of choices that generated proof beyond a

21    reasonable doubt that he agreed to provide an arsenal of

22    weapons to kill Americans.

23          THE DEFENDANT:  It's a lie (In English).

24          MR. McGUIRE:  We are here based on a quantity of proof

25    that primarily consists of his own words, his own recorded

C45MBOUS2                           Sentence.

words, spoken words at meetings and on phone calls, and written

words and drawings in e-mails and on paper.

        Now, your Honor has previously found, because the

defense has raised throughout this case, that there was no

outrageous conduct committed by the government in this case.

There was no coercion.  Nobody made Viktor Bout do what he did.

Nobody made him say what he said.  Nobody made him act in a way

he did.  He is an intelligent and sophisticated and experienced

man.  He could have withdrawn at any moment.  He could have

said to Andrew Smulian, I am not interested in this deal.  I am

no longer in the weapons business.  He made a choice not to.

Day after day, meeting after meeting, call after call, he

continued to pursue the deal.  And so the jury so found.

        Mr. Dayan has chosen not to focus at all in his

written submissions or today on his client's conduct.  Instead,

as he has throughout this case, he is focused on the

government's conduct.  He continues to malign the DEA, he

continues to malign the white house, and today, as in his

written papers, he maligned Mr. Sahni and myself.

        Your Honor has found as well this was not a vindictive

prosecution.  This prosecution, as the government has

proffered, was based on Viktor Bout's documented history of

supplying arms to some of the world's most destabilizing and

dangerous individuals and regimes.  A, perfectly acceptable

reason to initiate an investigation, to quote your Honor.

C45MBOUS2                          Sentence.

Now, only Mr. Dayan understands his reasons for
focusing so heavily on the government's conduct, but such
claims are irrelevant to our purposes here today and, frankly,
they don't merit any response, so I am not going to speak of
them any further.  But it is interesting, because they are
revealing in the sense that they do reveal an effort to divert
our attention away from Mr. Bout's conduct, from his history,
which, along with the other 3553(a) factors, should be our
focus today, and I know the Court is focused on those.  We have
provided the Court what we hope is a thorough and helpful
submission, and we do not want to belabor the points made
there.

I would like to make three brief points that I believe
warrant further discussion.

First, I think a seemingly minor but extremely
revealing fact.  It was Viktor Bout, not the confidential
sources, who suggested the quantities of weapons throughout
this case.  Neither Andrew Smulian nor the confidential sources
ever proposed these quantities.  It was Viktor Bout.  For
example, when Andrew Smulian showed up in Moscow in January and
went into Viktor Bout's study and said that the FARC needs
surface to air missiles, it was Viktor Bout who called Peter
Mirchev and it was Viktor Bout who said there was 100 available
immediately, 100 surface to air missiles available for a client
I have not even met yet, but I have just been able to arrange

C45MBOUS2                          Sentence.

 1    them from the comfort of my own home.  That's a chilling

 2    thought.

 3          Similarly, and as we know, at the meeting in Bangkok

 4    six weeks later he agreed to provide 100 immediately and 7 to

 5    800 in total.  At that meeting the sources asked, we also need

 6    C4 plastic explosives.  He then said, how many tons do you

 7    need, tons?  When they said, we will take one, he said, I can

 8    get you five, five tons of C4 plastic explosives, 10,000 pounds

 9    of explosives, at his suggestion.

10          These are just two examples from throughout that

11    meeting and those transcripts which we reviewed in detail over

12    the course of a trial.  But those two examples alone speak to

13    why Viktor Bout's conduct, and particularly his tone and his

14    command during the Thailand meetings are so chilling.  Here was

15    a man seated across from two Spanish-speaking South American

16    men in a hotel in Bangkok talking about weapons and drugs and

17    killing people, and he didn't hesitate once.  He was not only

18    in his element, he was in control.

19          His words and his actions as reflected by the

20    transcript do more, we would submit, than just establish his

21    guilt beyond a reasonable doubt.  They reveal exactly why the

22    DEA targeted him and why a sentence of life imprisonment is

23    appropriate.  Drone aircraft, land mines, fake end user

24    certificates, cover loads of flower and fruit, and purchasing a

25    foreign bank to engage in money laundering.  All of these were

C45MBOUS2                          Sentence.

his ideas brought up without any urging, all for two men he had just met for the first time who had told him they had planned to kill American pilots.

