# EXHIBIT R

```
                                                                    1
          92odkass
                                  SENTENCES

    1     UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
    2     ------------------------------x

    3     UNITED STATES OF AMERICA,              New York, N.Y.

    4             v.                             07 Cr. 0354 (JSR)

    5     MONZER AL KASSAR and LUIS
          FELIPE MORENO GODOY,
    6
                        Defendants.
    7
          ------------------------------x
    8
                                                February 24, 2009
    9                                           2:36 p.m.

   10     Before:

   11                      HON. JED S. RAKOFF,

   12                                          District Judge

   13                          APPEARANCES

   14     LEV L. DASSIN
               Acting United States Attorney for the
   15          Southern District of New York
          BY:  BOYD M. JOHNSON III
   16          BRENDAN McGUIRE
               Assistant United States Attorneys
   17
          DICKSTEIN SHAPIRO LLP
   18          Attorneys for Defendant
               Monzer al Kassar
   19     BY:  IRA SORKIN

   20     GALLET DREYER & BERKEY, LLP
               Attorneys for Defendant
   21          Luis Felipe Moreno Godoy
          BY:  ROGER STAVIS
   22
                    - also present -
   23
          Francisco Olivero
   24     Mario Michelena,
               Spanish Language Interpreters
   25
```

92odkass
                        SENTENCES

1           THE CLERK:  February 24, 2009, United States vs.

2    Monzer al Kassar and Luis Felipe Moreno Godoy.

3           Counsel, please state your name for the record.

4           MR. JOHNSON:  Good afternoon.  Boyd Johnson and

5    Brendan McGuire for the United States.

6           THE COURT:  Good afternoon.

7           MR. SORKIN:  Good afternoon, your Honor.  For the

8    defendant Monzer al Kassar, from Dickstein Shapiro LLP, by Ira

9    Lee Sorkin.

10          THE COURT:  Good afternoon.

11          MR. SORKIN:  Good afternoon.

12          MR. STAVIS:  Gallet Dreyer & Berkey, by Roger L.

13   Stavis, on behalf of Mr. Moreno Godoy.  Good afternoon, your

14   Honor.

15          THE COURT:  Good afternoon.

16          All right.  We are here for sentence.  I think it is

17   important to state the parameters so that everyone understands

18   the situation and then I will hear argument from both sides --

19   from all three sides.

20          There is a mandatory minimum sentence here of 25

21   years.  All counsel are agreed that that is binding on the

22   Court and the Court has no discretion to go below 25 years.

23          There is a request that was made in connection with

24   the extradition, really perhaps a condition so far as the

25   government is concerned -- a request made by the Spanish

                                                                    3
92odkass
                            SENTENCES

1     government that the government would not seek either the death

2     penalty or life imprisonment for Mr. al Kassar.  And since

3     Mr. Godoy, on any analysis, is situated below Mr. al Kassar in

4     terms of culpability, that would affect any sentence to be

5     imposed on Mr. Godoy as well.

6            Even assuming that these defendants were to live into

7     their 90s, well beyond what would be the actuarial expectation,

8     the sentence in the Court's view, therefore, could not be more

9     than 35 years without offending the thrust of the Spanish

10    government's request.

11           So I think we are talking, gentlemen, about a sentence

12    no less than 25, no more than 35 years.  Of course, if anyone

13    disagrees with me on that, I will be very happy to hear you on

14    that.

15           So let me start by asking Mr. Sorkin whether your

16    client has read and discussed with you the presentence report?

17           MR. SORKIN:  He has, your Honor.

18           THE COURT:  There are many objections to the report

19    made in your submissions.  Do you have any other objections

20    other than the ones, which we will address shortly, that are

21    set forth in your submission?

22           MR. SORKIN:  We do not, your Honor.

23           THE COURT:  All right.  Let me ask Mr. Stavis, has the

24    presentence report been gone over in translation with your

25    client and has he discussed it with you.

4
92odkass
SENTENCES

1          MR. STAVIS:  Yes, it has been reviewed at length, your

2    Honor, with the assistance of an interpreter, and all of our

3    objections are in our submission we made to the Court.

4          THE COURT:  Very good.  Any objections from the

5    government to the report?

6          MR. JOHNSON:  No, your Honor.

7          THE COURT:  All right.  So let's start with the

8    calculation of the guidelines, which, of course, are not

9    binding on the Court but which the Court must consider,

10   together with all the other factors under Section 3553(a) of

11   Title 18.

12         The guideline calculation from the probation officer

13   is for life imprisonment.  And Mr. al Kassar's counsel raises

14   numerous objections to the calculation, but what I wasn't clear

15   on, Mr. Sorkin, is what would be your calculation of the

16   guidelines?

17         MR. SORKIN:  Your Honor, my calculation of the

18   guidelines would be -- obviously, I cannot address the 25-year

19   mandatory minimum.  My calculation of the guidelines, your

20   Honor, would not be all of the enhancements.

21         THE COURT:  I understand.  But what I'm unclear of

22   is -- because the reason I'm raising this is that the

23   guideline, the offense level for this defendant was literally

24   off the chart.

25         MR. SORKIN:  Yes.

5
92odkass
SENTENCES

1          THE COURT:  So even if one were to eliminate certain
2    of the enhancements, he would still face a guideline range of
3    life in prison.  And before we go through all the rigmarole of
4    deciding whether or not certain enhancements should apply or
5    should not apply, I need to know whether it makes any
6    difference, because if it doesn't then this is just, you know,
7    lawyer talk.
8          MR. SORKIN:  Your Honor, I think it would make a
9    difference with respect to Counts One, Two, Four and Five.
10          THE COURT:  So what would be the calculation you
11    would -- what is the guideline range you are asking for?  How
12    can I --
13          MR. SORKIN:  I think, your Honor -- if your Honor will
14    bear with me, I think the guideline range that I would start
15    with, and I'm looking now at the presentence report, would be
16    the basic -- the 2332(g)(A)(1) and (b)(4) found in Section
17    2K2.1 is a base level of 18 your Honor.
18          THE COURT:  OK.
19          MR. SORKIN:  That can found, your Honor, at paragraph
20    95, page 23 of the presentence report.  Let me see if it is the
21    same corresponding section.
22          THE COURT:  OK.
23          (Pause)
24          THE COURT:  Yes, we are at 18.  Where do you go from
25    there?

6

92odkass

SENTENCES

1          MR. SORKIN:  18.  And I would add, your Honor, from

2     paragraph 101, three additional points.

3          THE COURT:  Looking at that page, page 23, that is

4     probably a good place.  The probation officer then adds, after

5     the 18, 10 points because the defendant conspired to sell to

6     the FARC 12,620 weapons and 2 million rounds of ammunition.

7          Are you contesting that?

8          MR. SORKIN:  Your Honor, to the extent that I am

9     contesting that with respect to grouping under the missile

10    count, which is what I believe the Probation Department did, I

11    don't contest that the firearms were part of Count One, but the

12    way I understood the Probation Department to be submitting this

13    is that they started out with Count Three and built upon Count

14    Three to arrive at those points.  I do not contest --

15         THE COURT:  We could discuss all of that.  I am happy

16    to take it any way you want.  But I don't want to -- my whole

17    point of this when I read through -- and Mr. Stavis has similar

18    arguments in his memo -- it was not clear to me that anything

19    you were suggesting would lead to a different bottom line.

20    I've already indicated that, barring something extraordinary

21    from the government, we are talking of a sentence of between 25

22    and 35 years.  Unless the guideline range is below that, then

23    there is no point even worrying about what the guideline range

24    is, assuming arguendo that the probation officer had it wrong.

25         MR. SORKIN:  I think the probation officer had it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92odkass
                          SENTENCES

1    wrong, your Honor, because I think they double counted.  If you

2    take, your Honor --

3              THE COURT:  Give me, first --

4              MR. SORKIN:  Yes.

5              THE COURT:  -- what is it, what offense level do you

6    think should apply?

7              MR. SORKIN:  I think 21, your Honor.

8              THE COURT:  So you think none of the other

9    enhancements should apply to any count?

10             MR. SORKIN:  That is correct, your Honor.

11             THE COURT:  OK.  And what do you think is the Criminal

12   History Category?

13             MR. SORKIN:  I, your Honor.

14             THE COURT:  OK.

15             MR. SORKIN:  I think we made that clear.

16             THE COURT:  So you think the sentence should be 25

17   years because the guideline range under yours would be 37 to 46

18   months?

19             MR. SORKIN:  That is correct, your Honor.  I think

20   what --

21             THE COURT:  Well, that is an interesting suggestion.

22             Now, let's see, then we have to go through this

23   exercise.  So why is it you think that the 10 points should not

24   apply, 10 points for the specific offense characteristic?

25             MR. SORKIN:  In 97, your Honor?

8

92odkass
                              SENTENCES

1              THE COURT:  Yes.

2              MR. SORKIN:  Because as I read -- and I may have

3     misread it, as I read that, your Honor, what the Probation

4     Department did was take that 10 points and add it to the

5     missile count, and separately and apart from that, your Honor,

6     the missile count I think was double-counted with respect to

7     the arms, I think it was double-counted with respect to a

8     destructive device, which is paragraph 98, and I think it was

9     double counted --

10             THE COURT:  Well, but then if that's true, then the

11    missile count would not be the most serious count, so we would

12    have to use some other count to calculate the guideline range.

13    So what other count would you prefer to use?

14             MR. SORKIN:  No, I think you have to start with the

15    missile count, your Honor.

16             THE COURT:  Why?

17             MR. SORKIN:  The missile count takes its own -- it

18    stands alone, your Honor, and I think what the Probation

19    Department did was take the missile count, your Honor, and add

20    the firearms to the missile count.

