

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*United States Courthouse*
*1 Saint Andrew's Plaza*
*New York, New York 10007*

November 25, 2016

**BY HAND AND ECF**

Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    **United States v. Virgil Flaviu Georgescu, 14 Cr. 799 (RA)**

Dear Judge Abrams:

      The Government respectfully submits this letter in connection with the sentencing of defendant Virgil Flaviu Georgescu (the "defendant" or "Georgescu"), which is scheduled for December 2, 2016 at 3:00 p.m., and in response to the defendant's sentencing submission, dated November 18, 2016 ("Def. Sub."). The defendant masterminded a for-profit scheme to sell an arsenal of military-grade weapons to men whom he understood to be terrorists, believing that those terrorists intended to use the weapons to protect drug production and kill American servicemen stationed in Colombia. Given the severity of the defendant's conduct, the Sentencing Guidelines contemplate a life sentence. The Government recognizes, however, that a substantial sentence of less than life could be sufficient to meet the goals of sentencing under Title 18, United States Code, Section 3553(a). As set forth below, such a sentence would reflect the gravity of the defendant's actions, ensure just punishment, promote respect for the law, and deter the defendant and others who seek to procure weapons for narcotics-trafficking terrorists.

      **I.**      **Background and Offense Conduct**

      As detailed in the Presentence Investigation Report ("PSR") and reflected in the Government's proof at trial, the defendant was the leader of a conspiracy to provide military-grade weapons to the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"). Unbeknownst to the defendant and his co-conspirators, the FARC representatives with whom the defendant had been negotiating the weapons deal were in fact confidential sources ("CSs") working at the direction of the Drug Enforcement Administration ("DEA").

### i. *May-August 2012: CS-1 Introduced to Georgescu*

The defendant first learned of the FARC's purported need for weapons in 2012, after one of the CSs ("CS-1") was introduced to a Southern California resident named Andi Georgescu ("Andi").[1]  During the years of their acquaintance, CS-1 represented himself to Andi as a Colombian drug trafficker, money launderer, and weapons broker.  In 2012, CS-1 provided Andi with a detailed list of weapons that CS-1 was attempting to procure, including shoulder-fired rockets, grenades, sniper rifles, and ammunition (the "Weapons List").  In May 2014, Andi introduced CS-1 via telephone to Georgescu, whom Andi explained to CS-1 had direct contact with weapons suppliers.  In recorded phone calls, CS-1 told Georgescu that he worked for the FARC and hoped to procure weapons for his organization.  Georgescu said that he could help, and urged CS-1 to communicate only via encrypted applications.  (PSR ¶ 18).

Meanwhile, Georgescu began attempting to procure the weapons for the FARC.  Through a mutual acquaintance, Georgescu contacted Vintila, who had contacts in the weapons industry by virtue of his former employment as a high-ranking official in Romanian government.  Vintila agreed to help Georgescu procure weapons for the Colombians, and began canvassing his weapons contacts in Romania, Russian, and Ukraine.  With Vintila's help, Georgescu put one of Vintila's Ukrainian weapons contacts in telephonic contact with CS-1 so that CS-1 could discuss the FARC's weapons needs directly with the supplier. (PSR ¶ 19).

### ii. *September 23, 2014: CS-1 Meets with Georgescu in Bucharest*

After they were introduced by phone, Georgescu and CS-1 discussed a possible weapons deal.  Eventually, they agreed to meet in person and, on September 23, 2014, CS-1 met with Georgescu and an individual identified only as "Marian" whom Georgescu said had close contacts with Serbian weapons suppliers (the "First Bucharest Meeting").  During the First Bucharest Meeting, the parties discussed weapons sales and CS-1 stated in front of Georgescu that CS-1's associates "want to fight and they want to kill the Americans.  And they want to buy this [weaponry] because of the Americans.  They want to shoot helicopters and airplanes."  After Marian indicated he understood, Georgescu added, "[I]t's the same thing in America.  In America they sell you the gun.  If you kill someone they don't care.  They sell it to defend yourself."  In Georgescu's presence, CS-1 also explored paying for some of the weapons with cocaine and re-emphasized that his associates wanted weapons to "protect their drug industry" and "bring down the American helicopters because they're the enemy."  (PSR ¶ 20).

### iii. *September 24, 2014: CS-1 & CS-2 Meet Georgescu & Vintila in Bucharest*

Georgescu and CS-1 agreed to meet the following day, September 24, 2014 (the "Second Bucharest Meeting").  Prior to the Second Bucharest Meeting, Georgescu called Vintila and asked if Vintila would attend this meeting and try to sell weapons to the CSs. Vintila agreed, and brought with him to the meeting four catalogues detailing weapons, optical devices, and other items that Vintila could procure through his Romanian weapons contacts. (PSR ¶ 21).

---

[1] Andi Georgescu, an unindicted co-conspirator, is not related to the defendant.

At the Second Bucharest Meeting, CS-1 and a second DEA CS ("CS-2"), met with Georgescu and Vintila at a hotel in Bucharest, Romania. CS-1 and CS-2 repeatedly stated that they wanted to secure weapons for the FARC to shoot down American helicopters in Colombia. CS-1 and CS-2 expressed their own distaste for the United States, at which point Georgescu interjected that once Americans established a presence in a country, it was impossible to rid that country of their presence. CS-1 echoed Georgescu's sentiment and explained that he and CS-2 wanted high-quality weapons to get the Americans out of Colombia, "even if we have to put them in [body] bags." Georgescu replied "Exactly," adding that "[t]hey [Americans] did the same thing in Iraq." Vintila proceeded to complain about the restrictions that Americans had placed on the defense industry in Romania and other European countries. (PSR ¶ 22).