These kind of statements in this day and age would have been alarming if they were made by an amateur who had appeared maybe was puffing and trying to impress a couple of guys he just met.  But in 2008 there are only a few people in the world who had demonstrated they were capable of turning these kind of words into action.

And one of those people was Viktor Bout, a man who watched a video about the benefits of pipe bombs used by the FARC and the IRA prior to the meeting in Bangkok and then during that meeting, without prompting, congratulated the FARC for using pipe bombs, saying that they were genius.  By his own words, recorded words, the accuracy of which have never been challenged, he said he had done 5,000 operations like this, including weapons deliveries to UNITA during the civil war in Angola.  By the mutually-consistent testimony of Charles Mukoto and James Roberts, he did it in the late 1990s in Rwanda during the regional conflicts there.  And this is not hard to believe, given the fluency that he employed and demonstrated in the language of weapons trafficking throughout this case.

What he said and how he said it, as we discussed and as we showed during the trial, was simply chilling.  Because he had closed on weapons deals in the past, it made it all the

C45MBOUS2                           Sentence.

1   more chilling.  If this scenario were as real as the defendant

2   believed it to be, he could have made this deal happen.  I

3   don't think we need a set of UN sanctions or the

4   weapons-related documents on his computer to conclude that.

5   Common sense compels that conclusion.

6          After listening to those hours of recordings and

7   considering the increasingly interconnected world in which we

8   live, we submit it is simply naive to think or to conclude that

9   Viktor Bout is simply a businessman.  He and men like him, men

10   who will no doubt fill the vacuum left, now that he has been

11   arrested, men who flourish in the gray arms markets are willing

12   to profit from violence and conflict.

13          There are a lot of eyes on this courtroom here today

14   and there are many who will be interested in this sentence.  We

15   submit that as a result, general deterrence, as we have said in

16   our submission, is therefore critical in this case and that a

17   sentence of simply the mandatory minimum would be insufficient.

18          The second point I would like to make relates to the

19   lies Viktor Bout told to the panel of judges in Thailand during

20   his extradition proceeding.  We have recounted those in our

21   submissions.  I will not repeat them.  But two of the most

22   egregious were that nobody in the meeting in Bangkok said they

23   were members of the FARC.

24          MR. DAYAN:  Judge, I have to object to that only

25   because I thought your Honor said that you would not address

C45MBOUS2                              Sentence.

1   the extradition process itself.  Does not that not entail --

2              THE COURT:  I said I wouldn't address it.  I certainly

3   didn't mean that Mr. McGuire couldn't address it.

4              MR. DAYAN:  I stayed away from it.

5              THE COURT:  I said it was an issue for the Court of

6   Appeals now.  But Mr. McGuire's point is I should consider what

7   he is going to call perjury that your client committed during

8   those proceedings.

9              Go ahead, Mr. McGuire.

10             MR. McGUIRE:  Mr. Bout stated in a written submission

11  to that court that he signed, among other things, that there

12  was no one at the meeting in Bangkok that were members of the

13  FARC and that there was no discussion about selling weapons to

14  the FARC.

15             He and his lawyers in Thailand also called a navy

16  official from the Thai navy, from the Thai military as a

17  witness to testify on his behalf.  And subsequent to that

18  testimony, the head of the royal Thai navy submitted a letter

19  that rendered that witness' testimony false.  These were both

20  attempts to undermine the Thai judicial process and the U.S.'

21  extradition request.  We submit that these should not go

22  unrecognized in his sentence.

23             As your Honor is well aware, one of the first factors

24  listed under Section 3553(a) is to ensure that the sentence

25  promotes respect for the law.  We submit that the defendant's

C45MBOUS2                          Sentence.

1    sentence here should reflect his efforts to obstruct this

2    prosecution.

3          My third and final point, Judge, is that the

4    defendant's conduct in this case and his documented history

5    exceed that of an analogous defendant who has been sentenced in

6    this courthouse, Monzer al-Kassar.  The quantities of weapons

7    and explosives and the nature of the services offered by Viktor

8    Bout simply dwarf those offered by Monzer al-Kassar.

9          As one point of comparison, Monzer al-Kassar agreed to

10   provide 15 surface to air missiles to the FARC.  As I noted

11   earlier, this defendant agreed to provide 7 to 800.