21             THE COURT:  I thought you made the argument in your

22    memo -- maybe I'm wrong -- that I should calculate

23    separately --

24             MR. SORKIN:  Yes.

25             THE COURT:  Well, then, let's do it separately.  Take

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

9

92odkass
                        SENTENCES

1    one of your other counts.

2            MR. SORKIN:  Count No. One, your Honor.

3            THE COURT:  OK.  What do you say is the base offense

4    level?

5            MR. SORKIN:  May I have just a moment, your Honor?

6            THE COURT:  Sure.

7            (Pause)

8            MR. SORKIN:  Can I have just one second, your Honor?

9            THE COURT:  Sure, take your time.

10           (Pause)

11           MR. SORKIN:  Your Honor, I think understand your

12   Honor.  If we start with 2A1.5, your Honor, it is 33.

13           THE COURT:  OK.  And then what would you add to that?

14           MR. SORKIN:  I would add only, your Honor, paragraph

15   97, which would leave you 10.

16           THE COURT:  So that would be 43.

17           MR. SORKIN:  Yes.

18           THE COURT:  And 43 at Criminal History Category I is

19   life in prison.

20           MR. SORKIN:  Yes, it is, your Honor.

21           THE COURT:  This is why I think, most respectfully,

22   that even if I were to agree with the entire approach, that

23   very, very interesting approach that both you presented, it

24   doesn't make a difference, it would still come to life in

25   prison under at least one of these counts that you say should

10

92odkass
SENTENCES

1    all be calculated separately, and I'm not going to impose even

2    life imprisonment, but that is the same calculation that the

3    Probation Office came to, albeit from a different method that

4    you say is incorrect.

5              So I think where we are at, and I'll hear anything

6    Mr. Stavis wants to say, because I think we are at -- the

7    calculation of the guidelines is going to be, under one

8    analysis or another, life imprisonment and, on the other hand,

9    it's of secondary relevance in this case.

10             MR. STAVIS:  Your Honor.

11             THE COURT:  Yes.

12             MR. STAVIS:  If you take the base offense level of 33

13   from 2A1.5, and I've asked for a minimal role adjustment of 4,

14   even if you add three, there is 33 plus the three --

15             THE COURT:  Ten for selling weapons, yes.

16             MR. STAVIS:  But I've objected as a legal matter,

17   not -- I've objected as a legal matter to those enhancements,

18   your Honor.

19             THE COURT:  What is the objection -- now, we are not

20   talking about the missile count now.  So what is the objection

21   to the enhancement on the non-missile count?

22             MR. STAVIS:  Because I believe that it overstates

23   the -- unless we want to deal with this in a 3553 capacity,

24   which I'm sure we'll be doing in another few minutes.

25             THE COURT:  Yes, and that's the place to do it.  I'm

92odkass
                              SENTENCES

1    really trying to figure out whether, as a practical matter,

2    this whole exercise on the calculation of the guidelines is of

3    any real momentary significance, in a sense.

4            But even on your view of it, I think you are still up

5    above 35 years.  You might not be up all the way to life in

6    prison.

7            MR. STAVIS:  I would be at 33 plus 3 for the 2A1.2

8    enhancement.  So that's 33 and 3 is 36, minus 4 is 32, which is

9    121 to 151.

10           THE COURT:  Wait a minute.  This is premised on my

11   disagreeing with you -- on my agreeing with you on the 10,

12   right?

13           MR. STAVIS:  Oh, yes, and not only that but agreeing

14   with me on all of the enhancements, your Honor, yes.

15           THE COURT:  But just taking the 10 for a moment, if I

16   didn't -- you're saying that he shouldn't get an increase for

17   conspiring to sell all those weapons because it overstates the

18   seriousness of the offense.

19           MR. STAVIS:  Yes.  But I have to be clear.  The

20   guidelines will say that if it is a guideline of I think I was

21   just at 32, it gets bumped up for the 25-year mandatory

22   minimum.

23           THE COURT:  For sure it is.

24           MR. STAVIS:  That becomes the guidelines.

25           THE COURT:  No.  For sure we are at 25, but I am

                                                                12
92odkass
                          SENTENCES

1    talking about higher than 25 for the guideline calculation.

2         I do disagree with you that it overstates the

3    seriousness of the offense, so even if I agree with you on

4    everything else, if I just disagreed with you on that one

5    point, we would be up above 35.

6         MR. STAVIS:  Yes, your Honor.

7         THE COURT:  All right.  So I am going to find that the

8    guideline calculation is life imprisonment, whether reached the

9    way the Probation Office reaches this, which I do believe is

10   correct, or, as a practical matter, the way in which Mr. Sorkin

11   would reach it, or, with the one disagreement that I noted on

12   the record, with the way Mr. Stavis would reach it.  So it is

13   of no significance in this sense.

14        So now let's turn to things that are of significance,

15   which is where under Section 3553(a) I should sentence this

16   defendant.  So let me hear first from Mr. Sorkin, then from

17   Mr. Stavis, then from the government, and then from each of the

18   defendants, if they wish to be heard.

19        MR. STAVIS:  Your Honor.

20        THE COURT:  Yes.

21        MR. STAVIS:  I had raised two factual issues.  I don't

22   know if your Honor wishes me to address those.

23        THE COURT:  Sure.

24        MR. STAVIS:  They are brief.

25        THE COURT:  Go ahead.

92odkass

SENTENCES

1          MR. STAVIS:  When I'm speaking to the Court.

2          THE COURT:  That will be fine, and if Mr. Sorkin has

3     anything.  There were a number of disagreements with particular

4     statements in the PSR.  My feeling about most of them is they

5     were not material, but if there are ones that you think are

6     material, certainly you should raise them now.

7          With the ones that I thought were immaterial, I

8     thought I would simply before rendering or issuing the written

9     final judgment, just go through all of those and issue a

10    directive to the Probation Office as to those I thought ought

11    to be corrected, if any, but what I want to hear today are the

12    material ones.

13         MR. SORKIN:  May I proceed, your Honor?

14         THE COURT:  Yes.

15         MR. SORKIN:  Thank you, your Honor.

16         As your Honor well knows, if a man is ever to receive

17    credit for the good he has done and his immediate misconduct

18    assessed in the context of his overall life, now is the time to

19    do it.  And I am quoting from a decision that I --

20         THE COURT:  Yes, it is a weak authority but one I will

21    accept.

22         MR. SORKIN:  But it is the best authority, your Honor,

23    that I could get for today.

24         THE COURT:  So let me in that regard say, because I

25    think it is important to state this for the record but then

92odkass
                              SENTENCES

 1    otherwise not pursue it unless counsel wants to, in the

 2    pretrial proceedings the Court became aware of assistance that

 3    had been rendered by Mr. al Kassar to one or another

 4    government/governments, and I certainly take that to be a

 5    mitigating factor.

 6            MR. SORKIN:  May I address that a little further, your

 7    Honor?

 8            THE COURT:  Sure.

 9            MR. SORKIN:  I don't mean to suggest that your Honor

10    has taken our thunder away, but I think -- and I don't mean

11    this in a pejorative way to the government -- I thought it was

12    somewhat disingenuous and unfair, fundamentally unfair for the

13    government to take the position publicly of all of the alleged

14    terrible things that Mr. al Kassar allegedly engaged in outside

15    of this case and at the same time taking the position that

16    certain information which, as your Honor correctly said we

17    addressed it pretrial, was never challenged by the government,

18    never alleged to be false, never alleged to be not material

19    and, quite frankly, ignored entirely.  Now is the time, and I

20    would say we are not going to go into those areas, for obvious

21    reasons, but your Honor is aware of them.

22            I think your Honor has to weigh that very carefully --

23    I say that respectfully -- because as we put in our sentencing

24    memorandum, Mr. Kassar put himself and his family at grave risk

25    for over two decades in doing certain things, which I think

92odkass
                              SENTENCES

1    your Honor certainly is aware of and as your Honor alluded to.

2         I think the paramount issue in this case, your Honor,

3    in addressing whether or not Mr. al Kassar engaged in conduct

4    which he was convicted of -- and while we disagree with the

5    verdict, we have to live with it; we're not here to challenge

6    the verdict, at least in this forum -- is whether or not Mr. al

7    Kassar should be deemed to be a terrorist.

8         I would respectfully submit to this Court that Mr. al

9    Kassar was not convicted of terrorism.  As the government said

10   in its summation --

11        THE COURT:  Well, let me -- I need to interrupt you --

12        MR. SORKIN:  Sure.

13        THE COURT:  -- to make sure I understand what you're

14   saying.

15        I do think it is common ground among the parties --

16   and I will, of course, stand corrected if any counsel disagrees

17   with this -- that the primary motivation of the defendants here

18   was to make money.

19        MR. SORKIN:  That is correct, your Honor.

20        THE COURT:  I think, it's certainly my impression that

21   over the years Mr. al Kassar played many roles and played many

22   angles, and some of them were laudable and some perhaps not so

23   laudable, but the common denominator was to make money.

24        However, that included, because he is in the very

25   unusual business of dealing in major weapons, entering into

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16

92odkass
                                    SENTENCES

1    arrangements, such as the one he was convicted of here, that

2    would have, as he understood, assisted terrorist activity and

3    led to the prospective deaths of Americans.

4              So I think we have to distinguish between primary

5    motivation, which was to line his pocket, and knowing effects,

6    which, as the jury found and as in this Court's view is

7    overwhelmingly supported by the evidence, that he full well

8    understood that the arrangements in this case, had they been

9    for real rather than a sting, would have resulted in the

10   advancement of the terrorists and the deaths of Americans.