Georgescu and Vintila discussed the logistics of supplying CS-1 and CS-2 with an array of military-grade weapons. Vintila introduced himself as the "head of the Army Industry in Romania," displayed his catalogues for the CSs, which showcased items that Vintila indicated he could provide, including handguns, machine guns, and an anti-aircraft cannon. (PSR ¶ 23). The meeting participants discussed specific items on the list and Vintila and Georgescu repeatedly assured CS-1 and CS-2 that they could supply them. At trial, Vintila explained that because of his job in the Romanian government, he in fact could have sold many of the weapons in these catalogues to the CSs and was prepared to do so at Georgescu's direction. (Tr. 570-72). Toward the close of the meeting, Georgescu stated that Vintila would investigate fake EUCs and that the parties would talk again once that matter had been resolved. (PSR ¶ 23).

Two days after the Second Bucharest Meeting, Georgescu approached Romagnoli and asked if Romagnoli had any weapons contacts. After showing Georgescu a photo of a gun, Romagnoli said that he did, and in Georgescu's presence called an individual named Gerardo Tanga, who Romagnoli knew to have the ability to procure weapons. (Tr. 916-17). Just as he had done with CS-1 and Vintila, Georgescu insisted that Romagnoli use only encrypted software to communicate about the weapons deal. (PSR ¶ 23). At trial, Romagnoli explained that Georgescu wanted him to use encrypted software to communicate to "avoid being intercepted by Americans, by FBI, by everybody." (Tr. 942).

### iv. October 8, 2014: The CSs Meet the Defendants in Tivat

On October 8, 2014, the defendants met with CS-1, CS-2, and a third DEA CS ("CS-3") at a Tivat, Montenegro, hotel (the "October Tivat Meeting"). Georgescu paid for Vintila's trip to Tivat, and all subsequent trips in furtherance of the weapons deal. (Tr. 602). At this meeting, the CSs repeated that they worked for the FARC and hoped to obtain weapons to kill Americans in Colombia, including antiaircraft weapons to shoot down American helicopters. At the outset of the October Tivat Meeting, Romagnoli introduced himself and Georgescu explained that Romagnoli would be providing all of the documentation for the weapons. Romagnoli showed CS-3 an image of a sample Ethiopian EUC on Georgescu's laptop, and Georgescu discussed the logistics of transferring the weapons from Ethiopia to Colombia. (PSR ¶ 25).

Also at the October Tivat Meeting, Romagnoli produced a catalogue of weapons (the "Romagnoli Catalogue"), which included pictures and quantities of different weapons systems. Vintila answered the CSs' questions about certain weapons systems, and made suggestions about what weapons would be most valuable in their fight in the Colombian jungle. (Tr. 606).

Georgescu, too, explained to the CSs how certain weapons systems worked, including explaining how a particular missile hones in on the thermal signature of aircraft. (Tr. 604). Vintila stated to Georgescu in Romanian that the CSs should pay an advance, come to the arms factory, test fire weapons, and then move forward with discussions about the order and payment. Georgescu roughly translated what Vintila had said, and emphasized that in two weeks the defendants would finalize the list of weapons they had available and the relevant prices, after which the CSs could go to the factory and "test the merchandise." The CSs asked Romagnoli how he wanted to be paid and if there was a particular account to which money could be wired—CS-2 stated that if Romagnoli did not have an account, the CSs would be happy to bring Romagnoli money in a box or to make payment in any one of a number of European countries. Romagnoli replied in Italian that payment in Spain would be best. Georgescu then volunteered that with fifty ZU23s, the CSs would be able to "change the balance in [their] country overnight," and emphasized that the anti-aircraft cannons could shoot "six hundred rounds a minute." (PSR ¶ 26).

On the evening of October 8, after Romagnoli left Tivat, Georgescu suggested to the CSs that they meet for dinner in Podgorica, Montenegro. That evening, Georgescu and Vintila drove from Tivat to Podgorica and met with the CSs in a hotel. During the ensuing conversation, Georgescu repeatedly remarked on how "stupid" Americans were and how the United States was a country "built on bullshit." He explained sarcastically that to impress Americans, one has to "tell them bullshit, I am proud, I am I'm… I, I am so proud to live in America. Oh, I love America, you know, God bless America." (GX 1T-L). Georgescu also installed an encrypted application on CS-1's telephone, which Georgescu explained would allow CS-1 and Georgescu to speak without fear of interception. Georgescu instructed CS-1 on how to use the application to talk or send covert text messages and saved Vintila and Georgescu's contact information in CS-1's phone. (PSR ¶ 27).

> *v. The Defendants Work to Complete the Deal*

Following the October Tivat Meeting, the defendants continued to search for a weapons supplier. With the help of a German named Werner Wintermeyer, the defendants submitted a request to a Ukrainian weapons company, asking if that company could procure the items on the Weapons List. Around this same time, Georgescu asked Vintila and Romagnoli to meet with him in Rome, Italy, at the Italian Parliament where Romagnoli maintained an office. Georgescu and Vintila traveled to Rome on October 29, 2014. While in Rome, the defendants discussed the ways in which they could advance the weapons deal, and decided that they needed to travel to Germany to visit Wintermeyer to discuss the Romagnoli Catalogue. (PSR ¶28).