12         In addition, Monzer al-Kassar was 18 years older than

13   Viktor Bout is now at the time of his sentencing, and the

14   30-year sentence imposed by Judge Rakoff in that case, which

15   was constrained by extradition-related assurances given to

16   Spain in that case, was effectively a life sentence because

17   Monzer al-Kassar was 63 at the time he was sentenced.

18         We submit that Viktor Bout's conduct warrants a more

19   severe sentence than that of Monzer al-Kassar, particularly

20   given that counsel has not pointed to any factors that mitigate

21   that sentence.

22         In closing, Judge, the government has never disputed

23   that this was a sting operation, investigation initiated by the

24   DEA to target the defendant.  In fact, we would argue that it

25   would be irresponsible for U.S. law enforcement not to

C45MBOUS2                              Sentence.

1    investigate the defendant, given his documented history of

2    fueling conflicts throughout the world.  Not every sting

3    investigation proceeds identically, as your Honor is well

4    aware.  Some prove to be a challenge to agents and prosecutors

5    because the targets do not decisively embrace the opportunity

6    that's proposed.  Others can prove to be a challenge because

7    the targets do not appear capable of actually committing the

8    proposed crimes.

9            This is not one of those cases.  Bout not only

10   decisively, immediately, and enthusiastically embraced the

11   opportunity to help the FARC kill Americans, he sought to

12   expand the opportunity to an extraordinary level in order to

13   develop a long-term relationship with the FARC, and we

14   respectfully request that his sentence reflect that.

15           Accordingly, the government respectfully requests that

16   the Court impose a sentence consistent with the guidelines of

17   life in prison.  Thank you.

18           THE COURT:  Thank you, Mr. McGuire.

19           I have a lot to say now.  It's not going to be so very

20   short, but I don't think suspense is a good thing.  I begin

21   with telling you the sentence I intend to impose and then

22   taking some time to explain it.

23           Based on my review of the statutory factors that I

24   will go through in a moment, I intend to impose a nonguidelines

25   sentence of 25 years in custody on Count Three, a sentence

C45MBOUS2                              Sentence.

required by statute and 15 years on Counts One, Two, and Four,

all to run concurrently with each other and with the sentence

on Count Three, to be followed by five years of supervised

release.  In addition, Mr. Bout is required to pay the

mandatory assessment of $400, which payment is due immediately.

No fine is imposed based on the required forfeiture.  There

will be a separate forfeiture order.  I think the government

has proposed one.

              I haven't heard you, Mr. Dayan, with respect to that,

but I am prepared to order forfeiture in the sum of $15

million, which is the minimum value of the goods the defendant

intended would be used to commit the federal crime of terrorism

against the United States, its citizens, residents, and

property.

              The mandatory drug testing condition is suspended due

to this Court's conclusion that this defendant poses little or

no risk of any future drug abuse.  The defendant is to be

supervised in the district of his residence and the standard

conditions of probation as recommended by the probation

department shall apply.

              The following special conditions shall also apply:

First, the defendant shall provide the probation officer with

access to any requested financial information; second, the

defendant shall not incur new credit charges or open additional

lines of credit without the approval of the probation officer;

C45MBOUS2                          Sentence.

and, third, defendant shall obey the immigration laws and

comply with the directives of the immigration authorities.

Finally, defendant is to report to the nearest probation office

within 72 hours of release from custody, and is to be

supervised by the district of his residence.

          Now, the reasons for the sentence.

          Based on all of the sentencing factors set forth in 18

U.S.C. Section 3553, I conclude that a nonguidelines sentence

of 25 years in custody is sufficient but not greater than

necessary to serve the required purposes of sentencing.

          I begin with the nature and circumstances of the

offense.  Viktor Bout was a well known and long time

international arms dealer.  He supplied arms over the years to

many violent regimes, including Angola, the Congo, Liberia, and

Rwanda.  There is some evidence, although somewhat vague, that

he may have been poised to supply arms to Tanzania and Libya.

There is also some evidence, although again somewhat vague,

that he may also have supplied military equipment to U.S.

forces in Iraq in or around 2003 through some companies that he

owned in whole or in part.  However, it is also the case that

the bulk of his known arms dealing activities ended more than a

decade ago.  Based on his international arms dealing, in

particular to violent regimes, he was the subject of various

sanctions imposed by both the United Nations and the United

States.

C45MBOUS2                              Sentence.

1          Turning to the instant case, in late 2007, the DEA

2     initiated a sting operation with the intent of persuading Bout

3     to agree to sell arms to the FARC, a terrorist organization

4     operating in Colombia and using violence against the Colombian

5     regime and American military support for that regime.  The FARC

6     efforts were financed, in part, through the cocaine trafficking

7     business.  Bout was approached by an old acquaintance from his

8     arms dealing days in Africa, Andrew Smulian, who in turn

9     introduced him to three confidential sources who Smulian

10    believed to be members of the FARC who were in need of weapons.