11             So that's the distinction I draw.

12             MR. SORKIN:  Your Honor, I would respectfully disagree

13   slightly, I think, materially.  I think one cannot ignore the

14   fact that this was a sting operation, that this was an

15   operation concocted by, developed by, instituted by, the United

16   States government through the DEA.  There is no in evidence

17   this record, your Honor, anywhere that Mr. al Kassar anywhere

18   in this case, with the evidence that came to trial, ever

19   assisted in any terrorist activities which under the definition

20   as it would apply to other conduct and this case was an

21   offense -- and I'm quoting from the definition under

22   2332b(g)(5) -- an offense, quote, that is calculated to

23   influence or affect the conduct of government by intimidation

24   or coercion or to retaliate against government conduct,

25   unquote.

92odkass
                              SENTENCES

1           If your Honor accepts the proposition that Mr. al

2    Kassar entered into this series of conspiracies to line his

3    pockets, the intent was not to engage in a terrorist activity,

4    which I think the statute may be ambiguous on that.

5           THE COURT:  I'm distinguishing intent from motive.

6    And what I said was his motive, his primary motive, was to line

7    his pockets.

8           But if you -- to take a hypothetical that's not this

9    case but just to make it an extreme situation:  If you possess

10   an atomic bomb and someone comes to you and says I would like

11   to buy your atomic bomb to blow Sweden off the map and you

12   don't say a word but you sell me the atomic bomb, you are just

13   as involved in the murder of all those Swedes as the people who

14   purchased the bomb because you knew darn well what it was going

15   to be used for.

16          MR. SORKIN:  I think you have to draw the distinction,

17   with respect to your hypothetical, your Honor, that the person

18   who approached me never had any intention to blow up Sweden,

19   the person who approached me never had any intention to harm

20   anyone because this was a made up story.

21          THE COURT:  I understand it is a sting but I don't

22   understand why that helps your client because he didn't know it

23   was a sting.

24          MR. SORKIN:  That may be true, your Honor, but if your

25   Honor -- I don't think the statute can be read as an either/or,

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

92odkass
                              SENTENCES

1    either he went into this conspiracy to influence the conduct of

2    the United States government or to retaliate against government

3    conduct, or he went into this conspiracy or series of

4    conspiracies to line his pockets, and I don't think,

5    respectfully, you can have it both ways.

6              THE COURT:  I think we're in disagreement on that.

7              But anyway, go ahead.

8              MR. SORKIN:  I would suggest to your Honor that that

9    is the case here, and I think it has a dramatic impact, your

10   Honor, not only on the issue of -- and I'll get to that in a

11   moment -- where he is incarcerated for a sentence that will

12   result more likely than not in his dying in jail but also, your

13   Honor, with respect to the forfeiture issue.  This --

14             THE COURT:  I do want to discuss forfeiture at some

15   length but separately.

16             MR. SORKIN:  Surely.

17             THE COURT:  We'll take that up after the we compose

18   the rest of the sentence.

19             MR. SORKIN:  I think, your Honor, by calling this an

20   act of terrorism improperly, as we discussed a little bit

21   earlier, takes this from a Category I criminal history to a

22   Category VI, and I would suggest to your Honor that would be an

23   improper enhancement based upon the facts of this particular

24   case.

25             We've already discussed, your Honor, what I regard as

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

92odkass
                        SENTENCES

1    the piling on of points and the various enhancements, and I do

2    not wish to waste the Court's time, but I would submit to your

3    Honor that in this particular case, that a downward departure

4    on Counts One, Two, Four and Five, which the Court certainly

5    has discretion to exercise, that it do so in this particular

6    case.

7           And I think, your Honor, the downward departure, as

8    your Honor alluded to earlier, is the information that we

9    believe, respectfully -- and, of course, we disagree with the

10   Court -- should have been introduced to the jury but was not,

11   and your Honor ruled that way.

12          I would also suggest, your Honor, that because Mr. al

13   Kassar will more than likely than not, as I just said, die in

14   prison.  With a 25-year sentence at the age of 63, the

15   expectation that he is going to walk out of prison at the age

16   of 88 is remote.

17          THE COURT:  Well, just so everyone again is on the

18   same wavelength, because I thought about this in preparation

19   for today:  While the federal government has done away with

20   parole, it has not done away with good time.  So any sentence

21   imposed by a court in any case that's in federal Court really

22   has a 15 percent range because that is the maximum good time.

23          MR. SORKIN:  I would suggest, your Honor, that even if

24   he lives past the age of 84, and I haven't done the 15 percent

25   calculation of 80, your Honor, without getting into the life

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

92odkass
                        SENTENCES

1    expectancy of his family, I would still submit that getting out

2    of prison on his own is remote.

3         I would point out to your Honor there is yet another

4    reason, and that is the fact that his immediate family, your

5    Honor, does not reside in the United States.  His only relative

6    in the United States is his niece, who resides with her husband

7    in Florida.  And this has all been put forth in our sentencing

8    memorandum and I don't want to --

9         THE COURT:  Yes, and I have her statement which was I

10   thought very cogent and helpful to the Court.

11        MR. SORKIN:  I would say to your Honor that a downward

12   departure based solely upon the information that your Honor had

13   at his disposal, which we litigated and which your Honor ruled

14   on, certainly mitigates for a downward departure and a

15   substantial downward departure with respect to Counts One, Two,

16   Four and Five.

17        THE COURT:  Again, I'm not sure this makes a

18   difference, but are you arguing technically for a downward

19   departure under the guidelines, which I don't think would be

20   supported by the argument --

21        MR. SORKIN:  No.

22        THE COURT:  Or you want a nonguideline sentence that

23   is substantially -- that is as close to 25 years as the Court

24   would come to?

25        MR. SORKIN:   I would ask the Court for a

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

92odkass
                          SENTENCES

1    nonguidelines sentence, and as we put in our papers, I think

2    5K2.0 would be the appropriate way to deal with that.  I think

3    your Honor can consider that, and I would submit that because

4    of the unusual facts related to that information, it is

5    certainly a matter that the Sentencing Commission, as far as

6    I'm aware of, never considered.  So I think 5K2.0 is certainly

7    something that your Honor should consider and --

8              THE COURT:  My point is it doesn't really matter

9    because I could consider it in any event under Section 3553(a).

10             MR. SORKIN:  That is correct, and I haven't even

11   addressed the 3553(a) matters, your Honor.  I don't think I

12   need to.  Your Honor is fully familiar with the Booker progeny,

13   Cavera, a recent case in the Second Circuit.  We've alluded to

14   it in our papers and I don't think I need waste the Court's

15   time on that.

16             I would also say, your Honor, and it is critically

17   important, as we put in our papers, that your Honor consider,

18   as well, what the Court says with respect to the judgment and

19   commitment order.  I think your Honor should take into

20   consideration -- I say this respectfully -- the fact that if --

21   and whatever you rule with respect to the sentence, if your

22   Honor deems it so, based upon the evidence that your Honor saw

23   in this case, that Mr. al Kassar is not a threat to national

24   security, then I would respectfully request that your Honor

25   note that on the judgment and commitment.

92odkass
                         SENTENCES

1            I would also respectfully request, your Honor, that

2    Mr. al Kassar be recommended by the Court to the FCI facility

3    in Coleman, or Coleman, which is in Florida.  That is where his

4    niece, her husband, their daughter reside.  It is the closest

5    he has to any family in the United States, a country he has

6    never visited before.  It is his only contact with his wife and

7    four children who reside, study overseas in various countries.

8    And I think if your Honor does, based solely on this case, make

9    the decision that he is not a threat to national security --

10   and we note in our papers, your Honor, that in the 20-odd-plus

11   months that he has been virtually in solitary confinement both

12   in Spain and in the United States, we are unaware of any

13   problem, misconduct, behavioral issue that he is alleged to

14   have engaged in.  Now, I'm not going to suggest for the moment

15   that he is the perfect prisoner, but, quite frankly, your

16   Honor, with 23-hours-a-day lockdown where he has been since he

17   came to the United States, I can speak for myself and the

18   people who work with me, we've never had an issue brought to

19   our attention by the MCC that Mr. al Kassar is in any way a

20   problem prisoner or has sought to disobey rules or in some

21   fashion has gone out of his way to at the very least do

22   something far be it below a threat to national security.  And I

23   think if your Honor makes note of that on the judgment and

24   commitment, it will play a substantial factor, your Honor, in

25   where Mr. al Kassar is incarcerated, and I ask again that the

92odkass
                          SENTENCES

 1   Court recommend that he be incarcerated in the FCI Coleman

 2   which is in Florida.

 3           I know Mr. al Kassar has something to say, your Honor.

 4           THE COURT:  We are going to turn to the defendants

 5   last.  I want to cover all the issues before then.

 6           MR. SORKIN:  Yes.  If your Honor has no other

 7   questions --

 8           THE COURT:  Now would be the time.  What did you want

 9   to say about the forfeiture?

10           MR. SORKIN:  Your Honor, I think the forfeiture,

11   issue, your Honor, is tied into whether or not this was an act

12   of terrorism.

13           That section, which is -- I'm always fascinated by the

14   number of sections and subsections and subsections.  As we both

15   get on in age, your Honor, it is very difficult to follow any

16   of them without reading them.  But 18 U.S.C. 981(a)(1)(G)

17   applies only to federal crimes of terrorism.  And as I read the

18   statute -- it is the definition that is taken from 2332b(g)(5).

19   As I read statute, your Honor, there is no forfeiture unless

20   there is an act of terrorism.  And I realize your Honor

21   disagrees, but I would also note, your Honor, that if your

22   Honor has any discretion with respect to forfeiture, certainly

23   the money that the government sent to the two or three banks

24   alleged in the Indictment which the government claims it was

25   their money, we have no issue with that.  But with respect to

92odkass
                              SENTENCES

1    the home in Marbella, which has been the residence of Mr. al

2    Kassar, his wife and four children for as many years as he has

3    been in Spain, which is 25, and his children essentially grew

4    up there and his wife lives there, to the extent your Honor has

5    any discretion, putting aside the statutory definition of

6    terrorism, we would urge your Honor that that not be made a

7    part of the forfeiture.