In November 2014, Georgescu and CS-1 spoke on the telephone numerous times (on one occasion CS-1 spoke with Romagnoli as well). During these calls, Georgescu confirmed that he and his co-conspirators had located the weapons that the CSs had asked for, and Georgescu and CS-1 discussed how the weapons would be transported. Georgescu also told CS-1 that Georgescu could obtain the surface-to-air missiles that CS-1 wanted to shoot down American helicopters. Georgescu told CS-1 that Georgescu, Vintila, and Romagnoli would meet the CSs in December to deliver the weapons. (PSR ¶ 29).

On November 15, 2014, the defendants met in Frankfurt, Germany, with Tanga and Wintermeyer to discuss the Romagnoli Catalogue and Wintermeyer's ability to supply the

weapons. The group discussed possibilities for prices, financing, commissions, and the viability of the Ethiopian EUC. Wintermeyer suggested that the group meet in Albania to inspect weapons at a factory, in the hopes that these weapons could be the ones that the defendants could sell to the FARC. (PSR ¶ 30).

The defendants, Tanga, and two other individuals traveled to Albania on December 9 and 10, 2014. Together, they drove to Gramsh, Albania and visited a weapons factory producing a military-style rifle. Vintila and Romagnoli test-fired the rifle, but the defendants left empty-handed since the factory was not producing what the FARC sought. (PSR ¶ 31).

Still seeking a reliable supplier of weapons, Georgescu sent Romagnoli to Poland to make contact with a weapons supplier there, while Georgescu and Vintila drove to Bulgaria to meet with representatives of a Bulgarian weapons company called Biem. (PSR ¶ 32). On the day-long drive to Bulgaria, Georgescu and Vintila were stopped at a border crossing. (Tr. 660). Vintila explained at trial that Georgescu was "panicked because the next morning [they] were supposed to visiting the Bulgarian [weapons] company." (Tr. 661).

On December 12, 2014, Georgescu, Vintila, and Romagnoli went to Biem headquarters and met with two company executives: Stefan Penchev and Peter Mangicov. Biem was able to supply the weapons that the CSs requested, and the defendants left Biem on December 12 with a draft contract. The next day, Georgescu and Vintila returned to Biem. Vintila asked Penchev to made some edits to the contract, and once those edits were implemented, Penchev signed the €18 million contract on behalf of his company. (PSR ¶ 32). As Vintila explained at trial, however, because Romagnoli was going to receive the commission from Biem, Georgescu devised another plan to maximize his own profit. (Tr. 859-60). Vintila explained that Georgescu raised the price on the Biem contract before presenting it to the CSs by creating a new, fake annex to the contact with higher prices than were in fact being charged by Biem. (Tr. 861).

> vi.   *December 15, 2014: The Defendants are Arrested in Montenegro*

On December 15, 2015, Georgescu and Vintila met the CSs in Podgorica, Montenegro. At this final meeting, Georgescu and Vintila explained what Biem could offer to the FARC, both immediately and in future deals. Vintila again discussed with the CSs the details of particular weapons in Biem's product line. Following this discussion, Georgescu and Vintila were arrested. At the DEA's direction, Georgescu called Romagnoli and asked him to come to Montenegro. Romagnoli did, and was arrested in Montenegro the following day. (PSR ¶ 33).

> vii.   *The Defendant Was an FBI Source from 2001-2003*

In or around June 2001—roughly thirteen years before the charged offense conduct—the defendant and another individual presented themselves to FBI agents in Las Vegas, claiming to have information about criminal activity. On or about June 6, 2001, the defendant signed a form which detailed the FBI's "[r]equired admonishments to criminal informants/cooperating witnesses" (the "2001 Admonishments"). Among other things, by signing the 2001 Admonishments, the defendant certified that he understood that he would:

- Not initiate a plan to commit criminal acts;

- Not participate in criminal activities unless specifically authorized by the FBI;

- Not engage in any unlawful acts, except as specifically authorized by representatives for the FBI, and would be subject to prosecution for any unauthorized unlawful acts;

- Report all information as promptly as possible; and

- Abide by the instructions of the FBI and not take or seek to take any independent action on behalf of the United States Government.

After signing these admonishments, the defendant was officially "opened" as an FBI confidential source. (GX 502, 503).

Between June 2001 and when the defendant was closed as an FBI source in 2003, the defendant met frequently with his handling FBI agents and reported information about various criminal activities, mostly credit card and other types of fraud. On one occasion, at the direction of FBI agents, the defendant traveled out of state in order to participate in a meeting related to the investigation. Though he was officially closed as a source in 2003, the defendant had infrequent, periodic contact with at least one of his handling FBI agents until in or around 2009. The defendant was not in contact with his handling FBI agents during the time period at issue in this case, nor did he receive any direction from them related to the offense conduct. (GX 1003).

### viii. The Defendant Called the CIA in April 2012

In April 2012—approximately two years before the offense conduct in this case—the defendant called the CIA via a publicly available CIA tipline. In this two-part call (the defendant called back after the initial call was terminated), which was recorded by the CIA, the defendant provided a CIA telephone operator with his name and contact information, and told the CIA that an individual named Andi Georgescu had contacted the defendant about brokering a $10 million weapons deal for Colombians. (GX 100T-A, 100T-B).