11    After Smulian met with these FARC imposters, he met with Bout

12    in Moscow to discuss the transaction and Bout agreed to supply

13    the FARC with the weapons they sought and with other weapons

14    that he thought they could effectively use.  Over the course of

15    the two months or so that he corresponded with and met with

16    Smulian, Bout researched the FARC and learned that they were a

17    terrorist organization based in Colombia, who were using

18    violence against the Colombian regime and against American

19    military support for the regime.  After meetings in Moscow and

20    many telephone calls, e-mails and text messages, Bout traveled

21    to Thailand to consummate the deal.  At a meeting in Thailand

22    with the imposter members of the FARC, as well as his colleague

23    Smulian, he agreed to supply hundreds of surface to air

24    missiles in addition to a vast array of other weapons.  It is

25    noteworthy, however, that he never actually received any money

C45MBOUS2                              Sentence.

1     for his efforts, nor did he ever transfer any weapons.  During

2     the meetings he expressed his sympathy with the cause of the

3     FARC and stated that he, too, disliked Americans and agreed

4     with the FARC's desire to harm Americans.  After the meeting he

5     was arrested, placed in jail in Thailand, and fought

6     extradition to this country.  He was eventually extradited,

7     tried, and convicted of the charged offenses already described.

8            Turning now to the history and characteristics of the

9     defendant.

10           This 45-year-old defendant was born in 1967 in

11    Tajikistan.  His wife, Alla Bout, now age 48, resides in Moscow

12    with their 18-year-old daughter.  At the time of his arrest,

13    Bout was living in Moscow.  Over the years he has lived in

14    South Africa, United Arab Emirates, Belgium, Cyprus, Romania,

15    and Angola.  Bout is multilingual.  He is fluent in Russian,

16    English, Spanish, and several other languages.  He was educated

17    in Tajikistan.  Between 1985 and 1992, he was a lieutenant in

18    the Soviet Army.  He served as a translator during that time.

19    Bout has been self-employed in the aviation field.  He owned

20    and operated an air transport business.

21           Since at least 2000, Bout has been identified in the

22    international community as being responsible for arming a

23    number of international conflicts, particularly in those areas

24    where the weapons trade has been embargoed by the United

25    Nations.  In March 2004, the UN Security Council adopted

C45MBOUS2                          Sentence.

1    Resolution 1532, which found, in part, that Bout had supported

2    Charles Taylor's regime in his efforts to destabilize the

3    Sierra Leone and gain illicit access to diamonds.  As a result,

4    all UN member states were directed to freeze any assets owned

5    or controlled by Bout.

6            In July 2004, four months after the UN resolution, the

7    president of the United States signed Executive Order 13348

8    which in part effectively prohibited Bout from engaging in

9    financial transactions within the United States.  In October

10   2006, Bout was blacklisted again in Executive Order 13413,

11   which prohibited transactions to certain individuals found to

12   have contributed to the Congo civil war.

13           The next factor is the need for sentence imposed.

14           Obviously, the crimes of which the defendant stands

15   convicted require a lengthy period of incarceration.  The only

16   question then before this Court was and is how long is needed

17   to properly punish this defendant.  I conclude that 25 years is

18   sufficient for the following reasons:

19           This is a sting operation in which the government set

20   out to make a case against Viktor Bout for crimes that could be

21   charged and prosecuted in an American court.  It is virtually

22   undisputed that until the DEA went after Bout, he had not

23   committed a crime chargeable in an American court in all his

24   years as an arms dealer.  While he had been sanctioned by the

25   United Nations and the United States for his arms trafficking

C45MBOUS2                              Sentence.

activities over the years, he was not under indictment by any

country or by any war crimes tribunal.  There is no evidence

that he had broken the domestic laws of any country, or more

particularly, of the United States, although he was considered

to have violated international law.  Interestingly, while the

assignment to make a case against Viktor Bout was given to the

Drug Enforcement Administration, there is no evidence that he

was ever involved in drug activity or that he had any

willingness to become involved with drug activity.