8           THE COURT:  All right.  Thank you very much.

9           MR. SORKIN:  Thank you, your Honor.

10          THE COURT:  Let me hear from Mr. Stavis.

11          MR. STAVIS:  Yes, your Honor.  I have, on behalf of

12   Mr. Moreno Godoy, there were two minor factual issues that I

13   want to just indicate to the Court what their significance is.

14          THE COURT:  Go ahead.

15          MR. STAVIS:  The first is that my client is a citizen

16   of Spain.  In page 14, paragraph 120 of the PSR, and also I

17   believe on the second part of the cover page, it says,

18   "Citizenship Chile."

19          He was residing in Spain.  He was a citizen of Spain.

20   When he was arrested in Romania he had his Spanish passport on

21   him.  Now, why is this material, your Honor?

22          THE COURT:  Well, paragraph 120 does not take a

23   position; that doesn't mean this Court shouldn't take a

24   position --

25          MR. STAVIS:  Yes, I'm urging the Court to do so.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

92odkass
                          SENTENCES

 1              THE COURT:  But just so the record is clear, paragraph

 2     120 says, "According to ICE, the defendant is a citizen of

 3     Chile.  He entered the U.S. on October 16, 2007 via

 4     extradition.  According to defense counsel, the defendant has

 5     dual citizenship in Chile and Spain, and the relevant

 6     citizenship documents were seized pursuant to a search of the

 7     defendant's bedroom."

 8              So I guess I didn't see why it matters --

 9              MR. STAVIS:  Yes.  One of the issues that I think we

10     tend to miss here is that Mr. Moreno Godoy is going to be

11     incarcerated for at least 25 years in what is for him a foreign

12     country.  That is what's unusual about the case.  Although your

13     Honor every day of the week passes sentence on people from

14     other countries, he didn't come here -- he here only through

15     extradition, your Honor.

16              And why it's material where he comes from is if there

17     are certain accommodations that the Spanish government can make

18     for him, if there are certain things that they could try to

19     persuade the Bureau of Prisons on his behalf.  Bearing in mind

20     that he is a Spanish citizen and is being incarcerated for what

21     in all likelihood is the rest of his life here in the United

22     States, it was also -- perhaps it's not material, as material

23     as these other issues -- it's very important to Mr. Moreno

24     Godoy, and he stressed this to me when we met on Sunday, that

25     this Court and the Bureau of Prisons know that he is a citizen

26

92odkass

SENTENCES

1    of Spain.

2              So I'm asking the Court to make that finding --

3              THE COURT:  All right.  I'll hear from the government

4    on that.

5              I have already given him, in effect, the benefit of

6    the one and only application the Spanish government made in

7    this case, which is that Mr. al Kassar not be sentenced to

8    death or life in prison, and I've made it because he's on any

9    analysis less culpable than Mr. al Kassar.  So he gets that

10   benefit but for a different reason.

11             Go ahead.

12             MR. STAVIS:  The second issue was on page 14, in

13   paragraph 52.  For some reason, the PSR, inartfully and

14   incorrectly, quoted the trial evidence, "Moreno Godoy stated

15   that al Kassar had buyers for the drugs in Syria."

16             I went back to Government's Exhibit 41T, which was

17   that conversation.  I went back to the transcript at page 760.

18   That particular sentence is factually incorrect, and it does --

19   the involvement -- and your Honor will remember, we had some

20   famous sidebars on this.  The informants make it clear that

21   they're from the FARC and they grow their own cocaine and they

22   use it to get money, that they use it to buy these arms or

23   weapons.

24             But this paragraph casts a different light on

25   Mr. Moreno Godoy; it is a false light.  And that's why we

92odkass
                        SENTENCES

1    believed it was material and that's why we asked -- first, we

2    asked the Probation Department.  They sort of kicked the can

3    down the road.  We're now down the road and that's why we're

4    asking the Court to --

5         THE COURT:  I want to hear from the government on

6    this.  My recollection is supportive of yours, Mr. Stavis, on

7    this point, but as Mr. Sorkin has so wisely pointed out, when

8    you reach a certain age memories are uncertain so we'll see

9    what the government has to say.

10        MR. STAVIS:  Your Honor, while we moved past the

11   guidelines' issues, there is -- one of them was the terrorism

12   enhancement that was requested, which is an additional 12

13   levels and six criminal history categories, and I won't repeat

14   what is in our presentence memorandum.  That enhancement has a

15   huge impact on the conditions of confinement.  Now, your Honor

16   may wish those conditions of confinement and we're going to

17   know soon enough.  But if your Honor doesn't wish those

18   extremely harsh conditions of confinement, I would ask the

19   Court not to apply the terrorism enhancement.

20        Which gets us to the 3553(a) factors, your Honor.

21        Now, 25 years is a long time.  Someone waking up from

22   a deep sleep might want to know if Ronald Reagan was reelected.

23   It is a long time.  And one of the things that when you come

24   out of law school and go to work for the District Attorney's

25   office, which I did because I wasn't fortunate enough to three

92odkass

SENTENCES

1   years later work for the U.S. Attorney's office, they used to

2   take us on a tour of Rikers Island because they wanted us to

3   know where we are sending people or where we're asking the

4   Court to send people.

5        Now, I know that your Honor has taken those tours, and

6   I know that your Honor is one of the most active judges on this

7   bench on those issues.  And I know from my previous sentences

8   before your Honor that you consider very, very deeply that

9   there is before you a human being.  This human being, your

10  Honor, must serve a 25-year sentence.  And, your Honor, this

11  human being, I submit to the Court, were it not for the statute

12  that compels you to do that, should not be receiving a 25-year

13  sentence.

14       This is his first offense, your Honor, and I'm not

15  saying his first conviction, with a string of arrests and bad

16  conduct.  Even the presentence report shows that he went to

17  live with Mr. al Kassar in 1997, or thereabouts.  He was

18  responsible for helping manage the employees and the other

19  things.  He also assisted Mr. al Kassar in all his business

20  endeavors.  There were a lot of real estate rental apartments,

21  there were investments and various other things.

22       Now, he is a person who is very educated.  He has a

23  Master's degree in agronomy.  He comes from a very prominent --

24  and it is a little interesting.  He comes from a prominent

25  Chilean family where his grandfather -- he was raised with his

29

92odkass
SENTENCES

1    mother and grandparents and that grandfather was the President

2    of the Supreme Court of Chile.  His uncle was a senator.  His

3    cousins are senators.  And I know your Honor is somewhat aware

4    of the politics of Chile because the United States was very

5    involved in the politics of Chile at one time.

6         He comes from a, for want of a better word, a somewhat

7    right-wing political family.  He is accused here of terrorism

8    on behalf of a left-wing Communist rebel group, the FARC, the

9    F-A-R-C.

10        THE COURT:  I need to interrupt you here in the same

11   way that I did with Mr. Sorkin.

12        I assume -- and I haven't heard yet from the

13   government so they may disagree, but I assume that it's common

14   ground among the parties that the primary motivation of

15   Mr. Godoy, just like the primary motivation of Mr. al Kassar,

16   was to make money.  In his situation there was the added role

17   of his, in effect, subordinate role to Mr. al Kassar.

18        But one has to distinguish between motive and

19   knowledge and intent.  With respect to Mr. Godoy, I think, as

20   with Mr. al Kassar, the evidence was overwhelming that he

21   entered into what he believed was going to be an arrangement to

22   sell vast quantities of very serious weapons to a terrorist

23   organization for, among other things, the purpose of killing

24   Americans.

25        It's one thing to say, well, deep down in his heart he

92odkass
                          SENTENCES

1    didn't care, he just wanted to make a buck, or a Euro.  It's
2    quite something else to say that he, both as a matter of law
3    and as a matter of common sense, can evade responsibility for
4    what he knows are the consequences of his actions if this had
5    not been a sting.
6             MR. STAVIS:  Yes, the distinction is an appropriate
7    one and it is one -- a distinction with knowledge and intent is
8    one that is landing him in the predicament where he is today
9    where no matter what happens he's going to jail for 25 years.
10   So, your Honor, we're arguing over how much more he can go.
11            THE COURT:  All right.
12            MR. STAVIS:  That is a factor --
13            THE COURT:  In that context I understand your
14   argument.
15            MR. STAVIS:  That is correct, your Honor.
16            And I might also say that the profit motive is
17   different because Mr. Moreno Godoy is not a business partner of
18   Mr. al Kassar, and Mr. Moreno Godoy would make the same amount
19   of money whether he was just shuttling guests to the home in
20   Marbella, taking care of the servants or going to the local
21   bank.
22            THE COURT:  At least tentatively, I think that may
23   well be the case.  That is an important point that I want to
24   hear from the government on.
25            MR. STAVIS:  Yes.

92odkass
                              SENTENCES

1              THE COURT:  But I think that is relevant.

2              MR. STAVIS:  Your Honor, the government has termed it

3      a, quote, pivotal role and it has termed it a, quote, vital

4      role.  I tried the case.  The evidence that came out came out.

5      I know exactly what the evidence was at the trial of what

6      Mr. Moreno Godoy did and what he heard when he was sitting in

7      the living room.  I'm very much aware of that.  I do not think

8      it's accurate to call that a pivotal or vital role, and I think

9      that your Honor should consider that under the 3553(a) factors

10     with regard to this offense.