The defendant told the CIA operator that he was "try[ing] to be useful to the U.S. government" and that he understood the "procedure" because it was the "same drill with the FBI." The CIA operator told the defendant that people in the CIA would "take a look at" the information provided by the defendant and would "get back in touch" with Georgescu if the CIA had any questions. At no time did the CIA operator instruct the defendant to obtain additional information about or otherwise investigate the request for weapons. Between April 2012 and the defendant's arrest, the defendant did not call or otherwise contact the CIA or any other U.S. law enforcement agency. (GX 100T-B).

### ix. The Defendant's Post-Arrest Conduct

After the defendants were arrested, they were extradited to the United States. On the trip from Montenegro to New York, Georgescu approached Vintila and told Vintila that Georgescu had previously called the CIA about this case. Georgescu suggested to Vintila that Georgescu

and Vintila should use Georgescu's call to the CIA to "build a story" that Georgescu and Vintila never intended to sell weapons to the FARC, but instead were collecting information to provide to the Government. Vintila declined the invitation. (PSR ¶ 34).

Georgescu approached Vintila again when they were housed together at the MCC and repeated his request. Vintila again declined, and so Georgescu asked Vintila if Vintila could teach him about weapons so that Georgescu could proffer the defense on his own, without Vintila's involvement. Vintila declined this offer as well. Finally, Georgescu told Vintila that it would be in Vintila's best interest to not cooperate with the Government and instead should cooperate with Georgescu by hiring a lawyer from the same law firm as Georgescu's lawyer so they could coordinate their defense. (PSR ¶ 35).

After Georgescu's attempts to recruits Vintila into his defense failed, Georgescu approached Romagnoli and told Romagnoli that they should cooperate with one another. Romagnoli also declined. In September 2015, Georgescu sent another MCC inmate to speak to Romagnoli. This inmate told Romagnoli that Georgescu had a message for Romagnoli: that Romagnoli should not cooperate with the Government, that Romagnoli should not forget that he was the father of three children, and that Romagnoli's surest route to getting home was by working with Georgescu. (Tr. 999-1000). Romagnoli understood the reference to his children to be a threat that should Romagnoli cooperate with the Government, "something bad could happen to [his] children." (PSR ¶ 36; Tr. 999-1000).

> *x. Georgescu's Testimony*

At trial, the defendant elected to testify on his own behalf. As discussed below, and witnessed by Your Honor at trial, his testimony was combative and perjurious in many respects. Georgescu attempted to convince the jury that from 2012 until his arrest in 2014, he ran a one-man covert CIA investigation for the benefit of the U.S. government, and that the CIA had authorized his activities. (Tr. 1205). He admitted that he spent thousands of dollars of his own money to engage in the scheme to acquire weapons, and insisted that his co-conspirators use encrypted applications to communicate. (Tr. 1214-15). Among other things, the defendant tried to convince the jury that he insisted on encrypted applications because he was afraid of the Romanian government, despite the fact that he (i) invited Vintila (himself a former high-ranking Romanian official) into the conspiracy through a second high-ranking Romanian government officer (Tr. 1217-18); (ii) insisted that the CSs travel to Romania to meet (Tr. 1220); and (iii) traveled to the United States multiple times between the CIA call and his arrest and never attempted to speak to U.S. law enforcement (Tr. 1229).

At the conclusion of the defendant's direct examination, Georgescu's attorney asked him if he regretted "what [he] did" in orchestrating the weapons deal. (Tr. 1204). The defendant responded "[n]o, never, and I will do it again. I promise to everybody. If I walk, I will do it again." (Id.).

## II. Procedural History

Georgescu, Vintila, and Romagnoli, were indicted in the Southern District of New York on December 4, 2014, in two counts. Count One charged the defendants with conspiracy to kill

officers and employees of the U.S., in violation of Title 18, United States Code, Section 1117. Count Two charged the defendants with conspiracy to provide material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.  Georgescu and Vintila were arrested in Montenegro on December 15, 2014 and Romagnoli was arrested the following day.  Georgescu and his co-defendants were extradited to the U.S. in February 2015. Vintila and Romagnoli pled guilty pursuant to cooperation agreements, and testified at trial for the Government.   Georgescu was convicted on May 25, 2016 following a ten-day jury trial.

### III.    Discussion

In his sentencing submission, in which the defendant seeks a below-Guidelines sentence, Georgescu argues that (i) a downward departure pursuant to U.S.S.G. § 5K2.0 is appropriate, based on his 2012 call to the CIA; (ii) an enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 is not appropriate; (iii) the application of the terrorism enhancement, U.S.S.G. § 3A1.4(a) is "unwarranted and unjust;" and (iv) the enhancement for official victims pursuant to U.S.S.G. § 3A1.2 is "unwarranted."  As set forth below, the defendant's arguments are unavailing.  After imposing both obstruction and leadership enhancements, the Court should properly calculate his Guidelines range as life imprisonment and sentence the defendant to a substantial term of imprisonment below his Guidelines range.

#### i.   *A Downward Departure Pursuant to U.S.S.G. § 5K2.0 Is Inappropriate*

Sentencing Guideline Section 5K2.0 is a policy statement, which lists grounds for departure not captured elsewhere in the Guidelines.  It includes a catch-all provision that permits departure from the Guidelines range when "the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  U.S.S.G. § 5K2.0.  However, section 5K2.0 "has no application at sentencing where the basis for defendant's motion has been considered and rejected by the government as a basis for a § 5K1.1 downward departure motion."  United States v. Khan, 920 F.2d 1100, 1107 (2d Cir. 1990).  This is because "[t]he very existence of § 5K1.1 demonstrates that the sentencing commission clearly considered the question of whether assistance to the government should be taken into account."  Id. Accordingly, when a defendant has provided assistance to federal—as opposed to state— authorities, Section 5K1.1 is the appropriate, and only, vehicle for a downward departure motion. United States v. Kaye, 140 F.3d 86, 87 (2d Cir. 1998) (holding that "the term 'offense' in Section 5K1.1 is properly interpreted to refer only to federal offenses and that Section 5K1.1 addresses assistance only to federal authorities" and, therefore, a downward departure pursuant to Section 5K2.0 on the basis of assistance to state authorities may be entertained by the Court).