          At the time the government initiated its case against

Bout, it is unclear whether he was still actively engaged in

the arms trade.  Some evidence could lead to the conclusion

that he was still involved, such as conversations regarding

potentially supplying arms to Tanzania, Kenya, and possibly

Libya, but there is no evidence that he had actually supplied

arms to anyone in recent years.  There was also no evidence

that he had ever committed any crimes against any American or

even expressed the desire to do so.  The entire case against

him is that when presented with an opportunity to commit such

crimes, through an approach made by a friend he hadn't seen in

many years, he willingly accepted the opportunity and expressed

to his customer, namely, the FARC, that he shared their goals,

namely, to harm Americans.  Whether this was simply good

business practice or an expression of his own goals can never

really be known.  I can only say that there is no evidence that

C45MBOUS2                              Sentence.

he ever expressed or acted on such goals prior to his two-month

involvement in this sting operation.  While the government

argues that the fact that this case arises from a sting

operation is not a mitigating factor, I disagree.  But for the

approach made through this determined sting operation, there is

no reason to believe that Bout would ever have committed the

charged crimes.  It is certainly true that he may have

continued to sell arms in other places in the world, but there

is no reason to believe he would have committed any crime over

which American courts have jurisdiction.  As a justice of the

United States Supreme Court recently said in a very different

context, this country does not purport to be the Supreme Court

of the entire world.  Thus, this case is unusual and requires

that the Court weigh the facts relating to this offender by

constructing a fair, adequate, and reasonable sentence.

          So the sentence must reflect the seriousness of the

offense and promote respect for the law and provide just

punishment for the offense, and I believe this sentence does

all of that.

          It must also afford adequate deterrence to criminal

conduct, both general and specific, and I believe it does that.

          It must protect the public from further crimes of the

defendant, and indeed the public does need protection from this

defendant.  This defendant has spent a lifetime as a weapons

dealer who had no concern as to the identity of his customers

C45MBOUS2                        Sentence.

1    or the use they would make of the weapons he sold.  He has sold

2    weapons to some of the most vicious and violent regimes in the

3    world and has demonstrated that he would do so again if the

4    opportunity presented itself.  However, it is unlikely that he

5    will have any knowledge of the latest weaponry or any contacts

6    in the arms trade when he is released from prison two decades

7    from now.

8          The next factor is to provide the defendant with

9    needed educational and vocational training or medical care or

10   other correctional treatment.  None of those services are

11   needed here.  It's not a factor.

12         Next factor is the kinds of sentences available.  That

13   was not a factor here.  There is a required mandatory jail term

14   of 25 years.

15         Then comes something that does take some time to

16   explain, and that's the guidelines sentence and applicable

17   policy statements.  As you know, the guidelines call for life

18   imprisonment.

19         I have given serious consideration to the guidelines

20   and the policy statements.  However, the guidelines here do not

21   produce a reasonable sentence.  First of all, the use of the

22   terrorism enhancement to increase the offense level by 12

23   levels and to place the defendant in criminal history category

24   VI, despite no criminal record at all, creates an

25   extraordinarily high guideline range that I find is

C45MBOUS2                           Sentence.

fundamentally unfair to this defendant, given all the

circumstances of this offense.  In addition, a number of the

other enhancements that the guidelines required ratcheted up

the final offense level in a manner that does not reflect the

facts and circumstances of the crimes of which this defendant

was convicted.  I have already explained the unique

circumstances here that make this case unusual if not sui

generis.  I will not repeat all that I've already said except

to say, in a single sentence, that this defendant responded to

an opportunity to sell arms presented to him by others, but no

evidence was adduced either at trial or pretrial, for that

matter, that this defendant was actively looking for an

opportunity to become involved with a terrorist organization,

such as the FARC, Al-Qaeda, or Hezbollah, nor was there any

evidence ever introduced that he was looking for a way to

attack Americans rather than embracing an opportunity presented

to him.

        Then there is the need to avoid unwarranted sentencing

disparity, and that goal remains an important goal that

survives the Booker analysis.  However, this case is different

than most of the terrorism cases that I am familiar with.  The

vast majority of terrorism cases around the country are

individuals who sought out opportunities to join a terrorist

organization for the sole purpose of harming Americans or

American interests.  That is simply not the case here.  As I

C45MBOUS2                          Sentence.

1   have repeatedly said, there is no such evidence against

2   Mr. Bout.  Yes, he embraced an opportunity to make money by

3   supplying a terrorist organization and claimed he had the means

4   to do that.  Of course, we don't know for sure that he could

5   have.  But he did not seek out such an opportunity because of

6   any long-held ideological based antipathy toward Americans or

7   American policies.  For these reasons, the nonguidelines

8   sentence I'm imposing creates no unwarranted sentencing

9   disparity.