11             He drove to the bank.  He had discussions, frequently

12     even -- even in the presentence memorandum that the government

13     served and filed yesterday, it keeps saying and Moreno Godoy

14     was present for this conversation, and Moreno Godoy was present

15     for that conversation, and Moreno Godoy was present for the

16     other conversation, all of which goes to that distinction where

17     your Honor called the knowledge and intent but not what do we

18     do with him now.  What do we do with this human being who was

19     living with his friend in Marbella, Spain, and was helping him

20     and is convicted and must receive a 25-year sentence?  Has his

21     life been a complete horror show where we should just wipe out

22     everything and forgot that he is a grandfather and a father,

23     and a good father.  And your Honor has received the faxes from

24     two his daughters, Maria Jesus and Maria Paz --

25             THE COURT:  Yes.  I think they strongly confirm what

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

92odkass
SENTENCES

1    you just said about his being a good father.

2          MR. STAVIS:  And they were here for their father

3    during the trial.  They came.  They traveled from Santiago,

4    Chile, and they supported him.  He's educated.  He has done a

5    lot of things in his life.  This is his first offense.

6          And I might point out, your Honor, the 25-year

7    sentence is a minimum sentence.  The government has confused a

8    "minimum" sentence with a "minimal" sentence, so that the

9    government has urged this Court that, well, Mr. Moreno Godoy

10   had the knowledge and intent and it was a terrible crime so why

11   should he receive the minimum sentence?  Why, your Honor?

12   Because the minimum sentence here is 25 years in prison, and

13   that's a minimum sentence, not a minimal sentence.  If the

14   government was arguing against a minimal sentence, they would

15   have a case, your Honor, not when it's 25 years.

16          I would ask the Court, as far as our specific

17   recommendations on behalf of Mr. Godoy, if your Honor believes

18   that a 25-year sentence for a 60-year-old first offender is a

19   very serious, long sentence, then we would ask the Court to

20   sentence for 25 years on Count Three -- that's the missile

21   count, that's the mandatory minimum -- and we had asked the

22   Court to set sentences in accordance with the 3553(a) factors

23   on Counts One, Two, Four and Five.

24          And as I've said in my submission to the Court

25   yesterday, that will -- if your Honor is inclined, and I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92odkass
                            SENTENCES

1    believe that your Honor -- I would urge your Honor to be so

2    inclined -- to show that the 25 years is because that is what

3    the statute and the law require.  And as I used to hear in the

4    pre-Booker days from courts in this district and others,

5    Mr. Stavis, my hands are tied.  Well, this is a case

6    post-Booker where your Honor's hands are tied and that would

7    underscore that.

8            I would ask that there be no terrorism enhancement

9    under Section 3A1.4 because of the consequences of his

10   conditions of confinement.

11           I would ask your Honor -- this is a recommendation --

12   that the judgment and commitment for Mr. Moreno Godoy reflect

13   that he does not present a threat to national security, also

14   going toward the conditions of confinement.

15           And I would ask the Court that Mr. Moreno Godoy -- I

16   would ask the Court for a recommendation -- I know that is it

17   is not binding -- I would ask the Court for a recommendation

18   that Mr. Moreno Godoy be incarcerated at the federal facility

19   at Coleman, Florida, because it has every different security

20   level so whatever they find, he could be there.  And, your

21   Honor, at the very end of his youngest daughter's letter to the

22   Court, she asks, "Please try to put him in Miami because from

23   Santiago, almost every flight goes there.  It's the cheapest

24   and easiest way.  Don't do it for him, do it for a 24-year-old

25   daughter."

92odkass
                          SENTENCES

1          So the family is in Santiago, Chile.  He would have

2     access to his family.  And, again, I'm stressing to the Court

3     Mr. Moreno Godoy is going to spend, under the mandatory

4     minimum, the rest of his life in a prison in a foreign country.

5     So if your Honor could make that recommendation, it would be

6     very much appreciated not only by Mr. Moreno Godoy but by his

7     family as well.

8          One moment, your Honor.

9          THE COURT:  Yes.

10         (Pause)

11         THE INTERPRETER:  Your Honor, may the Interpreter make

12    a request to the clerk of the Court?

13         (Pause)

14         MR. STAVIS:  Thank you, your Honor.

15         THE COURT: All right.  Thank you.

16         Let me hear from the government.

17         MR. JOHNSON:  Just to begin, your Honor, with respect

18    to the assurances that were given and in connection with the

19    extradition of al Kassar from Spain, the only assurance that

20    was given was that the government would not seek a sentence of

21    life in prison.  So --

22         THE COURT:  Just to -- I understand that on the one

23    hand, that doesn't bind me.  But on the other hand, to me it

24    has always been very important that anything that goes on in my

25    court reflect reality and not legal fictions.  So that would be

92odkass
                          SENTENCES

1    a hollow assurance if you were now asking, say, for a 100-year

2    sentence.  So that's why I framed this in terms of 35 years as

3    the highest; 25 years everyone agrees is the mandatory minimum,

4    because even if these defendants lived to a ripe old age, it is

5    unlikely that they would spend much beyond a 35-year sentence

6    out of prison.

7              So do you disagree with that?

8              MR. JOHNSON:  No, I don't disagree with that, your

9    Honor.

10             THE COURT:  OK.

11             MR. JOHNSON:  I just wanted to be clear with respect

12   to the nature of our assurances but I certainly understand what

13   you are saying.

14             THE COURT:  Then we are all on the same wavelength.

15             MR. JOHNSON:  With respect to the guidelines range

16   that applies, as your Honor is aware, obviously you do need to

17   find the guidelines in this case --

18             THE COURT:  I actually don't but I will.  You are

19   actually wrong about that.  The Second Circuit has said that

20   where there is a guideline difference between the parties that

21   makes no practical difference, the court is not required to

22   find the guidelines.  And I think actually this is such a case.

23             Nevertheless, I do in fact think that the calculation

24   made by the probation officer is the right one and I will adopt

25   that.

92odkass
                         SENTENCES

 1          MR. JOHNSON:  I just have a few points, then, your

 2     Honor, to respond to what defense counsel have said.

 3          This was a crime of terrorism, and the claim that this

 4     offense was somehow not a crime of terrorism simply ignores the

 5     evidence and certainly the verdict.  From the beginning these

 6     defendants knew that the weapons they had agreed to sell were

 7     going to the FARC to kill Americans.  They were on videotape

 8     where they discussed the fact that the informants who were

 9     portraying themselves as representing the FARC wanted to use

10     the weapons -- intended to use the weapons to kill Americans in

11     Colombia, to shoot down American helicopters in Colombia.

12          And armed with the knowledge that the FARC was going

13     to use these weapons to kill Americans, Moreno and al Kassar

14     went forward with this deal for months to get it done.

15          Now, with respect to Mr. al Kassar, certainly he was

16     looking for money, but your Honor will recall, the first thing

17     that he asked the informants when he was in his living room in

18     his mansion in Spain was whether they were for or against the

19     U.S.  He wanted to --

20          THE COURT:  I don't draw the same inference.  I

21     remember that testimony, but my own view of it was -- and this

22     was not necessarily the jury's view but for purposes of

23     sentencing I have to give my own view -- that Mr. al Kassar

24     wanted to test out his prospective purchasers as to what view

25     he should adopt.  I'm not sure that we'll ever know deep down

37

92odkass

SENTENCES

1    in his heart -- and I'm not sure it is relevant -- deep down in

2    his heart whether he was right-wing, left-wing, pro-American,

3    anti-American, etc., because for the reasons you've already

4    stated, and the Court has already stated, there is no doubt

5    what he intended in this case, as the videotapes show.

6            But I'm not sure that all his interplay was of a form,

7    as you would interpret it, "Well, I'm not going to sell to you

8    if you're pro-American."  I think it was more, "I want to

9    figure, out as a shrewd seller of arms, where your head is at

10   so I can adjust to it in my sales pitch."

11           I mean, Mr. al Kassar is a very sophisticated person,

12   a very complicated person.  It is a tragedy that a person of

13   his intelligence has spent so much of his life in activities

14   that certainly were not calculated to advance the human race.

15   But I am reminded a little bit -- this is an imperfect analogy,

16   but I'm reminded a little bit about a figure from the past,

17   Jackie Presser, who probably no one in this courtroom except me

18   remembers, who was the head of the Teamsters.  Jackie Presser

19   was a made member of the mob.  He was also a government

20   informant.  He was also a high-level teamster official, and he

21   was a master of playing everyone off everyone else because his

22   sole real intent was to further the interests of Jackie

23   Presser.

24           He convinced the mob that he was totally on their

25   side.  He convinced the FBI he was totally on their side.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

92odkass
                    SENTENCES

1    convinced the Teamsters he was totally on their side.  And he

2    was lying to every last one of them.

3            Now, as I say, the analogy is inept, but I think it is

4    fair to say that Mr. al Kassar is a man of many faces.

5            MR. JOHNSON:  I would agree with that, your Honor.

6    But just to highlight the evidence, which obviously should

7    control here, he did offer a thousand of his men, experts, to

8    show the FARC how to use explosives in Colombia and he offered

9    access to camps in his country where the FARC can be trained in

10   their war against the United States.  There is nothing

11   ambiguous or unclear at that point about what his intent was,

12   but certainly I agree that one of the motivations here for both

13   the defendants was greed.

14           We also think that al Kassar was and remains a threat

15   to the national security of this country, with his nearly

16   limitless wealth via the connections that he had to arms

17   companies, who he was able to use to get access to massive

18   amounts of arms, and the willingness that he demonstrated in

19   this case to make those arms available to groups he knew were

20   plotting to kill Americans.

21           Now, he posed a threat to the national security of the

22   this country when he was engaged in that conduct that we laid

23   out in this courtroom, and he remains, because of his

24   connections, because of the power that he wields and because of

25   the wealth that he demonstrated to use those things to harm the

92odkass
                              SENTENCES

 1   United States and its interests, a threat to the national

 2   security of this country.