Here, the defendant claims that his two-part call to a CIA tipline on a single day in 2012, is grounds for departure pursuant to Section 5K2.0.  This alleged assistance to a federal government agency, however, is more appropriately the basis for a downward departure pursuant to Section 5K1.1, should the Government elect to make such a motion.  See U.S.S.G. § 5K1.1 (noting that a downward departure motion pursuant to Section 5K1.1 is made "[u]pon motion of the government").  In this case, the Government is—obviously—not moving this Court for a downward departure pursuant to Section 5K1.1 on the basis that Georgescu' s 2012 call to the

CIA constituted "substantial assistance" to the Government. Under the law of this Circuit therefore, the defendant is not entitled to a downward departure pursuant to Section 5K2.0. Even assuming—contrary to fact—that the law did allow for such a departure, the Court should still reject the defendant's application on its merits.

The case cited by the defendant, United States v. Khan, is not to the contrary. In Khan, the Second Circuit considered defendant Khan's motion for downward departure pursuant to Section 5K2.0 on the basis that Khan claimed that he (1) aided the Government's "investigation and prosecution of other drug dealers," and (2) saved the life of a confidential DEA informant who had been kidnapped. 920 F.2d at 1107. The Court held that any actions undertaken by the defendant to aid the Government's investigation and prosecution of drug dealers "would not be appropriate grounds for departure under § 5K2.0," since those actions are properly considered under Section 5K1.1. The Court also held, however, that if Khan really did save the life of a DEA informant, that may have been a permissible ground for departure pursuant to Section 5K2.0 had the defendant timely raised it before the district court. Id.

Georgescu's attempt to analogize his pre-arrest 2012 call to the CIA tipline to a defendant who claimed to have actually saved the life of DEA informant falls flat. In Khan, the Court accepted as true for purposes of the opinion that Khan did, in fact, save a DEA informant's life, and noted that such an extraordinary act could be a possible ground for departure pursuant to Section 5K1.1 since "rescuing confidential informants from the jaws of death is not a grounds for departure taken into account by the Guidelines." Id. By contrast, providing information to a federal government agency to aid an investigation *is* taken into account by the Guidelines—in Section 5K1.1. Moreover, even assuming arguendo that Georgescu had noble motives in calling the CIA tipline, nothing in Section 5K2.0 or the law in this Circuit suggests that attempting to report criminal activity to the federal government but failing because the suspected criminal activity was already known to the Government is grounds for a downward departure. To the contrary, downward departures in this context should be reserved for assistance provided by a defendant that proved useful.

In any event, the Court need not decide whether 5K2.0 provides legal grounds for a downward departure. Even if a CIA tipline call could conceivably constitute a proper ground for departure under Section 5K2.0, on these facts, the Court should decline to downwardly depart—or downwardly vary—on that basis. Whatever the defendant's motives for calling the CIA in 2012, it is clear that, by 2014, the defendant had one goal in mind: to profit by selling weapons to men he believed represented the FARC. Even if the defendant, in 2012, had some desire to assist law enforcement, for the Court to give him credit after he changed his mind and opted to engage in the very criminal activity he had reported would be at odds with the purpose of Section 5K2.0, the aims of sentencing generally, and common sense.

Moreover, by calling the CIA tipline in 2012—and as demonstrated by his earlier willingness to cooperate with the FBI—the defendant clearly knew how to report suspected criminal activity to law enforcement when he was inclined to do so. Tellingly, he failed to make any such report in the months after meeting the CSs. Instead, he recruited influential associates and traveled across Europe in a determined effort to find the weapons he understood the FARC to be seeking. His claim that, despite never calling the CIA at any point after 2012, he undertook his 2014 activities in furtherance of a covert CIA operation is laughable.

Finally, not only did the defendant elect to engage in the very scheme that he previously reported to the CIA tipline, after his arrest, the defendant used his two-year-old call to the CIA as a tool to attempt to recruit Vintila to perjure himself for the defendant's benefit, as reflected in the following colloquy at trial:

> PROSECUTOR: Did Georgescu talk to you on the airplane [during the extradition flight to the U.S.]?
>
> VINTILA: Yes, because for the two months we spent in Podgorica [awaiting extradition], we were separated so we basically didn't talk at all.
>
> PROSECUTOR: What did Georgescu say to you on the airplane?
>
> VINTILA: He told me that previously, during the activity in this deal, he called the [CIA] and informed them about this activity. . . . . He [told] me that he called CIA, and he informed them about the Colombian's request. CIA answer was, Do not implicate yourself. . . . He told me that CIA answer was not to get implicated and mind his own business. And he also told me that when we got arrested, he told the agents who arrested us the same thing. So during the eight hours [flight], he told me that based on this, we should build a story that we weren't trying to do a deal with [the FARC], we were just trying to collect information to give it to the government so we can use it as a defense.
>
> PROSECUTOR: When Georgescu told you to build a story, what was your response?
>
> VINTILA: That I don't want to do this thing, and I only want to tell the truth . . . .