10          In his sentencing submission and again in argument

11  today, the government analyzes the sentencing disparity here by

12  referencing the 30 year sentence given to Monzer al-Kassar in a

13  similar sting operation involving the identical four counts of

14  conviction as those at issue here.  The government also notes

15  that the less culpable defendants in that case received the

16  minimum 25-year sentencings, arguing that it would be wrong to

17  sentence Bout as if he were on a par with the less culpable

18  defendants in the al-Kassar case.  However, the government

19  fails to note that the Court there had no choice but to

20  sentence those less culpable defendants to 25 years because

21  that was the required mandatory minimum.  If that were not the

22  case, I suspect that the spread between the sentence given to

23  al-Kassar and that given to the less culpable al-Ghazi and

24  Godoy are greater than five years.

25          As for a comparison of the al-Kassar and Bout

C45MBOUS2                          Sentence.

1    sentences, I can only say that every defendant and every

2    defendant's criminal activity are unique.  No two cases are

3    identical.  I can't know every factor that Judge Rakoff

4    considered in sentencing al-Kassar, but I do know that I have

5    considered all of the statutory factors that a court must

6    consider and have concluded that 30 years is not a reasonable

7    sentence for Mr. Bout, based on the facts of the case before

8    me.  I do note that there was some evidence that al-Kassar was

9    involved with drug trafficking and the financing of terrorist

10   organizations and that he already received a substantial down

11   payment for his purported sale of arms to the FARC.  I also

12   note that a sample of only two cases is far too small to

13   analyze an argument of unwarranted sentencing disparity.

14        Generally, the disparity argument is based on

15   thousands of sentences from around the country.  As already

16   noted, most of the terrorism cases involve defendants who are

17   active members of the terrorist organization committed to

18   conduct acts of terrorism without any involvement by government

19   agents acting in an undercover capacity.  The sample of cases

20   with the unusual facts of this case is far smaller, perhaps two

21   to three cases.

22        Those constitute are the reasons for my sentence.  Are

23   there any legal objections before sentence is imposed,

24   Mr. Dayan?

25        MR. DAYAN:  None from the defendant.

C45MBOUS2                              Sentence.

1                    THE COURT:  Mr. McGuire.

2                    MR. McGUIRE:  No, your Honor.

3                    THE COURT:  Pursuant to the Sentencing Reform Act of

4       1984, it is the judgment of this Court that the defendant,

5       Viktor Bout, is sentenced to 25 years in custody on Count Three

6       and 15 years on Counts One, Two, and Four, all to run

7       concurrently with each other and with the sentence on Count

8       Three, to be followed by five years of supervised release.

9       Defendant shall be supervised in the district of his residence

10      and be required to adhere to the standard, mandatory, and

11      special conditions that probation set forth earlier.  He is

12      further required to pay the mandatory assessment of $400, which

13      payment is due immediately, and a $15 million forfeiture.

14                   I have already explained the reasons for the sentence,

15      and I order the sentence imposed as stated.

16                   Mr. Bout, you have right to appeal both your

17      conviction and sentence within 14 days.  If you cannot pay the

18      cost of appeal, you have a right to apply for leave to appeal

19      in forma pauperis.

20                   Now, I already said I would make the recommendation to

21      the Bureau of Prisons that he not be placed in solitary

22      confinement.  Are there any other recommendations that you

23      would ask for, Mr. Dayan?

24                   MR. DAYAN:  If possible, if he could be placed in the

25      general population and, if possible, if he could be housed

C45MBOUS2                              Sentence.

1    somewhere next to the Tristate -- I know there is one in New

2    Jersey that's Fort Dix and -- for the simple reason, Judge, he

3    has no family here.  His wife will go back to Russia.  And I'm

4    working with him on issues of appeal.  It would be taxing upon

5    his appellate lawyer to travel.

6            THE COURT:  Given the length of the sentence I am sure

7    he will be assigned to a maximum security prison.  I don't know

8    where the nearest maximum security prison is.  I will certainly

9    recommend that he be placed in the appropriate prisons near to

10   New York as possible and that he not be placed in solitary

11   confinement, which I've already found is completely

12   unnecessary.  Those recommendations I will make, but I cannot

13   recommend the specific institutions you suggested because I

14   don't think they apply to people convicted of these crimes.

15           Is there anything further?

16           Thank you.

17                              o0o

18

19

20

21

22

23

24

25