 3          One thing that was highlighted is the history or the

 4   background of these two defendants, the fact that they are

 5   highly educated, that their families were ones of influence,

 6   that they had money and security, it appears, when they grew

 7   up.  We submit that these defendants are different from a

 8   number of defendants who appear in this courtroom for

 9   sentencing, who are defendants who don't have the same

10   opportunities, who don't have the same sort of support to make

11   the choices to follow the law, and here we have two defendants

12   who, with all the opportunities in the world to lead lives that

13   abided the law, made the choices that led them to this

14   courtroom here today.

15          Finally, the suggestion that because this case

16   involved an undercover operation on the part of the DEA and

17   that no Americans actually were at risk somehow merits a

18   reduction in the sentences that should be imposed frankly is

19   absurd.

20          The U.S. government and the DEA shouldn't have to wait

21   until Americans are harmed to identify a threat, to investigate

22   the threat, and to ensure that the harm will not be done.

23   That's exactly what occurred in this case.  The DEA identified

24   al Kassar and Moreno ultimately as a threat to the national

25   security of this country.  They investigated the threat.  They

92odkass
                              SENTENCES

1    developed an extensive amount of --

2         THE COURT:  I agree with all of that but I think you

3    are pushing it too far.  Every legal system, for example,

4    distinguishes between murder and attempted murder, even though

5    often the only reason an attempted murder doesn't become an

6    actual murder is because the attempted murder is caught -- the

7    scheme is foiled before it gets to the point of final fruition.

8    So I think it is relevant that no one was harmed because it

9    happened to be a sting, but that doesn't take away with the

10   part that I agree with you, which is that as far as these

11   defendants were concerned, they believed there would be all

12   sorts of extraordinarily awful harm that would result from

13   their sale of these weapons.

14        So let me ask you, though, one minor question and one

15   more major question.

16        The minor question is:  What about Mr. Stavis' issue

17   about paragraph 52 of his report, Mr. Godoy's report -- I think

18   actually it is the same on both reports -- where it stated that

19   Mr. Godoy stated that Mr. Kassar had buyers for the drugs in

20   Syria?  I don't really recall that.

21        MR. JOHNSON:  We agree, your Honor, that is not

22   supported by the evidence at trial.

23        THE COURT:  So I will -- I am going to issue an order,

24   anyway, as I mentioned earlier, going through a lot of the more

25   nitty-gritty kinds of things that were raised about the report

92odkass
                              SENTENCES

1    and I will certainly include the striking of that allegation.

2            MR. JOHNSON:  We also have no reason to dispute that

3    Moreno Godoy is a citizen of Spain.

4            THE COURT:  OK.  Fine.  We will correct that as well.

5            Now, the bigger question I have is:  There was

6    evidence presented by the defense of alleged services that Mr.

7    al Kassar performed for one or more governments.  Now, I don't

8    know that the government -- the defense says that the

9    government did not contest those.  I think a more accurate

10   statement, as I recall, is that the government took the

11   position, which the Court agreed with, that what was sought to

12   be presented should be excluded because it was not only totally

13   irrelevant to the issues being put before the jury but was

14   potentially a source of confusion, prejudice to the government,

15   a waste of the resources, a total smokescreen in terms of the

16   issues that were to be presented to the jury.  But now we're at

17   sentence and the Court can and does indeed wish to take account

18   of the entire life history of these defendants.

19           So what is the government's view as to the assistance,

20   or not, that was allegedly rendered by Mr. al Kassar?

21           MR. JOHNSON:  Well, a few points, your Honor.

22           First, I agree that the main objection at trial was as

23   to the relevance of the proffered information.

24           Second, we decline to take a position with respect to

25   confirming or denying any of the proffers that were made with

42

92odkass
                                    SENTENCES

1      respect to this issue.

2            Third, at this point I think your Honor is entitled to

3      take into account the histories and characteristics of the

4      defendants in total, and --

5            THE COURT:  But you see, here is the point I have.  He

6      was accused, very seriously accused, of playing a major role in

7      the Achille Lauro incident, but I have not chosen to take that

8      into account because, number one, he was acquitted, and, number

9      two, the parties dispute vigorously what his role was there and

10     I don't think it would be profitable for this Court to hold a

11     Fatico hearing on that issue.

12           Mr. Sorkin is saying that with respect to the positive

13     information, because the government's position was they will

14     neither affirm nor deny, that he should get the entitlement of

15     that information because it is not disputed.  The government is

16     essentially choosing not to take a position on the accuracy of

17     that information.  He says that's fine, but that means it is

18     not disputed so he should get the benefit.  And I think he may

19     be right if the government is not prepared to dispute that

20     information.

21           MR. JOHNSON:  Well, just to round out the issue, I

22     mean, there was evidence at trial -- in fact, the defense at

23     trial was that al Kassar was working as an informant as a part

24     of this investigation --

25           MR. SORKIN:  No, no.

92odkass
                        SENTENCES

1          DEFENDANT al KASSAR:  No, no.

2          THE COURT:  Gentlemen, excuse me.  This is a court of

3    law.

4          Go ahead.

5          MR. JOHNSON:  That he was providing information to

6    authorities in Spain, whose depositions we took the week before

7    the trial, and that as a result of that he lacked the intent to

8    commit the conspiracies that were charged.  That obviously was

9    an issue at trial.  The jury did not take very long to reject

10   that defense.  But the point is in this case, as I point out in

11   our papers, Monzer al Kassar used the relationship that he had

12   with Spanish intelligence to protect himself and to protect his

13   criminal activities, and that was the verdict in this case.

14         So I think that is important to take into account in

15   terms of assessing this issue.

16         THE COURT:  All right.

17         MR. SORKIN:  May I make three points, your Honor?

18         THE COURT:  Yes.  Is there anything else the

19   government wanted to address?

20         MR. JOHNSON:  No.  I could address forfeiture issues

21   but if you want --

22         THE COURT:  Yes, I do want to address the forfeiture

23   issues and then I will hear from the defense.

24         MR. JOHNSON:  We submitted an Order of Forfeiture --

25         THE COURT:  Yes.  By the way, I got a request from the

44

92odkass
                              SENTENCES

1   press for the letter that you submitted in support of the

2   forfeiture, and I didn't see anything indicating that you were

3   seeking to seal that in any way.  So --

4              MR. JOHNSON:  We are not, your Honor.

5              THE COURT:  OK.  So that will be made available to the

6   press.

7              So go ahead.

8              MR. JOHNSON:  The statute that applies here with

9   respect to forfeiture is clear.  For the reasons that we've

10  articulated -- and it appears that your Honor, in agreeing with

11  the guidelines' calculation in the presentence report, has

12  agreed with -- is that this is a crime of terrorism and, as a

13  result, that Congress has mandated that the defendant forfeit

14  his right to all assets whether they be foreign or domestic.

15             In addition, we've asked for the forfeiture of the

16  assets that were involved in the crimes of terrorism,

17  specifically the mansion and the handful of accounts that --

18             THE COURT:  The defense raises the question -- they

19  are not challenging the accounts.  They are challenging --

20  putting aside the legal challenge, they are raising, if you

21  will, the equitable question of, assuming I have discretion as

22  to the forfeiture, whether the forfeiture of the house should

23  be foregone because it is not clearly going to be occupied by

24  Mr. al Kassar but it will be occupied by his family.

25             MR. JOHNSON:  That is addressed, respectfully, in the

                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

92odkass
                         SENTENCES

1    rule that applies.  Your Honor is empowered -- in fact,

2    required -- to order the forfeiture of the assets that were

3    involved in the offense without regard for the interests of

4    anyone else in those assets.  It sounds to me like the defense,

5    and appropriately, is concerned that Mr. al Kassar's wife and

6    members of his family may have an interest with respect to that

7    asset.  Certainly, it would be appropriate for them to come

8    before --

9             THE COURT:  I understand that.  Sure, you are

10   absolutely right in your reading of the law.  They have a right

11   if they have a legal interest in that asset to make their own

12   application to the Court and I will certainly hear about that,

13   but what I understood Mr. Sorkin to be saying is that Mr. al

14   Kassar owned the home but that there was a humanistic interest

15   in not forfeiting it because it is really the place of abode of

16   the wife and children.

17            MR. JOHNSON:  It was clear at trial that the mansion

18   was the headquarters of the arms trafficking organization that

19   al Kassar led.  I took a number of hours, much to the chagrin

20   of the Court, to go through all the documents in the search

21   that were recovered inside that house, but it showed that all

22   the operations of this arms trafficking organization were based

23   in that house in Marbella.  Cell phones were all over the

24   house.  The fax machine was in the house.  This was where al

25   Kassar operated from to run his international enterprise.  So

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

46
92odkass
                              SENTENCES

1    there was also evidence at trial of the number of other

2    apartments that al Kassar controlled in Marbella --

3                THE COURT:  Also, I think it is fair to say, if I

4    remember correctly, the children were all well educated, they

5    are certainly highly employable.  It is not as if they are

6    without the means of sheltering themselves, so to speak.

7                MR. JOHNSON:  The PSR also indicates, I believe, that

8    none of the family members are residing in the mansion.  That

9    may change and that may be inaccurate --

10               THE COURT:  The one who testified indicated that she

11   was only there now and then.

12               MR. JOHNSON:  That is correct, your Honor.

13               THE COURT:  All right.  Thank you very much.

14               Let me hear from defense counsel and then we'll hear

15   from the defendants.

16               MR. SORKIN:  Your Honor, I have just a couple of

17   points.