(Tr. 709-11). In other words, after being caught red handed trying to profit from the very misconduct he claims to have reported, the defendant used his CIA tipline call in an effort to subvert justice and escape responsibility for his actions. Against this backdrop, the Court should reject his audacious request to receive any benefit for the 2012 call.

### ii. *The Court Should Apply an Enhancement for Obstruction of Justice*

Here, a two-point obstruction enhancement is warranted for two independently sufficient reasons. First, as noted above, and reflected in Vintila and Romagnoli's trial testimony, following the defendant's arrest, he made repeated efforts to dissuade his co-conspirators from providing truthful information to the Government, including a threat to Romagnoli through another inmate. Second, when he chose to testify, the defendant put forth a fraudulent account of his conduct, which was inconsistent with the evidence and squarely rejected by the jury's verdict.

Under the Guidelines, the obstruction enhancement is warranted if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to [] the defendant's offense of conviction and any relevant conduct . . . ." U.S.S.G. § 3C1.1. The Guidelines commentary includes a non-exhaustive list of circumstances when the enhancement should be applied, among them "threatening, intimidating, or otherwise unlawfully influencing a co-defendant" and "committing, suborning, or attempting to suborn perjury." Id. cmt. nn.4(A)-(B).

### *a. The Defendant Sought to Suborn Perjury and Threaten a Witness*

At trial, the Court heard detailed testimony from Vintila and Romagnoli regarding the defendant's efforts to prevent them from cooperating. Vintila explained that, while en route to the United States from Montenegro the defendant attempted to enlist him in the cover story, which was ultimately the defendant's trial defense. (Tr. 710) (Vintila's testimony that the defendant's asked him to "build a story that we weren't trying to do a deal with [the FARC], we were just trying to collect information to give it to the government so we can use it as a defense"). After Vintila rebuffed the defendant's efforts, the defendant continued to engage with Vintila at the MCC and "told [him] not to cooperate because it is not good." (Tr. 718).

Romagnoli described similar efforts by the defendant to induce him to deceive law enforcement and the Court. He testified in particular that, shortly after the co-conspirators arrived in this country, the defendant "invited [him] to make up a story, a believable story that would help [them] go back home as soon as possible." (Tr. 998). The defendant proceeded to encourage Romagnoli to pretend "to take [Georgescu's] role" as "the mediator between the seller and the purchaser." (Id.). After Romagnoli rejected the defendant's proposal and a subsequent attempt by the defendant to engage with Romagnoli after the two had been separated, the defendant appears to have arranged for another inmate to threaten him. As Romagnoli explained, that inmate told him "not to accept any deal if it were to be offered to me, and not to accept to cooperate with the government if it were to be offered to me." (Tr. 999). The defendant's menacing message to Romagnoli concluded with an admonition "not to forget that [he] was the father of three children," which Romagnoli understood to be "[a] clear intimidation," that is, a warning that were Romagnoli not to work with the defendant "something bad could happen to [his] children." (Tr. 1000).

The defendant's repeated efforts to enlist his co-defendants in an effort to deceive the Government and the Court, as well as his threat to Romagnoli, amply support imposition of the obstruction enhancement. See, e.g., United States v. Gaskin, 364 F.3d 438, 465 (2d Cir. 2004) ("A threat to a potential witness qualifies as an attempt to obstruct justice and fully warrants a sentencing enhancement pursuant to § 3C1.1."); United States v. White, 240 F.3d 127, 138 (2d Cir. 2001) (finding the enhancement appropriate where a narcotics defendant instructed a co-arrestee to lie to police). The defendant's assertion that "[t]he verdict did not address this subject" is beside the point. (Def. Sub. at 8). While the jury was not asked to return a special verdict with respect to the defendant's obstructive conduct, its guilty verdict is certainly consistent with jurors having credited the cooperating witnesses' accounts. Together with the Court's own observations of the relevant testimony—which was subject to vigorous cross-

examination—as well as the other evidence adduced at trial, that verdict provides a more-than-sufficient basis to impose the enhancement.  See, e.g., United States v. Washington, 100 F. App'x 39, 42 (2d Cir. 2004) (affirming district court's imposition of obstruction enhancement for perjury "based upon the evidence adduced at trial, the contents of [the defendant's] testimony, the jury verdict, and its own observation of [the defendant's] demeanor during his testimony").

### *b. The Defendant Perjured Himself at Trial*

In order to apply the enhancement for perjury, a sentencing court must find by a preponderance of the evidence that a defendant "1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Stewart, 686 F.3d 156, 174 (2d Cir. 2012) (internal quotation marks omitted). On May 23 and 24, 2016, the defendant took the stand, and, under oath, denied any intent to execute the weapons deal.  (Tr. 1079-1241, 1259-1266).  On direct examination, he urged in particular that he had been engaged in a one-man clandestine effort to gather evidence against the FARC and "was arrested one day before to get th[e final] signature" on the weapons contract, which, in his view, would have been sufficient to take his information to authorities.  (Tr. 1168). In an effort to explain away the trial evidence, the defendant claimed, for instance, that his obsession with secrecy and encryption was merely an effort "to play fancy, to play sophisticate" and avoid detection by "the Romanian Government."  (Tr. 1202).