18               I think with respect to the issue of threat to

19   national security, it is my understanding, your Honor, that the

20   threat has to be from prison.  If he was out on the street,

21   your Honor, the government's argument would carry some weight,

22   but the threat has to be "when incarcerated."  As I understand

23   the law and the Bureau of Prisons' rules, he has to be in

24   prison and while in prison a threat to national security.

25               That's point number one.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

47

92odkass
                              SENTENCES

1            Point number two, your Honor.  I heard Mr. Johnson

2    just say that there was evidence that there was a threat from

3    Mr. al Kassar that American lives were in jeopardy and that's

4    why the DEA commenced the sting.  Your Honor, I saw nothing in

5    the government's papers that they submitted to the Court with

6    respect to the sentencing, nothing in the Indictment, except

7    broad allegations that he was an arms dealer and sold to

8    alleged terrorist organizations, I saw nothing anywhere in this

9    case in any evidence that he was a threat and that's why the

10   sting was commenced.  So I take serious issue with what

11   Mr. Johnson said.

12           Third, your Honor, I think, again, it's a bit

13   disingenuous for the government to say they take no position

14   with respect to that information.  They did take the position

15   and the position was that it was classified.  There was nothing

16   with respect to we don't deny, we don't admit, we don't have

17   any contact with him, we don't want to discuss.  They took the

18   position, your Honor, that it was classified.  If it was not

19   true and inaccurate and a fiction, then why was it classified?

20   OK?  So I really takes issue with that point.

21           The last point I want to raise, your Honor, is that --

22   two points, I'm sorry.

23           THE COURT:  I just want to note for the record, not

24   that I disagree with the point that they took a position that

25   it was classified, that was one of two positions they took.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

48

92odkass
                         SENTENCES

1    The other was that it was irrelevant, and it was on the grounds

2    of irrelevancy that I ruled it out.

3           MR. SORKIN:  That is correct, your Honor.  The point I

4    want to make --

5           THE COURT:  No, I understand the point you are making.

6    I just want to make it clear --

7           MR. SORKIN:  We took issue.  We argued the point.

8    Your Honor ruled against us, but at no time in any discussion

9    with the Court, putting aside the relevance issue, was there

10   any suggestion, inference by the government that the

11   information which they deemed classified was a fiction and was

12   fantasy.  None of that.  They took elaborate steps, your Honor,

13   to make sure it stayed classified.

14          The third point I want to make, your Honor, is -- and

15   I say this just so it is clear because Mr. al Kassar feels very

16   strongly about this:  He was not an informant, and I think the

17   information which the government deemed classified will show

18   that he was not merely an informant.

19          Lastly, your Honor, as I understand forfeiture under

20   981, unlike restitution, it is not mandatory, and the Court

21   does have some discretion with respect to forfeitable assets.

22          Thank you, your Honor.

23          THE COURT:  Thank you.

24          MR. STAVIS:  Your Honor.

25          THE COURT:  Yes.

92odkass
                        SENTENCES

1        MR. STAVIS:  Very briefly, because you mentioned to

2   Mr. Johnson that you are going to adopt the calculation of the

3   probation report, the Probation Department --

4        THE COURT:  Yes, and, therefore, I am disagreeing with

5   you on the terrorism enhancement.  I do have some other thing

6   to say on that issue which I will say when we get to

7   sentencing --

8        MR. STAVIS:  Yes.  But I just wanted to remind your

9   Honor that that would encompass, if your Honor does that, the

10  terrorism enhancement.

11       THE COURT:  I was consciously aware of that,

12  Mr. Stavis.  Thank you.

13       So let me hear from each of the defendants, if they

14  wish to be heard.

15       DEFENDANT al KASSAR:  Good afternoon, your Honor, and

16  thank you and the court for giving me this opportunity to

17  speak.  I am going to be very short statement.

18       Before I start my statement, I want to just, because

19  I've noted there is some reporters here and some interesting

20  people:  I'm not an informer.  It's just absolutely lies.  I'm

21  not an informer.

22       Now, of course, in all religions from God demand

23  justice.  In the Torah, they say justice, justice and justice

24  above all.  The Jesus Christ said justice is the salt of the

25  earth.  If we lose it, what's left?  And the Holy Koran said if

50

92odkass

SENTENCES

1      you judge people, judge them correctly and fairly.

2             Of course, I'll summarize my case in two lines from an

3      old Arabic poet.  Maybe it will lose the meaning but I'll try

4      to translate it as much as I can.  They said that throw him in

5      the water in the mad sea handcuffed and told him be careful to

6      be wet.  This is my case.

7             Now, with all my respect to the Court and to the

8      jurors, and I think some of them are here listening, if they

9      had been allowed or seen the classified information which this

10     Court sealed, which is in the possession of the government and

11     the court, which will prove what goes back to 20 years ago, it

12     proves without any doubt I have saved lots of human lives,

13     including American, and soldiers.  And it proves without any

14     doubt I have no intent for animosity against America or against

15     any other nation.  I think also it proves more than that, if we

16     had been allowed to use it.  And if the jury had seen this

17     classified information, I'm sure they would have come with a

18     different verdict.

19            Finally, I would like to thank my family -- my niece

20     is here -- and my lawyers for their support and belief in my

21     innocence -- in our innocence.

22            Nothing left to say but I've heard it so many times

23     that justice sometimes goes slow but sure.

24            Thank you, your Honor.

25            THE COURT:  Thank you.

92odkass
                              SENTENCES

1          And now from Mr. Godoy.

2          DEFENDANT GODOY:  Thank you, your Honor, for the

3    opportunity you give me to address the Court.

4          I am innocent and my conscience is at peace except

5    that I don't understand what, why the American government has

6    proved distrust against me.  I am a person who hates terrorism.

7    I am a person who respects any constitution and order and the

8    fundamental rights of all the governments, although they are

9    generally from the right-wing.  I am a person with mere

10   conservative ideas and I come from a family with the same kind

11   of thinking.

12         My grandfather, who raised me and with whom I lived

13   throughout my youth, was a judge of the Supreme Court for

14   decades, and my cousins and my uncles have been and continue to

15   be senators and congressmen from right-wing parties.

16         I remember years ago that me and my family got

17   traumatized because of an attack with a terrorist bomb that

18   caused injuries to my small daughters in Santiago, in Chile.  I

19   remember helping the intelligence services in Spain in many

20   opportunities, giving them very important information to fight

21   and to combat against terrorism, information that even helped

22   the United States a lot in many opportunities.

23         My family and friends cannot understand how a person

24   like me who hates terrorism so much can be accused and

25   condemned of helping left-wing groups that just want to sow

92odkass
SENTENCES

1     chaos and destruction.

2            Lastly, I want to thank my family in these moments for

3     keeping me company and also to thank my attorneys because they

4     believed in my innocence.

5            Thank you, your Honor.

6            THE COURT:  Thank you.

7            Well, I listened carefully to the very articulate

8     statements of the defendants, and of course I have been

9     privileged throughout this trial to have the benefit of the

10    excellent representation of the defendants by their very

11    outstanding lawyers, and they make many points that are worthy

12    of consideration.

13           But one cannot ignore, first, the totally overwhelming

14    nature of the proof in this case, vast amounts of which were

15    videotaped.  We don't have to speculate about what agreements

16    these two defendants entered into because it was there on

17    tape -- their voices, what was being said to them, what they

18    were agreeing to, and not just once but over a period of

19    months.  I was blessed and the system of justice was blessed by

20    the wonderful jury we had in this case, but it would have been

21    totally irrational for them to come to any verdict other than

22    the one they did.

23           And the notion that the information that related to

24    alleged good deeds that Mr. al Kassar had done in other

25    circumstances would have dissuaded the jury from finding the

92odkass
                              SENTENCES

1   facts on this case is, in my view, a defamation of the jury.

2   The Court, in its view, had no choice under the law but to keep

3   out that evidence because it was so plainly irrelevant.  And

4   had it been admitted for the jury to be in any way, shape or

5   form affected by it would have been a denial of their duty.

6            And what the evidence showed was that the two

7   defendants here, knowingly and intentionally, and without any

8   hesitation, and with their full embrace, entered into an

9   arrangement to sell huge quantities of the most serious weapons

10  to what they believed was a terrorist organization who would

11  use those weapons, among other things, to kill Americans and to

12  wreak havoc.

13           So the crimes of which they stand convicted are, in

14  this Court's view, properly considered terrorist crimes and

15  they are crimes of the utmost seriousness.

16           It is important, however, when one is imposing

17  sentence to take account of the entire picture, not only the

18  crimes before the Court.  And I put first and foremost giving

19  full recognition to the request of the government of Spain that

20  the government not seek a life sentence, but I take that to be

21  implicitly a request to this Court to exercise its discretion

22  not to impose a life sentence.

23           And it's interesting where that request was based.

24  The request with respect to the death penalty is more or less

25  standard from countries that disapprove of the death penalty

92odkass
                              SENTENCES

 1    and, therefore, will only extradite if no death penalty will be

 2    requested by the government, and the one against life

 3    imprisonment is not unheard of either.  This is not the only

 4    such case.  But it's interesting because, as the testimony that

 5    the defense themselves sought from the two Spanish intelligence

 6    officers and that was presented fully to the jury showed, Mr.

 7    al Kassar, among other things, deceived the Spanish authorities

 8    about the deal that we're considering here.  But I think it is

 9    fair to say that in other contexts he performed services for

10    the Spanish government, and others, and that that has to be

11    weighed in the balance.

12              So as a matter of comity to the Spanish government, I

13    will not impose in this case a sentence greater than 35 years.

14              And when I take account of all the factors under

15    Section 3553(a), but most especially the services I just

16    mentioned, and the Court's own conclusion that the ultimate

17    primary motive here, though it by no means excuses the

18    knowledge and intent, was a monetary motive, the Court

19    concludes that the proper sentence for Mr. al Kassar is 30

20    years.