On cross-examination, the defendant tried to evade even the most basic of Government questions, and repeatedly erupted into combative speeches advancing his defense theory.  See, e.g., Tr. 1212 ("Q: After he told you that, you introduced Vintila to the Colombians, correct? / A: "Everything which I did, I did for the United States government, sir.  Don't try to put words in my mouth."); Tr. 1216 ("Q: Now, the CIA had not, as you testified on direct, the CIA had not told you to use encrypted applications, correct? / A: I was mention when I was with the CIA agent on the phone, he never tell me anything.  Based on my experience with FBI, they don't tell me how to do it.  The important is the result. The three investigation which I was investigating Montenegro shows the truth.  Bring the reports.  You have the very report, Mr. Graff.  Why you don't bring the report in front of the jury and show them?"); Tr. 1220 ("Q: But to be clear, you were the one who asked Juan to come to Romania, correct? / A: To get intel, I do everything. Sorry, and I do it again. What you want to do?  Even if you kill me, it's like, you know, whatever.  I keep saying the same thing.").

In light of the facts set forth in the PSR, the evidence presented at trial, the jury's verdict, and the Court's assessment of the defendant's demeanor when he testified, the Government respectfully submits that his perjurious testimony independently warrants imposition of the obstruction enhancement.  Washington, 100 F. App'x at 42.  The defendant's contention that the enhancement should not be imposed because his testimony was "consistent with the evidence the defense proffered, as well as [his] prior statements to the government" lacks merit.  (Def. Sub. at 8 n.4).  That the defendant repeated his cover story on multiple occasions does not render his lies any more truthful.  And the defense theory was both at odds with the evidence presented at trial and squarely rejected by the jury's guilty verdict.

### *iii. The Court Should Apply a Leadership Enhancement*

Sentencing Guideline Section 3B1.1 provides for a two-point enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described" elsewhere in the section. See U.S.S.G. § 3B1.1(c). The Guidelines set forth a series of factors for a Court's consideration when assessing whether the enhancement should be imposed, including "the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Id. cmt. n.4.

Notably, by the defendant's own admission, he recruited his co-conspirators. (PSR ¶¶ 21, 24). The defendant was also the conspiracy's principal point of contact with the CSs, whom he understood to be FARC representatives. (E.g., PSR ¶ 29). Moreover, as reflected in the testimony at trial, the defendant subsidized, guided, and directed at least some of his co-conspirators' activities. See Tr. 612 (Vintila's testimony that the defendant paid for all of Vintila's scheme-related travel expenses); Tr. 942 (Romagnoli's testimony regarding the defendant's guidance to him about communicating through encrypted applications); Tr. 976 (Romagnoli's testimony that the defendant was "the coordinator of the group," as reflected, for instance, by the defendant instructing Romagnoli to travel to Poland to meet with a weapons supplier). As a result, a leadership enhancement is appropriate.

### *iv. The Terrorism Enhancement is Applicable in this Case*

Without reference to any legal authority, the defendant asks the Court to determine that the application of the terrorism Guidelines enhancement, U.S.S.G. § 3A1.4(a) is "unwarranted and unjust" and decline to apply it in this case. Guidelines Section 3A1.4 states:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4. In assembling the defendant's PSR, the Probation Department applied this enhancement, which increased his base offense level by 12 levels. (PSR ¶ 48).

As a matter of law, the PSR is plainly correct. The application notes to U.S.S.G. § 3A1.4 incorporate 18 U.S.C. § 2332b(g)(5) by reference, which defines a "Federal crime of terrorism" as:

an offense that—

Case 1:14-cr-00799-RA   Document 132   Filed 11/25/16   Page 14 of 16

Page 14 of 16

>    (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

>    (B) is a violation of [any one of many statutes, including 18 U.S.C. § 2339B, relating to the provision of material support to terrorist organizations].

U.S.S.G. § 3A1.4 cmt. n. 1; 18 U.S.C. § 2332b(g)(5).  The jury convicted Georgescu on Count Two of the indictment, which charged that Georgescu participated in a conspiracy to provide material support to a terrorist organization, in violation of Title 18, United States Code, Section 2339B.  By the plain terms of the Guideline, therefore, the 12-level enhancement for a crime involving a federal crime of terrorism applies here.  See United States v. Meskini, 319 F.3d 88, 91-92 (2d Cir. 2003) ("The wording of § 3A1.4 could not be clearer: It directs courts to increase both the offense level and the criminal history category based on a single crime involving terrorism.").

Georgescu has not cited to any law to the contrary.  In his submission, he claims that a court in this district elected not to apply the terrorism enhancement in United States v. Bout, No. 08 Cr. 365 (SAS) (SDNY). (Def. Sub. at 19).  This is incorrect.  Judge Scheindlin expressly *did* apply the 12-level enhancement to Bout, who, like Georgescu, had been convicted of a terrorism offense following a DEA sting.  At Bout's sentencing proceeding, Judge Scheindlin stated:

>    Finally, because the offense involved or was intended to promote a federal crime of terrorism, defined as an offense that 'is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct, [a]n additional 12 level enhancement . . . is warranted pursuant to Section 3A1.4(a) of the guidelines.

Sentencing transcript at 6, United States v. Bout, No. 08 Cr. 365 (SAS) (SDNY) (attached to the defendant's submission as Exhibit F).  After properly calculating the Guidelines range, which included the terrorism enhancement, Judge Scheindlin sentenced Bout to a below-Guidelines sentence of 25 years' incarceration, his mandatory minimum.