21              So the sentence of the Court is that the defendant is

22    sentenced to 30 years on Counts One, Two and Three.  The

23    maximum on Count Four is 15 years, so it will be 15 years on

24    Count Four.  The maximum on Count Five is 20 years, so it will

25    be 20 years on Count Five, all terms to run concurrently.

92odkass
                              SENTENCES

1              I will not impose a fine because I am going to impose

2        the forfeiture.   I leave open if the family does have an

3        interest in the asset, they of course can make their own

4        application in that regard.   But for now the Forfeiture Order

5        as presented will be signed.

6              There is a special assessment of $500 that must be

7        paid.

8              There will be imposed to follow any imprisonment a

9        total of five years of supervised release on Counts One, Two

10       and Three, to run concurrently with each other and concurrently

11       with three years of supervised release on Counts Four and Five.

12             The terms of supervised release are the mandatory

13       conditions:

14             The defendant shall not commit any other federal,

15       state or local crime; that the defendant shall not illegally

16       possess a controlled substance; that the defendant shall not

17       possess a firearm or destructive device; and that the defendant

18       shall cooperate in the collection of DNA.

19             The mandatory drug testing condition is suspended

20       based on the Court's determination that the defendant poses a

21       low risk of future substance abuse.

22             There will also be imposed the standard conditions of

23       supervision 1 through 13.   They appear on the face of the

24       judgment and will be gone over with the defendant by the

25       Probation Office when he appears to begin supervised release.

92odkass
                        SENTENCES

1           And, finally, there are the special conditions that

2    the defendant will provide the probation officer with access to

3    any requested financial information; second, that the defendant

4    shall obey the immigration laws and comply with the directives

5    of the immigration authorities; and, third, that upon his

6    release from prison, the defendant will report to the nearest

7    Probation Office and he will be supervised by the district of

8    his residence.

9           Before I turn to Mr. Godoy, let me say with respect to

10   the request for recommendations, I reluctantly do not believe

11   that I can make the finding that the defendant is not a threat

12   to national security.  My reluctance comes not from any belief

13   that he is not a threat to national security but from the

14   consequences of not making that finding that may affect how he

15   fares in prison.  But I think the evidence with respect to Mr.

16   al Kassar is that he has a far-flung network that, as was shown

17   by the facts of this case, has the potential even while he is

18   in prison to be utilized for purposes that could constitute a

19   threat to national security.

20          I am prepared to recommend that he be imprisoned in

21   Coleman on the representation, which I have not independently

22   checked, that it has all levels of security.  So given that

23   representation, I will recommend Coleman.

24          I am sure, Mr. Sorkin, you have told your client I

25   can't order that.

92odkass
SENTENCES

1          MR. SORKIN:  Yes, your Honor.

2          THE COURT:  But I will recommend it.

3          All right.  Before we turn to Mr. Godoy -- my

4    courtroom deputy just said he checked.  It does appear it has

5    low, medium, and high security.

6          MR. SORKIN:  Yes, I was going to represent to the

7    Court, as an officer of the court, that that is our

8    understanding, your Honor.

9          THE COURT:  OK.  Before I turn to Mr. Godoy's

10   sentence, and we'll get at the very end to the question of

11   advising the defendants of their right to appeal, but is there

12   anything else with respect to Mr. al Kassar's sentence that we

13   need take up now?

14         MR. JOHNSON:  No, your Honor.

15         THE COURT:  OK.  Anything further from defense

16   counsel?

17         MR. SORKIN:  Your Honor, I realize your Honor cannot

18   make a judgment that he is or is not a threat to national

19   security, but I've heard nothing from the government today, nor

20   since he was extradited from Spain, nor from the prison

21   authorities at the MCC that he is in fact a threat to national

22   security or would be so from prison.  And I think in the

23   absence of any of that information, would your Honor

24   consider -- perhaps your Honor does not have to decide today,

25   consider it before the judgment and commitment order is

92odkass

SENTENCES

```
1    entered -- as to whether or not your Honor would say that based

2    upon what you have seen since you were assigned to this case,

3    the lack of representation by the government, nothing from the

4    MCC, that based solely on that, that will be the only thing

5    that your Honor could do.

6              THE COURT:  I'm basing it on what I just said, what

7    has emerged from the evidence of the case.  My understanding --

8    the government can correct me if I am wrong -- is that Mr. al

9    Kassar has not done anything improper while he has been in

10   prison.  But of course, one has to factor into that the fact

11   that he has been held in solitary.

12             But let me find out if the government disagrees with

13   me.

14             MR. JOHNSON:  We don't, your Honor.

15             THE COURT:  OK.  So you have that statement on the

16   record, if that is of better use to you, Mr. Sorkin.

17             Let me turn to Mr. Godoy.

18             I think I will not burden the record with repeating

19   all that I said about the serious and, but for the fact that it

20   was a sting, potentially catastrophic nature of the crimes that

21   were committed here, but I think it's also important to

22   distinguish between Mr. al Kassar and Mr. Godoy.  Now, Mr. al

23   Kassar got certain benefits because of his services and that's

24   why I reduced his sentence from potentially 35 to 30, but even

25   so, I think it is important that the sentences reflect the
```

92odkass
                              SENTENCES

1    difference in the culpability between those.

2            Mr. Godoy was an important contributor to the

3    conspiracies here, and I do not share the defense view of his

4    minor role or anything like that.  But I do think he was less

5    culpable than Mr. al Kassar.  It was Mr. al Kassar who was the

6    major doer.  So I am going to impose a 25-year sentence on

7    Mr. Godoy.

8            So the sentence of the Court is that the defendant,

9    Mr. Godoy, is sentenced to 25 years on Counts One, Two and

10   Three, to run concurrently; again, the maximum on Count Four,

11   15 years; and the maximum on Count Five, 20 years -- all those

12   terms to run concurrently -- to be followed by five years of

13   supervised release on Counts One, Two and Three and three years

14   of supervised release on Counts Four and Five, again all to run

15   concurrently.

16           No fine will be imposed even though here there is no

17   forfeiture being presented to the Court, but the Probation

18   Officer, after taking into account I think all the relevant

19   factors, in particular the fact that this defendant did not, if

20   at all, seeming at least enjoy anything like the wealth of Mr.

21   al Kassar and he obviously won't be in a position to have any

22   earning power in the future, recommends that no fine be

23   imposed, and I will in this respect follow the recommendation

24   of the probation officer.  There is, however, a special

25   assessment of $500 that is mandatory and must be paid.

60

92odkass
                            SENTENCES

1           The terms of supervised release are, first, the

2    mandatory conditions that the defendant shall not commit any

3    other federal, state or local crime; that the defendant shall

4    not illegally possess a controlled substance; that the

5    defendant shall not possess a firearm or a destructive device;

6    and that the defendant shall cooperate in the collection of

7    DNA.  The fifth mandatory condition, the drug testing

8    condition, is suspended based on the Court's determination that

9    the defendant poses a low risk of future substance abuse.

10          There will also be imposed the standard conditions of

11   supervision 1 through 13.  They appear on the face of the

12   judgment and will be gone over with the defendant by the

13   Probation Office when he reports to begin his supervised

14   release.

15          And finally, there are the special conditions.  First,

16   that the defendant shall provide the Probation Office with

17   access to any requested financial information; second, that he

18   shall obey the immigration laws and comply with the directives

19   of the immigration authorities; and, thirdly, that the

20   defendant upon his release from prison will report to the

21   nearest Probation Office to begin his period of supervised

22   release, and he will be supervised by the district of his

23   residence.

24          I will also recommend, though I cannot order, but

25   recommend his incarceration in Coleman.

92odkass
                          SENTENCES

1            With respect to the request that I make a finding that

2      he is not a threat to national security, while it is perhaps a

3      closer case, I decline to make that finding.

4            The point is, as the evidence so clearly showed, these

5      two gentlemen have an operation that is virtually worldwide

6      that involved Romania, that involved various countries in South

7      America, that involved Spain, that involved operatives in many

8      locales.  And while they may be in prison, it does not follow

9      that they will be so totally incommunicado with their

10     operatives that they don't present a threat to national

11     security.  So I decline to make that finding.

12           Again, is there anything, before I advise the

13     defendants of their right of appeal, anything further on

14     Mr. Godoy's sentence?  Anything from the government?

15           MR. JOHNSON:  No, your Honor.

16           THE COURT:  Anything from the defense?

17           MR. STAVIS:  No, your Honor.

18           THE COURT:  Mr. al Kassar, you have a right to appeal

19     your conviction and this sentence.  Do you understand that?

20           DEFENDANT al KASSAR:  Yes, I do.

21           THE COURT:  If you can't afford counsel for the appeal

22     at any time, the Court will appoint one for you free of charge;

23     do you understand that?

24           DEFENDANT al KASSAR:  Yes.

25           THE COURT:  Mr. Godoy, you have a right to appeal the

                                                                     62
92odkass
                            SENTENCES

1     judgment of the jury and also the sentence; do you understand

2     that?

3               DEFENDANT GODOY:  Yes.

4               THE COURT:  And if you can't afford counsel for any

5     such appeal, the Court will appoint one for you free of charge;

6     do you understand that?

7               DEFENDANT GODOY:  Yes.

8               THE COURT:  All right.  Court stands adjourned.

9               THE CLERK:  All rise.

10              MR. JOHNSON:  Your Honor, I'm sorry, just one

11    housekeeping matter.

12              We move to dismiss the underlying indictments as to

13    both defendants.

14              THE COURT:  Yes.  Thank you very much.  That

15    application is granted.

16

17                              -  -  -

18

19

20

21

22

23

24

25