There can be no dispute, therefore, that the defendant's properly calculated Guidelines range includes a 12-level enhancement pursuant to Section 3A1.4.  Notwithstanding the applicability of that enhancement, however, the Court of course retains discretion to depart or vary downward from the defendant's Guidelines range if it chooses to do so.[2]

---

[2] On these facts. the Government does not object to the defendant's request that the Court decline to apply the official victim enhancement pursuant to U.S.S.G. § 3A1.2, as suggested in paragraph 47 of the PSR.  The Government notes that the courts in United States v. Bout, No. 08 Cr. 365 (SAS) (SDNY) and United States v. Garavito, No. 12 Cr. 839 (JSR) (SDNY), both of which were DEA sting cases similar to the instant case, were not asked by the Government to apply, and did not apply, this enhancement.  The Government also does not object to the defendant's request that he receive credit for the time he served in Montenegro awaiting extradition.

> v.  Pursuant to Section 3553, the Court Should Impose a Substantial Sentence Below the Guidelines Range of Life

Here, the severity of the defendant's offenses, his obstructive conduct since his arrest, and his continuing failure to accept responsibility for his actions all counsel in favor of a significant sentence. Indeed, the Sentencing Guidelines call for a life sentence, which Probation has recommended to the Court. (PSR at 24). The Government shares the Probation Department's sense that the defendant's conduct is profoundly serious, and all the more so, because he offended "[a]fter attaining the right and privilege to become a U.S. citizen." (Id. At 26). However, the Government believes that a life sentence may be greater than necessary to achieve the objectives of sentencing. Accordingly, the Government respectfully submits that the factors set forth in Title 18, United States Code, Section 3553(a), including the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct, provide just punishment, and promote respect for the law, militate in favor of a substantial term of imprisonment that is less than a life sentence.

The seriousness of the defendant's conduct is self-evident. In relentless pursuit of profit, he was prepared to broker a multi-million dollar weapons deal aimed at furthering the FARC's reign of terror in Colombia and murdering American soldiers. As discussed in the PSR, and demonstrated by the evidence at trial, the defendant was far from a passive participant in this criminal enterprise. The hours of recordings in this case reflect the defendant's enthusiasm for the agreement, as does his willingness to enlist a cadre of criminal associates to ensure its successful execution. Indeed, from the outset of his participation in the conspiracy, the defendant—who had ample experience with U.S. law enforcement and an array of influential connections—recruited Vintila and Romagnoli, and actively nurtured and directed their conduct over the course of the conspiracy.

The defendant's risible claim that he intended to disrupt the very deal that he was striving to execute is starkly at odds with his conduct. As the Court saw at trial, the defendant never wavered in his commitment to the deal's execution, traveling the length and breadth of Europe in a determined effort to find the FARC a weapons supplier. He introduced a weapons expert (Vintila) to men whom he understood to be FARC representatives. He also coached virtually everyone he encountered in connection with the deal—including the men he thought were Colombian terrorists—in how to use encrypted technology to avoid detection by authorities. His actions were not confined to days or weeks but instead represented months of focused effort to achieve the conspiracy's illegal goals. In the days before his arrest, he worked with Vintila to doctor the weapons contract to inflate Biem's true prices, underscoring his *true* motive: greed.

Troublingly, the defendant's misconduct did not end with his arrest. As discussed above, once in custody, the defendant embarked on a sustained effort to induce his coconspirators to lie. When that failed, he warned them both against cooperation and dispatched another inmate to threaten Romagnoli. In other words, even the prospect of a looming prosecution for his illegal activities did not deter continued lawless behavior. Equally concerning was his decision to perjure himself and his continued refusal to accept any measure of responsibility for the offenses of conviction. To the contrary, the defendant has made no secret of the fact that, had he eluded the jury's verdict, he would have "do[ne] it again." (Tr. 1204).

The Government does not have cause to dispute the circumstances of the defendant's upbringing, his prior work for the FBI, or the fact that he has some health issues, all of which warrant consideration in connection with sentencing. However, these factors do not and cannot diminish from the magnitude of his offense, particularly in light of his central and influential role in carrying out the scheme. Whatever views of government he had absorbed as a young man in Romania, the defendant engaged in this scheme after attaining U.S. citizenship and an unusual degree of familiarity with the workings of U.S. law enforcement—knowledge that he twisted in an effort to conceal his efforts to purchase weapons for the FARC from authorities. By the same token, as set forth above, his 2012 call to the CIA is not a mitigating factor but an aggravating one; it demonstrates that the defendant knew how to contact authorities when he was inclined to do so and had at least some understanding of the intense threat that Colombian terrorists posed to American interests—but that he elected to proceed with the scheme anyway.

Given the defendant's offense—which placed him at the heart of a far-reaching, and potentially lethal, criminal conspiracy—as well as his obstructive conduct and failure to accept responsibility, a significant sentence is appropriate to reflect the seriousness of his crimes, account for his individual characteristics, and ensure that he is justly punished. Such a sentence will also send a powerful deterrent signal to others who would supply weapons to terrorists and protect the public from similar conduct by this defendant. Whatever service the defendant has previously provided this country he was a key player in an effort to put deadly weapons in the hands of men he understood to be terrorists. He deserves to be sentenced accordingly.

### IV.     Conclusion

For these reasons, the Court should calculate Georgescu's Guidelines range as life imprisonment, and impose a significant sentence that reflects the nature, circumstances, and seriousness of his criminal conduct.

Respectfully Submitted,

PREET BHARARA
United States Attorney

By:     _____
Andrea Surratt/Ilan Graff
Assistant United States Attorneys
(212) 637-2493/-2296